**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| **FAIRWAY ENERGY, LP, *et al.*,**[1] | § | **Case No. 18-12684** |
| | § | |
| Debtors. | § | **(Joint Administration Requested)** |
| | § | |

**DECLARATION IN SUPPORT OF**
**THE CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Robert M. Flavin, hereby submit this declaration (this

"Declaration") under penalty of perjury:

1.       I am the Chief Financial Officer for each of the above-styled Debtors: (i) Fairway

Energy GP, LLC, a Delaware limited liability company ("Fairway GP"), which is (ii) the general

partner of Fairway Energy, LP, a Delaware limited partnership ("Fairway LP"), which is (iii) the

sole member of Fairway Energy Partners, LLC, a Delaware limited liability company ("FEP

LLC"), (collectively Fairway GP, Fairway LP, and FEP LLC, the "Debtors" or "Fairway").  In

such capacity, I am familiar with the Debtors' day-to-day operations and financial affairs.

2.       I joined Fairway in November 2012 and have served as Chief Financial Officer

since that time.  I was a member of Fairway's board of directors from February 2014 through

July 2015. I have over 30 years in senior financial management and leadership positions in both

public and private companies primarily in energy related businesses.

3.       For over 16 years, I was employed by, and worked within various affiliates of,

Phibro Energy ("Phibro"), starting as a Controller. After having held various positions with

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification
number, include: Fairway Energy, LP (4200); Fairway Energy Partners, LLC (7914); and Fairway Energy GP, LLC
(7808).  The location of the Debtors' service address is Three Riverway, Suite 1550, Houston, Texas 77056.

increasing responsibilities, I was named Senior Vice President and Chief Financial Officer of the refining division in 1992, a position I held through 1998.

4.      Since leaving Phibro, I have served as Chief Financial Officer for Ambar, Inc., Coast Energy Group, Twin Eagle Resource Management, and a division of Cheniere Energy, Inc.  In addition, I also have served as Executive Vice-President Business Support at Sequent Energy and as the Vice President of Accounting and Administration at a division of CMS Energy, Inc.

5.      I have a Bachelor of Science degree in Accounting from Marquette University and am a Certified Public Accountant.  I have extensive experience in the accounting and operational aspects in the midstream sector of the oil and gas industry.

6.      The Debtors operate as an integrated business that owns and operates an underground crude oil storage facility.  Each of the Debtors commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court") to ensure the going concern value of the business could be maintained.  The Debtors intend to operate their businesses and manage their properties as debtors in possession under the Bankruptcy Code.

7.      To minimize the adverse effects of the bankruptcy filings on their businesses, the Debtors have filed, with the assistance of restructuring advisors and legal counsel, motions and applications seeking certain relief (collectively, the "First Day Pleadings").  Through the First Day Pleadings, the Debtors seek authority from the Court to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the facts and relief sought in each of the First Day Pleadings and believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in the Chapter 11 Cases with

minimal disruption or loss of productivity and value. I further believe that the relief sought in the First Day Pleadings constitutes a critical element in achieving a successful sale of the Debtors' businesses as a going concern, which will maximize the value of the Debtors' estates for the benefit of the Debtors' stakeholders.

8.        Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of Fairway's business operations, my review of relevant business record documents, information provided to me or verified by other executives or employees of the Debtors, Fairway's professional advisors, including Haynes and Boone, LLP ("Haynes and Boone"), and Alvarez & Marsal North America, LLC ("Alvarez & Marsal"), as well as consultation with Fairway's investment bankers and accountants, and upon my experience in the crude oil storage industry generally.  Unless otherwise indicated, the financial information contained in this Declaration is presented on a consolidated basis and is unaudited and subject to change.  I, and others I supervised or worked with, were involved with the preparation of the petitions, schedules, and the First Day Pleadings.  I was also involved in the Debtors' prepetition efforts to obtain an equity investment, to secure alternative refinancing, and to obtain an alternative transaction to restructure the Debtors' existing secured debt and operations.  I am authorized to submit this Declaration on behalf of Fairway, and if called upon to testify, I would testify that the facts set forth herein are true and correct.

## I.        OVERVIEW OF FAIRWAY'S BUSINESS AND OPERATIONS

### A.        The Debtors' Business

9.        Fairway provides storage, throughput and ancillary services for third-party companies engaged in the production, distribution and marketing of crude oil. The Debtors provide such services at the Pierce Junction Crude Oil Storage Facility (the "Facility"), which they developed and operate through certain leasehold interests and ownership interests.

B.    **Salt Dome Cavern Storage**

10.    The Facility is an undersurface salt cavern storage operation.  Underground salt cavern storage has been utilized since the 1940s for the storage of hydrocarbons.  Due to the impermeability characteristics of salt, salt cavern storage incurs an extremely low risk of leakage through self-sealing under cavern operating pressures.  Deep underground, salt dome cavern storage offers the most environmentally secure and lowest cost way to store hydrocarbons.  The salt is impervious to liquid and gas hydrocarbons, has strength comparable to concrete and moves like plastic to seal any incipient fractures that might be encountered.

11.    Salt dome storage is a method that has been used by the U.S. Department of Energy, U.S. Department of Transportation, and the Office of Fossil Energy.  Used for more than seventy (70) years by the U.S. government, the natural properties of salt caverns make them ideal storage facilities for storage of hydrocarbons including crude oil.  The salt is impervious to crude oil and there is no contamination.  In terms of affordability, salt dome caverns store crude oil at less cost than above ground tanks.  Using a process referred to as "solution mining," salt caverns are carved out of underground salt domes by drilling a well into the salt dome and then injecting and circulating large amounts of fresh water to dissolve the salt and form a cavern, an example of which is depicted below.  This process is repeated, and the cavern becomes larger as the saturated brine is removed and replaced with fresh water.  Each converted cavern includes a line for crude oil to the top of the cavern and another line for brine that extends towards the bottom of the cavern.  The cavern remains completely full of either crude oil, brine, or a combination of both.  With a higher density than crude oil, the brine stays at the bottom of the cavern and the crude oil floats to the top.  As more crude oil is injected into the cavern, the displaced brine is pumped into adjacent brine ponds for storing, and the opposite occurs when crude oil is

scheduled for delivery—brine is pumped back into the cavern from the adjacent brine ponds which pushes the crude oil out of the cavern and into the outbound pipelines.



*Salt Dome Storage Caverns*

C.    **Fairway's Underground Storage Facility**

12.    The Facility is a 10 million-barrel maximum capacity salt dome crude oil storage facility located in Houston, Texas, just south of the NRG/Astrodome sports complex. The Facility is the only independent salt dome crude oil storage terminal in the region. The Debtors began construction on the Facility in 2015 after they obtained the exclusive rights to store crude oil in the Pierce Junction Salt Dome and entered into certain leases for brine caverns and land. Fairway leased all of its caverns and obtained the exclusivity agreement through Underground Storage, LLC ("USL"). Fairway has future capacity with USL as commercial demand grows to further expand the salt dome storage capacity at the site.



*Location of Salt Domes*

13.    The Debtors planned to bring the Facility online in multiple phases. The following tables summarize Fairway's leased system assets included in Phase 1A:

| SALT CAVERN CRUDE OIL STORAGE | | |
|---|---|---|
| Cavern | Capacity (thousand barrels) | Lease Term (years) |
| 5 | 2,500 | 30 |
| 12 | 4,000 | 30 |
| 3 | 3,600 | 30 |
| TOTAL | 10,100 | |

Note: Each 30-year term includes two additional 15-year
term options.  Accompanying brine ponds volume at
1-1 ratio with cavern capacity.

| FAIRWAY PIPELINES | | | |
|---|---|---|---|
| Location (from) | Location (to) | Length (miles) | Flow (bbls/hour) |
| Pierce Junction | Genoa Junction | 14.6 | 15,000 |
| Genoa Junction | Speed Junction | 5.95 | 15,000 |

Note: Two parallel 24-inch diameter, bi-directional

Cavern 3 is currently operable at 1.0 million barrels (with expansion capacity capable up to 3.6 million barrels) providing a current total operational capacity of 7.5 million barrels of storage.

14.    Phase 1A of the project was completed in April 2017 after Fairway converted three existing underground storage caverns into crude oil storage service and built out supporting infrastructure to put the Facility into commercial service, including central pumping and metering facilities, brine ponds with approximately 6.5 million barrels of capacity, and two bi-directional, 24-inch pipelines that traverse approximately twenty (20) miles across the Houston area to connect the Facility with interconnecting pipelines.  The Debtors planned to increase their storage capacity by an additional 2.6 million barrels in Phase 1B, followed by (nine) 9.0 million barrels of additional capacity in Phase 2; however, only Phase 1A has been completed as of the Petition Date. Currently, Fairway has approximately 10.1 million barrels of maximum capacity, which is connected to customers via owned and third-party pipelines systems, as shown below.



*Current Pipeline Routes and Plans for Future Expansion*

15.    The pipelines enable Fairway to provide receipt capability from inbound crude oil pipelines from the Permian Basin, Eagle Ford Shale Basin, and Canada/Midcontinent. The pipelines also connect to hubs that provide downstream connectivity to terminals, refineries, and water outlets located in the Houston Ship Channel, Texas City and Beaumont/Port Arthur market areas.

16.    With the current pipeline routes, Fairway has the capacity to serve potential customers, including refiners and/or marketers using crude oil for their own operational use or trading purposes.  Fairway offers flexibility to customers, providing for short and long-term storage agreements.

**D.    Contracts with Customers**

17.    Fairway believes it is well positioned in this market, albeit somewhat early, given longer term trends in the crude oil industry.  While the Debtors concede that storage is not

01:23891773.5

currently full in the Houston area, some extra capacity is not accessible for commercial purposes. Moreover, the substantial increases in domestic west Texas production suggest that this capacity will be needed, especially as additional pipelines deliver more crude oil from west Texas to the Houston area.

18.     Fairway offers new crude oil storage opportunities with control of the "last mile" into the Houston market as well as a lower cost advantage over competing surface alternatives. As a result of its prime location in the Houston area, Fairway is well positioned to market its storage and handling services once current market, pipeline and offshore capacity, and liquidity issues are resolved.

19.     Potential Fairway customers are refiners and/or marketers using crude oil for their own use or speculative trading.  Fairway customers are ideally looking for a facility that can provide large capacity options in order to aggregate barrels to ensure consistent supply "at will." Fairway targets well capitalized entities that need a reliable place to store the crude oil prior to such crude oil being shipped for export or use in crude oil refining and the petrochemical facilities on the Gulf Coast. Although some customers request quotes for spot or short-term contracts, Fairway initially focused on creating storage agreements with anchor tenants on longer term take-or-pay type contracts.  More recently, Fairway has expanded its offerings to include shorter-term arrangements.

### i.      Crude Oil Storage Service Fees

20.     Fairway's contract terms require that it make available to its customers the ability to store the contracted capacity of crude oil. Therefore, Fairway is entitled to the storage capacity fee as long as it makes available, to each customer, the contracted capacity, regardless of whether the customer actually stores crude oil or not.  Fairway recognizes crude oil storage fees ratably over time as the crude oil storage capacity is made available.  Fairway's contract terms provide

that each customer, not Fairway, maintains (or retains) title to any crude oil delivered to Fairway. Payment for storage services is generally received in advance during the month preceding the month of storage service.

### ii.      Pipeline Transportation Fees

21.      Fairway's contract terms provide a fee based on the actual volume of crude oil received at or delivered from its Facility upon receipt at delivery locations. With respect to the pipeline transportation fee, Fairway expects to recognize the revenue when the performance obligation is satisfied, that is when crude oil is received at receiving points and when crude oil is delivered at delivery points in accordance with the terms of the contract. Payment for throughput service fees is received in the month after the crude oil has been received in storage or been delivered from storage.

22.      In addition to the pipeline transportation fee, for any volumes of crude oil actually delivered to or from Fairway's facilities, Fairway is entitled to a certain amount of crude oil loss in the transportation process. Fairway recognizes an ancillary service fee (the "Pipeline Loss Allowance"), as revenue when the performance obligation is satisfied, that is after both the crude oil is received at receiving points and the crude oil is delivered at delivery points in accordance with the terms of the contract, and as it becomes probable that no subsequent significant reversal of these fees will occur.  The Pipeline Loss Allowance is recovered at the time the crude oil is delivered to a third party pipeline.  Payment of the Pipeline Loss Allowance is received at the time the crude oil is delivered to a third party pipeline.  At the termination of the contract, if there is a shortfall or over-delivery of the crude oil owed to Fairway or the customer over and above this Pipeline Loss Allowance, Fairway or the Customer is deemed to have purchased that volume of crude oil from the customer at the crude oil settlement price within an agreed upon margin of error.  The crude oil settlement price is equal to the Calendar Month Average of the

01:23891773.5

NYMEX WTI price, as reported by a trade publication (Argus) plus a differential as defined in the storage contract.

**E.      The Debtors' Operations and Organizational Structure**

23.      The following chart illustrates the Debtors' organizational structure as of the Petition Date:





*Fairway Organizational Chart*

24.      As shown on the chart above, Fairway LP is the direct parent company of Fairway GP and FEP LLC. Fairway LP is a privately held Delaware limited partnership. The current structure has been in place since March 24, 2017.[2]

25.      Fairway GP serves as the general partner of Fairway LP.  As of the Petition Date and as more fully described in the Wages Motion (as hereinafter defined), the Debtors rely on the

---

[2] FEP LLC was formed in April 2011, whereas Fairway LP and Fairway GP were formed in March of 2016. FEP LLC became a wholly owned subsidiary of Fairway LP in March 2016. Fairway GP became a wholly owned subsidiary of Fairway LP in March 2017.

services of approximately sixteen (16) members of its workforce, who are either employed by the Debtors or serve as independent contractors.  The workforce has deep experience in the industry and with the Facility.  The Facility was planned, designed and constructed under their supervision.  Fairway GP does not receive any management fee or other compensation in connection with its management of the business, but it is entitled to be reimbursed for all direct and indirect expenses incurred on behalf of Fairway LP, including directors' compensation and expenses, and an administrative processing fee not to exceed five percent (5%).

## II.    PREPETITION CAPITAL STRUCTURE

26.    As of September 30, 2018, the Debtors' unaudited balance sheet reflected total book assets of approximately $382,700,000, total book liabilities of approximately $94,000,000, and owner's book equity of approximately $288,700,000. The Debtors' principal assets consist of the Facility, claims and contract accounts receivable, inventory, prepayments, deferred interconnect costs, net of amortization, and cash.

## A.    Prepetition Facility

27.    The investment made to acquire, design and construct the Facility is considerable. In addition to the initial capital of approximately $390 million (excluding fees and other offering costs) provided by the Unitholders (as defined below), Fairway also obtained debt financing to address and satisfy construction overruns.  The Debtors' debt financing was procured from Riverstone Credit Partners, L.P. ("Riverstone") as lead arranger and administrative agent for the lenders (the "Prepetition Lenders") and as a Prepetition Lender pursuant to a certain senior secured term loan Credit Agreement dated as of March 29, 2017 (as amended as of July 6, 2017 pursuant to that certain Omnibus Consent and Amendment to Credit Agreement and Security Agreement, as further amended as of April 27, 2018 pursuant to that certain Third Waiver and Second Amendment to Credit Agreement (the "Second Amendment"), as further amended as of

July 31, 2018 pursuant to that certain Fourth Waiver and Third Amendment to Credit Agreement (the "Third Amendment"), as further amended as of October 1, 2018 pursuant to that certain Fifth Waiver and Fourth Amendment to Credit Agreement (the "Fourth Amendment"), as further amended as of October 22, 2018 pursuant to that certain Sixth Waiver and Fifth Amendment to Credit Agreement (the "Fifth Amendment"), as further amended as of October 26, 2018 pursuant to that certain Sixth Amendment to Credit Agreement (the "Sixth Amendment"), as further amended as of November 7, 2018 pursuant to that certain Seventh Waiver and Seventh Amendment to Credit Agreement (the "Seventh Amendment"), as further amended as of November 20, 2018 pursuant to that certain Eighth Waiver and Eighth Amendment to Credit Agreement (the "Eighth Amendment") and as further amended, restated, supplemented and/or otherwise modified from time to time (the Prepetition Credit Agreement"). The Prepetition Credit Agreement originally provided for a senior secured term loan credit facility (the "Prepetition Facility") of up to $80 million with an additional $50 million available if certain conditions were met.

28.     To provide additional runway and flexibility to raise additional necessary financing, Fairway entered into eight amendments and waivers with Riverstone prepetition. The Second Amendment contemplated, among other things, that Fairway would obtain a capital infusion on or prior to March 31, 2018, and, if Fairway consummated such an equity raise, that $15 million of the proceeds of such equity infusion would be used to prepay the loans under the Prepetition Credit Agreement. Fairway was unable to raise equity capital by the March 2018 deadline set forth in the Second Amendment, and pursuant to the Third Amendment, Fourth Amendment and Fifth Amendment, Riverstone agreed to postpone the deadline for such equity raise through October 2018.

29.     Under the Sixth Amendment, as consideration for the removal of the requirement to repay $15 million of loans with the proceeds of an equity raise, Riverstone was granted the right to convert, in its sole and absolute discretion, an aggregate principal amount of first lien debt in an amount equal to up to $15 million into second lien debt, and the further option thereafter to convert such second lien debt into equity of Fairway LP.

30.     Further, under the Seventh Amendment and the Eighth Amendment, Riverstone provided additional incremental loans of $600,000 and $775,000, respectively (the "Incremental Facility").  The Incremental Facility was provided by Riverstone on a "first out" basis in the weeks leading up to the Petition Date to fund the Debtors' attempts to complete their prepetition marketing process and prepare for the filing of these Chapter 11 Cases, if necessary, in an orderly fashion, with the understanding being that such financing was a "bridge" to either an equity investment or, if necessary, a bankruptcy filing.   Under the terms of the Eighth Amendment, these incremental loans matured on November 26, 2018 (*i.e.*, the Petition Date).  A failure on the part of Fairway to repay the Incremental Facility at maturity would have caused the entire Prepetition Facility to be in default.

31.     As of the Petition Date, the outstanding principal amount owing to Riverstone under the Prepetition Facility, excluding the $1,422,458 owing under the Incremental Facility but capitalizing all accrued but unpaid interest, is approximately $94 million plus interest, fees, prepayment premiums, and all other amounts owed under the Prepetition Credit Agreement.

32.     The obligations under the Prepetition Facility are secured by certain liens, pledges, and security interests in substantially all of the Debtors' assets and property, including a first priority lien on (i) Fairway LP's ownership interest in FEP LLC, and (ii) all of FEP LLC's and Fairway LP's assets (collectively, the "Prepetition Collateral") as more fully described in the

Prepetition Credit Agreement, security agreement, and related agreements, amendments, and documents among the Debtors, and Riverstone (collectively, the "Prepetition Loan Documents").

33.     By its terms, the Prepetition Facility will mature on March 29, 2020. Amounts borrowed under the Prepetition Facility bear interest at an adjusted base rate plus an applicable margin.  Subject to certain conditions, FEP LLC may elect to make the full amount of any interest payment by capitalizing such interest payment and increasing the principal amount of the loan by the amount thereof (a "PIK Election").

34.     The Prepetition Credit Agreement contains a borrowing base financial covenant that becomes effective after the first quarter of 2019 and that is based upon FEP LLC complying with a certain consolidated total leverage ratio.  In the event the consolidated total leverage ratio exceeds the borrowing base for any fiscal quarter after the borrowing base becomes effective, FEP LLC is required to make a mandatory prepayment as necessary to cure such excess.

**B.     Unsecured Liabilities**

35.     The Debtors' unsecured obligations consist of, among other things, trade debt, lease obligations, and contract obligations.  The Debtors estimate that, as of the Petition Date, their outstanding aggregate unsecured obligations total approximately $7.2 million.   These comprise the following:

**i.     Trade Obligations**

36.     The Debtors' trade obligations primarily arise as a result of the construction projects and other operational costs associated with the Debtors' operations that arise from various services provided by third parties. The Debtors have generally remained current on their trade debt obligations.  As of the Petition Date, the Debtors' unpaid trade obligations were approximately $1,650,000.

01:23891773.5

### ii.        Lease Obligations

37.    The Debtors' have three leases related to their operations: (i) an office lease at Three Riverway, expiring December 31, 2018; (ii) a thirty (30) year surface lease with the Stevenson owners (the "Stevenson Lessor") for the brine ponds that support the Facility; and (iii) a thirty (30) year lease with USL for the subsurface caverns.  The surface and subsurface cavern leases are long term agreements that provide the Debtors with decades of contracted use of the facilities needed to operate the Facility. As of the Petition Date, the Debtors' unpaid lease obligations were approximately $72,300.

### iii.       Pipeline Agreements

38.    The Debtors also have agreements with a number of midstream companies that own and operate interstate and intrastate pipelines that provide access to and from the Facility. Such agreements enable the Debtors to have transportation, supply and offtake capabilities for petrochemical and refining plants on the Gulf Coast and other export markets, which would otherwise be inaccessible in the absence of such agreements. As of the Petition Date, the Debtors were current on their unpaid pipeline agreement obligations.

### iv.       Severance Obligations

39.    The Debtors have approximately $1.4 million in potential severance obligations to current and former officers as well as employees of the Debtor.

### v.        Property Tax

40.    The Debtors have approximately $4.15 million in contractual property tax obligations due to local governmental entities associated with the Facility arising from improvements to the leases of the surface and subsurface real estate and personal property of the Debtor.

C.    **Equity Interests in Fairway LP**

41.    As of September 30, 2018, the total number of outstanding units of common equity in Fairway LP is 39,266,019, which are held by approximately sixty-three (63) investors (the "Unitholders"). The Unitholders consist mainly of investors that provided capital to fund the construction of the Facility. The total equity capital raised to date is approximately $390 million.

III.    **EVENTS LEADING TO THE CHAPTER 11 FILINGS AND PREPETITION RESTRUCTURING INITIATIVES**

A.    **Events Leading to Bankruptcy**

42.    Since the spring of 2018, Fairway has experienced liquidity issues given operational and market issues that impeded use of the Facility.  For the nine (9) months ended September 30, 2018, Fairway had an operating loss of $38,600,000 (before interest, expense, and other income).  Fairway's financial performance has been negatively affected by (i) reduced and delayed demand for its services, (ii) cost overruns on the Facility, (iii) commercial restrictions on accessing the Facility by existing pipeline connections, and (iv) general market conditions that undermine the demand for crude oil storage.

43.    The Debtors' liquidity constraints impacted both their ability to operate and to comply with their obligations under the Prepetition Credit Agreement.  Anticipating a liquidity crisis, Fairway engaged in negotiations with Riverstone beginning in March 2018 regarding the terms on which Fairway could obtain additional runway and avoid defaulting under the Prepetition Credit Agreement.  As noted above, pursuant to a series of amendments and waivers of requirements under the Prepetition Credit Agreement, Riverstone made certain concessions to give Fairway time to raise equity capital to address its emerging liquidity constraints.  Pursuant to such amendments, Riverstone agreed to extend the deadline by which Fairway was required to raise equity capital under the terms of the Prepetition Credit Agreement through October 2018.

Ultimately, promising candidates for raising equity capital failed to materialize as expected. To allow the Debtors to pursue a potential candidate, if necessary, and to prepare for these chapter 11 filings, Riverstone provided the Incremental Facility. Discussions with this potential candidate terminated on November 19, 2018, at a time when Debtors had largely exhausted their operating funds. As a result, Fairway was left with a default under the Prepetition Credit Agreement and a near complete lack of liquidity.

### i. Market Supply Fluctuation Not Yet Meeting Demand for Storage

44. Fairway strongly believes in the value proposition represented by its crude oil storage facility. Recent history indicates that Houston area storage for crude oil is increasingly being used for operational purposes rather than speculative trading. Fairway forecasted that market conditions would lead to increasing export opportunities by producers and shippers trying to deliver crude oil east of Houston to refineries in Texas and Louisiana and for export purposes. However, Fairway has not yet been able to generate sufficient contracts to manage its current debt obligations.

### ii. Market Difficulties

45. Market conditions have curtailed the economic incentives required for customers to contract for crude oil storage in the Houston market. However, these conditions appear to be easing recently. In addition to this long prevailing unfavorable market environment, Fairway continues to face aggressively competitive business practices imposed by a competitor to Fairway, Enterprise Products Partners, L.P. ("Enterprise"), which inflates transportation rates in and around Fairway's interconnect at Genoa Junction. These conditions have negatively impacted Fairway's ability to contract storage capacity and are expected to continue to do so in the short term.

46.     Fairway believes there is evidence of positive fundamental market indicators that should support greater use of Fairway's storage facilities. Those indicators include continued rising U.S. crude oil production volumes led by the Permian Basin, increased pipeline volumes headed for Houston (Enterprise's 450 Mbpd Permian to Sealy pipeline commenced shipments in January 2018 with an expectation to reach its maximum operating capacity during the 2nd half of 2018) and a predicted sharp increase in exports from the Texas Gulf Coast. Fairway believes that these factors combined with the operational commencement of Fairway's Magellan (as defined below) interconnect, will provide it with greater opportunities to market its storage capacity in order to increase revenues in the future.

### iii.     Magellan Interconnect

47.     Fairway sought access to a pipeline system owned by Magellan Midstream Partners, L.P. ("Magellan").  Fairway began construction work on an interconnection with Magellan at Genoa Junction which was completed in July 2018.  Fairway's construction costs were materially below the original $22 million projection.  The completion of the Magellan interconnect increases the opportunities for shippers to use Fairway's facilities.

### iv.     Issues Raised by the Texas Railroad Commission

48.     In an April 10, 2018 letter, the Oil and Gas Division of the Texas Railroad Commission of Texas ("TRRC") alleged that FEP LLC is violating provisions of its Pit Permit Nos. P012098 and P012099, asserting that the clay liners of those brine pits have been compromised, and purports to suspend those permits.  In an April 13, 2018 response, Fairway explained that it had compelling evidence refuting that allegation and, to present that evidence, requested both an informal meeting and a contested case hearing in the event that informal meeting was unsuccessful.  In its April 13 response, Fairway expressed its view that the TRRC staff does not have the power to suspend its permits without complying with the TRRC's own

01:23891773.5

rules and pertinent statutory provisions, which afford Fairway the right to a contested case hearing at which the burden will be on the TRRC to show good cause as to why the permits should be suspended.  The TRRC staff agreed to meet with Fairway and has indicated that the filing of the hearing request stays the effect of the letter.

**B.      Prepetition Restructuring Initiatives and Search for Capital**

49.      In the period leading up to the Petition Date, the Debtors have been engaged in constructive discussions with Riverstone on a range of restructuring alternatives other than bankruptcy.  These efforts were preceded by significant efforts for over a year to attract equity capital.  In this regard, in August 2017, the Debtors hired Piper Jaffray & Co., through its Simmons & Company International division ("Simmons"), to act as financial advisor for the purpose of pursuing (i) a business combination, including the sale of the Debtors' assets or equity, and (ii) debt or equity financing.

50.      As it became evident that the Debtors required additional sources of financing, the Debtors instructed Simmons to identify, assess and explore options to address the Debtors' liquidity concerns.  In April 2018, the engagement was expanded to include procurement of debt financing.  To address the Debtors' liquidity constraints and obtain additional working capital, the Debtors engaged in numerous exploratory discussions with various potential buyers and lenders.  In the months prior to the Petition Date, the Debtors and Simmons contacted a total of approximately 150 prospective strategic buyers, financial buyers and lenders.  Eleven (11) of such parties expressed an interest in considering an acquisition or financing and proceeded with non-disclosure agreements.  At all material times, Fairway also contacted and remained open to proposals from existing equity holders to raise additional equity capital to either pay down or to enable the restructure of the Prepetition Facility.  Despite Fairway and Simmons' extensive efforts, as of the Petition Date, no commitments have materialized.

51.     Following the Debtors' comprehensive marketing process for equity and debt financing that did not result in any commitments, and due to financial constraints and the termination of interest from several possible investors, the Debtors determined that a bankruptcy process was the optimal way to complete its marketing process and transition the business to new ownership.  The Debtors believe that the sale process contemplated by the filing of these Chapter 11 Cases will maximize the value of the Debtors' estates for the benefit of the Debtors' stakeholders.  In this manner, the Debtors intend to file, in short order, a motion seeking approval of a sale process by which heretofore sidelined strategic and investment candidates can have a full and fair opportunity to acquire the assets.  By such process all stakeholders gain the chance to obtain repayment or return of capital.

## IV.     FIRST DAY PLEADINGS

52.     Below is an overview of the First Day Pleadings.  In the First Day Pleadings, the Debtors seek relief intended to facilitate a smooth transition into the Chapter 11 Cases and minimize disruptions to the Debtors' business operations. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Pleading. I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

**A.      Debtors' Motion for Entry of an Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Joint Administration Motion")**

53.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of the Chapter 11 Cases. The Debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code, as Fairway LP directly owns and controls 100% of the member interests in FEP LLC and Fairway GP.

54.     The Debtors operate as an integrated business.  I believe that joint administration of the Chapter 11 Cases will save the Debtors and their estates substantial time and expense because it will remove the need to prepare, replicate, file, and service duplicative notices, applications, and orders. Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee for the District of Delaware (the "U.S. Trustee") and other parties in interest will similarly benefit from joint administration of the Chapter 11 Cases by sparing them the time and effort of reviewing duplicative pleadings and papers.

55.     I do not believe joint administration will adversely affect creditors' rights because the Debtors request only the administrative consolidation of the estates. The Debtors do not seek substantive consolidation. As such, each creditor may still file its proof of claim against a particular estate. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.     Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Secured Superpriority Postpetition Financing and Granting Liens and Superpriority Administrative Claims and, (III) Provide Adequate Protection, (B) Scheduling a Final Hearing, and (C) Granting Related Relief (the "DIP Motion")**

56.     Pursuant to DIP Motion, the Debtors seek entry of an Interim Order,  and subsequently a Final Order: (i) authorizing the Debtors to obtain postpetition financing pursuant to sections 363 and 364 of the Bankruptcy Code by entering into the DIP Facility on an interim and final basis; (ii) authorizing the Debtors' use of Cash Collateral and all other collateral on an interim basis in accordance with the DIP Budget; (iii) granting adequate protection to the Prepetition Lenders for the use of the Prepetition Collateral, including Cash Collateral; (iv) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to

01:23891773.5

the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the Final Order; (v) scheduling a Final Hearing on the DIP Motion within 40 30 (forty) days of the entry of the Interim Order; and (vi) granting related relief.

57.    For an extended period before the Petition Date, the Debtors and their advisors have considered a variety of potential transactions to avoid bankruptcy, including further equity investment, refinance of debt, and even sale options.   These efforts continued until mid-November 2018.   No equity investment was forthcoming that would enable the Debtors to continue operations while also addressing the more than $94 million in secured debt owing. Based on the complete lack of operating funds, the Debtors have determined that the DIP Facility presents the only viable mechanism for providing the liquidity that the Debtors require to continue their operations.   Simply put, the prior extensive efforts to obtain debt or equity capital from existing unitholders never resulted in any firm offer of needed financing.   The same was true for those numerous parties contacted by Simmons.

58.    The Debtors require immediate access to the DIP Facility and Cash Collateral to satisfy the day-to-day financing needs of the Debtors' business operations.   The Debtors have been literally reliant upon week-to-week financing from its existing Prepetition Lenders, as represented by the Incremental Facility.   Without this support, the Debtors would be completely out of operating funds.   The Debtors must have operating liquidity to procure goods and services from vendors, pay their employees, meet overhead costs, provide the necessary 24/7 security and operations needed at the storage facility, and make all other payments that are essential for the continued management, operation and preservation of the Debtors' businesses.   The ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of these Chapter 11 Cases and properly bridge to a sale of the

Debtors' assets or equity.   In such circumstances, the DIP Facility's terms are appropriate, reasonable, and in the Debtors' business judgment essential to enable it to continue operating.  I believe that the inability to have use of these funds during the Chapter 11 Cases would cripple the Debtors' business operations, causing immediate and irreparable harm to the Debtors and their estates.

59.     It is the Debtors' business judgment that the DIP Facility represents the best possible opportunity for the Debtors to retain the chance to preserve going concern value.  As indicated, the Debtors are literally out of cash and lack any operating funds.  They have had to obtain further loan advances from the Prepetition Lenders each of the last two weeks simply to pay operating expenses, as they tried to obtain agreement with a last interested party that proffered an interest in making a conditional equity investment, with an option to purchase the Debtor' in the future.  The negotiations broke down and terminated last week, with the last remaining party refusing to provide a commitment that would allow the Debtors to continue to operate out of bankruptcy, much less to proffer a purchase offering price that would have assured the payment of all creditors or any real return for the equity stakeholders.  Based upon the extended efforts made by the Debtors and their investment advisors going back for over a year, and the lack of any firm proposals that would enable the Debtors to confirm a favorable agreement to deal with all stakeholders, the Debtors' business judgment remains that the current financing terms are the best and only option available.

60.     In addition, the Debtors' business judgment is to do this financing with affiliates of its current lenders.  Because of the lack of any firm proposals to invest in or purchase the facilities, the Debtors have been engaged in arm's-length discussions with Riverstone prepetition to seek alternatives to bankruptcy, and to otherwise restructure the debt.  No viable alternatives

01:23891773.5

that enabled the Debtors to obtain full value for its assets presented themselves. In the meantime, the Debtors ran out of operating funds. Riverstone alone (through its affiliates) was willing to provide further financing as provided under the DIP Facility. In this manner, the Debtors can attempt to maximize value through a court sanctioned process fair to all stakeholders.

61.     Based upon the previous extensive efforts, the Debtors do not believe there is any viable alternative to the DIP Facility. Efforts to induce firm offers for further financing have been made, but none have resulted in any proposals. Active negotiations with one strategic industry participant lasted until November 12, 2018 but did not result in a firm offer. The existing capital structure and the indicated inability to assure any possible lender sufficient value support makes the DIP Facility the only reasonable alternative for enabling the Debtors to continue operations.

62.     The Debtors request authority to provide the Prepetition Secured Parties with adequate protection as set forth in the DIP Motion. This adequate protection will include replacement liens on postpetition property, a superpriority claim, and certain adequate protection payments, and also will be provided through the maintenance of going concern values and the use of the financing to enable the Debtors to implement a sale or investment process through which the DIP Facility and the Prepetition Obligations can be paid, with residual value expected for payment of remaining creditor claims and distribution to equity. I understand based on advice of the Debtors' restructuring advisors that the adequate protection described in the DIP Motion is reasonable under the circumstances and necessary in order to allow the Debtors to use Cash Collateral and to obtain the DIP Facility.

63.     I believe on behalf of the Debtors that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in Chapter 11 without disruption. Absent access to cash collateral and the DIP Facility, the Debtors could not operate and bridge to a value-maximizing sale.  No sale process could be implemented that permits all stakeholders some opportunity to obtain recovery.  The going concern value of its business would be severely impaired and the Debtors could lose access to the Facility. Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

**C.    Debtors' Motion for an Order (I) Authorizing Continued Use of Existing Business Forms and Records; (II) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System; (III) Waiving Certain U.S. Trustee Requirements; and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>")**

64.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order (i) authorizing the Debtors to continue using their existing business forms and records; (ii) authorizing the Debtors to maintain the Bank Accounts and Cash Management System; and (iii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the U.S. Trustee and Section 345(b) of the Bankruptcy Code to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under their cash management system or (b) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases.

**i.     Books and Records**

65.     The Debtors operate their business using accounts in Fairway LP and FEP LLC. Certain of the accounts are pledged under collateral documents to the Prepetition Secured Creditors.  Fairway GP provides the services needed to operate the Debtors' business using three accounts.  I believe that opening a new set of books and records would create unnecessary

administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.  The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the business in which the Debtors are engaged and the numerous other parties with whom they deal, I believe the Debtors need to use their existing business forms without alteration or change.  I believe that printing new business forms would take an undue amount of time and expense and that fulfillment of the requirement would likely delay the payment of postpetition claims and negatively affect operations and the value of these estates.

### ii.        Bank Accounts and Cash Management System

66.     Prior to the Petition Date, in the ordinary course of business, the Debtors used a cash management system (the "Cash Management System") to efficiently collect, transfer and disburse funds generated by their business operations.  As more fully described below, the Debtors' Cash Management System consists of six (6) accounts at Amegy Bank ("Amegy"), a division of ZB, N.A; four (4) of which support the operations of FEP, one (1) of which provides for employee related costs of Fairway GP, and one (1) other account supporting the operations of Fairway LP.  Amegy is an authorized depository pursuant to the *United States Trustee's Authorized Depository Listing* established for the District of Delaware.  The Debtors do not hold any foreign operating bank accounts.

67.     The Debtors' accounts (collectively referred to herein as the "Bank Accounts") include:

> i. The master operating account of FEP (x1064) (the "FEP Operating Account") where the Debtors transfer balances between the Debtors' other accounts, make select vendor payments and, upon approval by the Court, will receive proceeds of the DIP Facility;

  ii. An investment/concentration account of FEP (x1200) (the "<u>Investment Account</u>") where excess funds not needed to satisfy the current activities of the FEP Operating Account are held;

  iii. A P-Card payment account (x0135) (the "<u>P-Card Account</u>") where the charges of the Debtors' eight (8) P-Cards are settled;

  iv. A restricted, cash-backed collateral account (x0923) (the "<u>P-Card Collateral Account</u>) where a $200,000 certificate of deposit collateralizes the payment of the P-Card Account;

  v. A payroll and benefits account (x7497) (the "<u>Payroll Account</u>") where the Debtors' employee obligations to Insperity are funded; and

  vi. The operating account of Fairway LP (x7489) (the "<u>FELP Operating Account</u>"), which is currently inactive and funded from the FEP Operating Account only as needed, and only upon the prior consent of the DIP Lender.

Debtors FEP LLC and Fairway LP are party to (i) a Deposit Account Control (Default) Agreement, dated as of May 26, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>DACA</u>") with Riverstone, as administrative agent under the Prepetition Credit Agreement (the "<u>Prepetition Agent</u>"), and Amegy governing the respective parties' rights and obligations with respect to the FEP Operating Account and the FELP Operating Account and (ii) a Securities Account Control Agreement, dated as of June 5, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>SACA</u>"), with the Prepetition Agent and Amegy governing the respective parties' rights and obligations with respect to the Investment Account.

  68. As set forth herein, the Debtors request authority (i) to maintain their Bank Accounts subject to control agreements presently in place between the Debtors and the Prepetition Secured Creditors and (ii) to continue in place the first-priority perfected liens on all of the cash in the Bank Accounts in favor of the Prepetition Secured Creditors.

### iii.        Use of Corporate Bank Accounts

69.        The Debtors respectfully request authority to maintain their existing Bank Accounts and Cash Management System in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to operations.

70.        The Debtors also request authority to close any of the Bank Accounts or open new bank accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates or if a new bank account is required to comply with an order of the Bankruptcy Court; provided that Debtors shall not close any Bank Accounts (a) at Amegy or (b) subject to control agreements in favor of Amegy as secured party thereunder or further order of this Court.

71.        I believe that the Debtors' continued use of the Bank Accounts with the same account numbers is necessary for the transition into Chapter 11 to be smooth and orderly, with minimal interference with continuing operations.  I believe that requiring the Debtors to open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' businesses.

72.        By preserving business continuity and avoiding the operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would create, I believe all parties-in-interest will be best served and the benefit to the Debtors' estates will be considerable.  The Bank Accounts are in a financially stable institution that is insured by the Federal Deposit Insurance Corporation up to the applicable limit.

### iv.        Cash Management System

73.        I believe the Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and

(iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. I believe that any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' reorganization efforts.

74.     I believe the relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  I believe that authorizing the Debtors to maintain their Cash Management System, will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of the Chapter 11 Cases.

### v.     Modification from U.S. Trustee Guidelines

75.     Further, the Debtors seek a permitted deviation from the U.S. Trustee Guidelines to the extent that the requirements of such guidelines otherwise conflict with (a) the Debtors' existing practices under the Cash Management System or (b) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or other order entered in the Chapter 11 Cases.  I believe the use of the Debtors' Cash Management System is an ordinary course, customary, essential business practice.  I believe that requiring that the Debtors alter their current practices to comply with the Guidelines would risk disruption to the Debtors' businesses and be inefficient.

76.     While the Debtors believe that their cash management practices comply with section 345(b) of the Bankruptcy Code, to the extent that that the requirements of section 345(b) of the Bankruptcy Code are inconsistent, or otherwise conflict, with (a) the cash management practices under the Cash Management System or (b) any action taken by the Debtors in accordance with an order of this Court, the Debtors seek a waiver of the requirements of section

345(b) of the Bankruptcy Code to allow the Debtors to continue their existing cash management practices.

77.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**D.     Debtors' Application for Entry of an Order, Pursuant To 28 U.S.C. § 156(c), Authorizing the Retention and Appointment of Prime Clerk LLC as Claims, Noticing, and Balloting Agent Nunc Pro Tunc to the Petition Date (the "<u>Claims Agent Application</u>")**

78.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Prime Clerk LLC (the "<u>Claims Agent</u>") as the Claims and Noticing Agent for the Debtors in the Chapter 11 Cases, in accordance with the terms and conditions of the engagement agreement dated November 19, 2018 between Fairway and the Claims Agent.  The Claims Agent's duties will be assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases. It is my understanding that the Claims Agent has substantial experience in matters of this size and complexity and has acted as the official claims and noticing agent in many large bankruptcy cases. I am informed a separate motion to retain Prime Clerk will be filed, and that the firm has prior experience in handling the matters.  Prime Clerk was selected after the Debtors' advisors received proposals from several such providers.  I believe that the Claims Agent is fully equipped to manage claims issues and provide notice to creditors and other interested parties in these Chapter 11 Cases and, therefore, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

E.    **Debtors' Motion for Order (I) Authorizing Debtors to Pay Certain Prepetition Employee Wages, Other Compensation and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs (the "Wages Motion")**

79.    The Debtors seek to continue to pay certain prepetition obligations owed to either their employees or those who provide employee benefits, to honor and continue certain employee benefits (collectively, and as described herein, the "Workforce Obligations")[3] and to authorize and direct financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Workforce Obligations and related programs during the postpetition reorganization process.  I believe the continuation of these programs is essential to the success of the Debtors' reorganization.

    i.    **Payment of Pre-Petition Wages, Payroll and Other Compensation**

80.    I believe that, in order to minimize the personal hardship that the Debtors' employees will suffer if prepetition obligations are not honored, as well as the harm which would result to the Debtors if there were departures and employee morale is not maintained, it is of critical importance that the Debtors pay prepetition wages, compensation, and amounts associated with employee benefit programs and continue such programs in the ordinary course.

81.    As of the Petition Date, the Debtors employ nine (9) full-time salaried employees and five (5) full-time hourly employees (the "Employees").  In addition, the Debtors employ two (2) independent contractors (the "Independent Contractors") (together with the Employees, hereafter the "Workforce").  The Workforce are responsible for the ongoing business operations of the Debtors.  The skills, knowledge and understanding that the Workforce possesses with

---

[3] The summary of the Debtors' various Employee Obligations provided herein is qualified entirely by the Debtors' official policies or other practices, programs or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (as defined herein) (each, an "Official Policy").  In the event of any inconsistency or ambiguity between the summary contained in the Motion and an Official Policy, the terms of such Official Policy shall govern.

respect to the Debtors' operations are essential to the effective reorganization of the Debtors' financial affairs.

82.      In the ordinary course of business, the Debtors pay the Employees through Insperity PEO Services, LP, (the "Payroll Service"), a third-party service provider, which makes payments either directly to Employees via check or through direct deposits with funds advanced by the Debtors.  The Debtors' aggregate gross monthly payroll is approximately $237,000 for wages and benefits for all of the hourly and salaried Employees.  The Debtors pay all amounts due for payroll and benefits to the Payroll Service by wire transfer, and the Payroll Service then pays each of the Employees either by check or by direct deposit.

ii.      **Wages and Salaries**

83.      The Debtors' estimate that, as of the Petition Date, no Workforce Obligations are due and outstanding to the salaried Employees.

84.      The Debtors' estimate that, as of the Petition Date, approximately $22,000 of wage obligations are due and payable to the hourly Employees.

85.      Assuming that all checks cleared, the Debtors estimate that as of the Petition Date, total prepetition wages and salaries (excluding expense reimbursements and vacation time) earned by the Employees and Officers prior to the Petition Date that have accrued and remain unpaid (collectively, the "Wage Obligations") total approximately $22,000 (and include amounts withheld for taxes, garnishments, and other amounts needed to be withheld).

86.      I believe that no Employee has accrued but unpaid compensation in excess of the priority cap established by the Bankruptcy Code.

87.      As of the Petition Date, the Debtors estimate that approximately $12,250 in fees owed to Independent Contractors for prepetition services has accrued and remains outstanding (the "Unremitted Independent Contractor Compensation").

01:23891773.5

33

### iii.        Other Compensation: Vacation, Holiday, and Business Expenses

88.        The Debtors provide the Employees with vacation time and holidays ("Vacation and Other Time Off").  Vacation accrues at the beginning of each calendar year and the amount is dependent upon an Employee's length of employment.  If an Employee does not use his or her vacation time in a given year, the Employee loses that year's vacation time.  Vacation does not carry over to the next year unless the Debtors make a special exception, which the Debtors do in very limited circumstances.  If an Employee is terminated or resigns, such Employee is paid for any unused vacation time since vacation is granted at the beginning of each year (the "Unused Vacation").  By this Motion, the Debtors seek authority to honor their respective vacation and other leave policies to all Employees in the ordinary course of Debtors' business.  The Debtors request authority to permit their Employees to use accrued vacation and other leave, and subject to the budget approved by the lenders in connection with the Debtors' request for authority to enter into a debtor-in-possession financing agreement and the terms and conditions thereof, the Debtors request authority to pay Employees for Unused Vacation in accordance with their prepetition policies.

89.        In addition, the Debtors routinely reimburse their Employees for certain expenses incurred within the scope of their employment, such as cell phone, travel reimbursement expenses, mileage, professional association fees and other expenses (collectively, the "Reimbursable Expenses").  As more fully described in the Cash Management Motion, certain of the Debtors Workforce have access to corporate P-Cards for purposes of certain expenses.  The Employees who do not have access to P-Cards and incur out-of-pocket-costs are reimbursed for these expenses.  To the extent an Employee has not yet submitted an expense report or has not yet been reimbursed for Reimbursable Expenses incurred prior to the Petition Date, the Debtors are seeking authority to reimburse Employees for such amounts.  The Debtors seek authority to

01:23891773.5

34

pay the Reimbursable Expenses to Employees for prepetition amounts incurred on behalf of the Debtors and to continue to process and pay Reimbursable Expenses incurred by Employees in the ordinary course of business and consistent with past practice.

90.     These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees during the reorganization process.

### iv.     Employee Benefit Plans

91.     The Debtors have established plans and policies to provide their Employees with (a) health benefits, including medical, dental, and vision benefits and (b) insurance benefits, including long-term disability, life insurance, supplemental life insurance, and accidental death and dismemberment insurance (collectively, the "Employee Benefits"). The Employee Benefits Plans and the Employer Welfare and Administrative Costs (as defined below) are funded in part through the Debtors' payments to the Payroll Service, which then administers the Health Plan and the Welfare Benefits (as defined below). The Employee Benefits represent an important component of an Employee's compensation. All regular, full-time, Employees are eligible to receive medical, prescription drug, dental, and vision insurance coverage (collectively, the "Health Benefits"). The Payroll Service provider administers the Debtors' medical, dental, vision and prescription drug coverage for the Debtors' fourteen (14) covered Employees fully-funded health plan (the "Health Plan"). As part of the Health Plan, Employees may choose their individual levels of coverage from a wide array of benefits, including; (i) one of eight medical coverage plans offered through United Healthcare, (ii) dental insurance offered through United Healthcare, (iii) vision insurance offered through Vision Service Plan,  (iv) flexible spending accounts ("FSA") plan offered through United Healthcare, (v) , a health saving account ("HSA") plan offered through Tango Health, and (vi) an employee assistance program offered through Optum.

01:23891773.5

92.    In addition to the Health Plans above, the Employees access to certain welfare benefits (the "Welfare Benefits") including (i) basic term life insurance, (ii) optional group life insurance, (iii) personal accident insurance, and (iv) disability insurance plans, all administered through Cigna insurance.  The basic term life is 100% employer paid and all other Welfare Benefits are voluntary, and 100% employee paid.

93.    The Employees' portion of monthly premium for the Health Plan is deducted from each participating Employees' payroll amount.  The Debtors also pay: (i) the employer portion for the Health Plan and (ii) 100% of the basic term life insurance portion of the Welfare Benefits (the "Employer Health and Welfare Obligations").  As of the Petition Date, there are no amounts outstanding for the Employer Health and Welfare Obligations; however, the Debtors seek the authority to continue to fund these obligations in the ordinary course of business and consistent with past practice on a post-petition basis.

94.    The Debtors also pay an administrative expense to the Payroll Service (the "Employer Welfare and Administrative Costs").  On an aggregate basis, the Debtors pay approximately $40,000 per month to the Payroll Service Provider for Employer Welfare and Administrative Costs.  The Debtors estimate that approximately $7,000 of Employer Welfare and Administrative Costs are outstanding as of the Petition Date (the "Unremitted Employer Welfare and Administrative Costs").

95.    Considering that the Employee Benefits are vital to the Debtors' Employees and that the vast majority of the Unpaid Employee Benefits is held in trust for the Employees and is not property of the Debtors' estates, the Debtors seek authority to remit the Unpaid Employee Benefits and to continue providing the Health Benefits in the ordinary course of business on a post-petition basis.  I firmly believe that the relief requested in the Wages Motion is in the best

interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be approved.

F.     **Debtors' Motion for Interim and Final Orders Under Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment (the "Utilities Motion")**

96.     In the normal operation of their business, the Debtors have relationships with many different utility companies and other providers (each a "Utility Company" and, collectively, the "Utility Companies") for the provision of electric, water, sewer, natural gas, trash removal, telephone, cellular telephone, internet services, and similar utility products and services (collectively, the "Utility Services"). The Utility Companies service the Debtors' corporate offices and other locations. The Debtors estimate that the average monthly amount owed to the Utility Companies is approximately $43,200.

97.     The Debtors anticipate that the equity value represented by its invested capital and facilities will be sufficient to allow them to satisfy all administrative expenses, and the Debtors intend to pay all postpetition obligations owed to the Utility Companies from available cash collateral in a timely manner. Nevertheless, to provide additional adequate assurance of payment for future Utility Services, the Debtors will deposit $21,660, a sum equal to approximately fifty percent (50%) of the Debtors' estimated monthly cost of their Utility Services, into a separate, segregated, interest-bearing account, that will be established and funded within twenty (20) business days after the Petition Date (the "Utility Deposit Account"), subject to the terms and conditions of the debtor in possession financing agreement and applicable orders authorizing the

01:23891773.5

Debtors to enter into the same.  The Debtors will maintain the Utility Deposit Account with a minimum balance equal to fifty percent (50%) of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

98.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

[SIGNATURE ON FOLLOWING PAGE]

I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  November 26, 2018

By:    _____*/s/ Robert M. Flavin*_____
     Name:  Robert M. Flavin
     Title:   Chief Financial Officer
           of Fairway Energy GP, LLC
           As General Partner to Fairway
           Energy, L.P., the sole member of
           Fairway Energy Partners, LLC