**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **FAIRWAY ENERGY, LP,** *et al.,*[1] | § | **Case No. 18-12684 (LSS)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |
| | § | **Bid Procedures Obj. Deadline: December 20, 2018 at** |
| | § | **4:00 p.m. (ET)** |
| | | **Bid Procedures Hrg. Date:  January 8, 2018 at 2:00** |
| | | **p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF ORDERS:**
**(I) (A) AUTHORIZING AND APPROVING BIDDING PROCEDURES IN**
**CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'**
**ASSETS, (B) APPROVING PROCEDURES FOR DETERMINING CURE AMOUNTS**
**FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) APPROVING THE**
**FORM AND MANNER OF NOTICES IN CONNECTION WITH THE SALE OF**
**SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND THE ASSUMPTION AND**
**ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN**
**CONNECTION THEREWITH, (D) SCHEDULING A HEARING ON APPROVAL OF**
**THE PROPOSED SALE OF THE DEBTORS' ASSETS, AND (E) GRANTING**
**RELATED RELIEF; AND (II) (A) APPROVING THE SALE OF SUBSTANTIALLY**
**ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING AND**
**APPROVING THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH,**
<u>**AND (C) GRANTING RELATED RELIEF**</u>

Fairway Energy, LP ("<u>Fairway LP</u>"), Fairway Energy GP, LLC ("<u>Fairway GP</u>"), and

Fairway Energy Partners, LLC ("<u>FEP LLC</u>"), debtors-in-possession in the above-referenced

chapter 11 cases (collectively, the "<u>Debtors</u>" or "<u>Fairway</u>"), file this *Debtors' Motion for Entry*

*of Orders:  (I) (A) Authorizing and Approving Bidding Procedures in Connection with the Sale*

*of Substantially All of the Debtors' Assets, (B) Approving Procedures for Determining Cure*

*Amounts for Executory Contracts and Unexpired Leases, (C) Approving the Form and Manner*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, include: Fairway Energy, LP (4200); Fairway Energy Partners, LLC (7914); and Fairway Energy GP, LLC (7808).  The location of the Debtors' service address is Three Riverway, Suite 1550, Houston, Texas 77056.

*of Notices in Connection with the Sale of Substantially All of the Debtors' Assets and the Assumption and Assignment of Executory Contracts and Unexpired Leases In Connection Therewith, (D) Scheduling a Hearing on Approval of the Proposed Sale of the Debtors' Assets, and (E) Granting Related Relief; and (II) (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith, and (C) Granting Related Relief* (the "<u>Motion</u>") and in support thereof, respectfully represent as follows:

## <u>JURISDICTION AND VENUE</u>

1.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Sections 105(a), 363, and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rules 2002-1, 6004-1, and 9006-1.

## BACKGROUND

### A.   The Chapter 11 Cases

4.      On November 26, 2018 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no official committee (a "Committee") has been appointed or designated.

5.      The Debtors' Chapter 11 Cases are consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).

6.      Additional information about the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases can be found in the *Declaration in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 3].

### B.   The Debtors' Marketing Process and Prepetition Restructuring Efforts

7.      Since the spring of 2018, the Debtors have experienced liquidity issues given various operational and market obstacles that impeded use of the Pierce Junction Crude Oil Storage Facility. For the nine (9) months ended September 30, 2018, Fairway had an operating loss of $38,600,000 (before interest, expense, and other income) and has had no revenues.

8.      The Debtors' liquidity constraints impacted both their ability to operate and to comply with their obligations under that certain senior secured term loan Credit Agreement dated as of March 29, 2017 (as amended as of July 6, 2017 pursuant to that certain Omnibus Consent and Amendment to Credit Agreement and Security Agreement, as further amended as of April 27, 2018 pursuant to that certain Third Waiver and Second Amendment to Credit Agreement (the "Second Amendment"), as further amended as of July 31, 2018 pursuant to that certain Fourth

01:23937916.1

Waiver and Third Amendment to Credit Agreement (the "Third Amendment"), as further amended as of October 1, 2018 pursuant to that certain Fifth Waiver and Fourth Amendment to Credit Agreement (the "Fourth Amendment"), as further amended as of October 22, 2018 pursuant to that certain Sixth Waiver and Fifth Amendment to Credit Agreement (the "Fifth Amendment"), as further amended as of October 26, 2018 pursuant to that certain Sixth Amendment to Credit Agreement (the "Sixth Amendment"), as further amended as of November 7, 2018 pursuant to that certain Seventh Waiver and Seventh Amendment to Credit Agreement (the "Seventh Amendment"), as further amended as of November 20, 2018 pursuant to that certain Eighth Waiver and Eighth Amendment to Credit Agreement (the "Eighth Amendment") and as further amended, restated, supplemented and/or otherwise modified from time to time (the "Prepetition Credit Agreement")). The Prepetition Credit Agreement originally provided for a senior secured term loan credit facility (the "Prepetition Facility") of up to $80 million with an additional $50 million of borrowing available if certain conditions were met. Currently, over $95 million in obligations remain outstanding under the Prepetition Facility.

9.      Anticipating a liquidity issue, beginning in March 2018, the Debtors engaged in negotiations with their lender and administrative agent under the Prepetition Credit Agreement, Riverstone Credit Partners, L.P. (together with its affiliated entities acting as DIP Agent and DIP Lender under (and as defined in) the DIP Order (as defined below), "Riverstone"), regarding the terms on which Fairway could obtain additional runway and avoid an event of default under the Prepetition Credit Agreement.

10.      On or around this time, the Debtors determined that in order to address their liquidity concerns and avoid an event of default, it would be necessary to procure additional capital. As referenced above, pursuant to a series of amendments and waivers of requirements

under the Prepetition Credit Agreement, Riverstone made numerous concessions to give the Debtors time to raise equity capital or to address its emerging liquidity constraints. Specifically, the Second Amendment contemplated, among other things, that the Debtors would obtain a capital infusion on or prior to March 31, 2018, $15 million of which would be applied to the outstanding obligations under the Prepetition Credit Agreement (the "Pay-Down Requirement"). Fairway was unable to raise equity capital by the March 2018 deadline set forth in the Second Amendment, and, pursuant to the Third Amendment, Fourth Amendment and Fifth Amendment, Riverstone agreed to postpone the deadline for the equity raise through October 2018.

11.     Under the Sixth Amendment, as consideration for the elimination of the Pay-Down Requirement, the Debtors granted Riverstone the right to convert, in Riverstone's sole and absolute discretion, up to $15 million of obligations under the Prepetition Credit Facility, into second lien debt, and the further option thereafter to convert such second lien debt into equity of Fairway LP.

12.     Further, under the Seventh Amendment and the Eighth Amendment, Riverstone provided additional incremental loans of $600,000 and $775,000, respectively (the "Incremental Facility"). The Incremental Facility was provided on a "first out" basis in the weeks leading up to the Petition Date to fund the Debtors' attempts to complete their prepetition marketing process and prepare for the filing of these Chapter 11 Cases, if necessary. It was understood by all parties that the Incremental Facility was a "bridge" to either an equity investment or, if necessary, a bankruptcy filing. Under the terms of the Eighth Amendment, the Incremental Facility matured on the Petition Date.

13.     In connection with the foregoing, the Debtors engaged Piper Jaffray & Co. ("Piper"), through its Simmons & Company International division ("Simmons"), on or around

August 2017, to act as financial advisor for the purpose of pursuing (i) a business combination, including the sale of the Debtors' assets or equity, and (ii) debt or equity financing, in order to provide the Debtors with the liquidity necessary to avoid an event of default under the Prepetition Credit Agreement.

14.     As it became evident that the Debtors required additional sources of financing, the Debtors instructed Simmons to identify, assess and explore options to address the Debtors' liquidity concerns, which it has done since it was retained in August 2017. In April 2018, the engagement was expanded to include advisory services with respect to the procurement of debt financing. To address the Debtors' liquidity constraints and obtain additional working capital, Simmons and the Debtors engaged in numerous exploratory discussions with various potential buyers and lenders. In the months prior to the Petition Date, the Debtors and Simmons contacted a total of approximately 150 prospective strategic buyers, financial buyers and lenders. Eleven (11) of such parties expressed an interest in considering an acquisition or financing and proceeded with the execution of non-disclosure agreements. At all material times, Fairway also contacted and remained open to receiving proposals from existing equity holders to raise additional equity capital to either pay down or otherwise restructure the Prepetition Facility. Despite the Debtors' and Simmons' extensive efforts, no commitments materialized prior to the Petition Date. Nonetheless, the Debtors and their advisors remain optimistic that a strategic buyer will emerge if the sale is pursued under Section 363 of the Bankruptcy Code, thereby maximizing recoveries of the Debtors' stakeholders including, to the extent possible, holders of equity interests.

15.     Believing that a sale process pursued in the Chapter 11 Cases would best maximize value for the Debtors' estates, the Debtors, in consultation with their legal and

business advisors, have determined that a reasonably prompt and open sale (the "Sale") of all or substantially all of the Debtors' assets, including, without limitation, all property and assets held by FEP LLC and the equity interests in FEP LLC (collectively, the "Assets") in accordance with the bidding procedures described herein (the "Bidding Procedures"), including the solicitation of competing Bidders (defined below) to participate in an auction in accordance with the Bidding Procedures, will enable the Debtors to obtain the highest or otherwise best offer(s) for the Assets, thereby maximizing the value of such Assets for the benefit of the Debtors' estates and creditors.

16.    In order provide the necessary funding to allow the Debtors to run the Sale process described herein and in the Bidding Procedures, the Debtors have obtained from Riverstone (through its affiliates) a $20 million commitment for postpetition financing (the "DIP Facility"). On November 29, 2018, the Court entered an order approving the DIP Facility on an interim basis in an amount up to $6 million [Docket No. 45] (the "DIP Order"). A request for approval of the DIP Facility on a final basis is scheduled for January 8, 2019.

17.    Piper continues to advise the Debtors in connection with the proposed bidding process and Sale.  Accordingly, the Debtors will soon file an application to continue to employ Piper as their investment banker in these Chapter 11 Cases.  Piper, through its Simmons Energy division, is one of the largest and most experienced energy investment banking teams in the industry, offering mergers & acquisitions advisory services, capital markets execution and investment research.  In addition, Piper's Restructuring and Special Situations Group has extensive experience marketing assets via sale processes conducted under Section 363 of the Bankruptcy Code and in similar contexts.  Piper specializes in providing investment banking advice related to midstream assets such as those here.  These services include traditional investment banking, prospect marketing, property valuation, and assistance with data

aggregation, packaging and presentation, virtual data rooms, compiling potential buyer lists, offer solicitation, negotiations, and transaction execution.

18.     Given the extensive marketing undertaken pre-bankruptcy, Piper believes it has sufficient time to conduct a robust marketing and solicitation process under the milestones in the DIP Facility and DIP Order to ensure that a market tested sale price is obtained.

## **RELIEF REQUESTED**

19.     By this Motion, and pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rules 2002-1, 6004-1, and 9006-1, the Debtors respectfully request the entry of two orders concerning the Sale of the Assets.

20.     First, to provide for an orderly sale process, the Debtors seek the immediate entry of the sale procedures order substantially in the form attached hereto as **Exhibit A** (the "Sale Procedures Order"):[2]

    a.     approving the Bidding Procedures[3] attached as **Exhibit 1** to the Sale Procedures Order setting forth the process by which the Debtors are authorized to conduct the Sale;

    b.     establishing certain dates and deadlines, including the bid deadline and the date of the auction (the "Auction");

    c.     scheduling a hearing (the "Sale Hearing") to approve the Sale to the highest or otherwise best bidder for the Assets and establishing deadlines for objections and responses to the approval of the Sale;

    d.     approving the form and manner of notice of the Auction and the Sale Hearing as described herein;

---

[2] The proposed form of Sale Procedures Order contains dates proposed by the Debtor.  These dates are subject to the availability and approval of the Court and may change.

[3] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Bidding Procedures.

e.    establishing the Assumption and Assignment Procedures (as hereinafter defined); and

f.    granting any related relief.

21.    Second, following the entry of the Sale Procedures Order, the solicitation of Bids according to the Bidding Procedures, and the Auction (if applicable), at the Sale Hearing the Debtors will request the entry of an order (the "Sale Order"), in a form to be filed by the Debtors no later than ten (10) days after the entry of the Sale Procedures Order: (a) authorizing and approving the Sale of substantially all of the Debtors' Assets free and clear of all liens, claims, encumbrances and other interests pursuant to Bankruptcy Code Section 363; (b) authorizing (as applicable) the assumption and assignment or rejection of certain executory contracts and unexpired leases in connection with the Sale; and (c) granting related relief.

**A.    The Debtors' Prepetition and Postpetition Secured Creditors Support the Sale Process**

22.    The DIP Order provides that, subject to the Final Order (as defined in the DIP Order), Riverstone shall have the unqualified right to credit bid up to the full amount of the DIP Obligations and the Prepetition Obligations (each as defined in the DIP Order) and the DIP Superpriority Claim and the Adequate Protection Superpriority Claim (each as defined in the DIP Order) without the need for further Court order authorizing same.  Such credit bid rights are provided under Section 363(k) of the Bankruptcy Code.

23.    Under the DIP Credit Agreement (as defined in the DIP Order), the Debtors are required to obtain entry of an order approving the Bidding Procedures by January 10, 2019. The DIP Credit Agreement further requires the Debtors to obtain the Court's approval of the Sale by March 26, 2019, and the Debtors are required to consummate the Sale by April 16, 2019.  The Debtors have designed the proposed Sale process in consultation with Riverstone, who has reviewed these procedures and is in support of the Sale process as described herein and the

01:23937916.1

Bidding Procedures (but, for the avoidance of doubt, reserves all rights with respect to the conduct of the Sale process and the Sale itself).

**B.      The Proposed Bidding Procedures and Sale Process**

24.      The Debtors propose to conduct the Sale of the Assets, or any part thereof, through the bidding and sale process described below.  The Debtors propose to conduct the Sale in accordance with the Bidding Procedures to ensure that the Debtors' estates realize the maximum value for the Assets.  The Sale may be for all of the Assets or for a portion thereof, as potential purchasers direct.  The Sale in all cases will be free and clear of interests in such Assets, in its broadest meaning.  The Debtors request that this Court approve the Bidding Procedures, the material terms of which are as follows pursuant to Local Rule 6004-1(c):[4]

*<u>Provisions Governing Qualifications of Bidders and Bids</u>*

1)  <u>Qualification as a Bidder and Access to Due Diligence</u>.  Any party interested in submitting a proposal, solicitation or offer (a "<u>Bid</u>") for the Assets and seeking to become a Qualified Bidder (as defined below) may be granted access to due diligence, including confidential and non-public information relating to the Assets, as necessary to enable such potential bidder to evaluate the Assets and to facilitate the consideration of submitting a Bid, so long as such party has provided the Debtors: (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, their advisors, and Riverstone; (b) financial and other information sufficient for the Debtors, in consultation with Riverstone and any Committee, to make a reasonable determination as to such party's financial and other capabilities to consummate an acquisition of the Assets within the time frame set forth for closing the Sale (the "<u>Proposed Transaction</u>"); and (c) a written request for due diligence information.  Any party that satisfies the foregoing requirements will be given access to the on-line data room for the Debtors and may begin conducting due diligence.

2)  <u>Qualified Bids</u>.  In order to constitute a Qualified Bid (as defined below), any Bid submitted by a bidder (each, a "<u>Bidder</u>") must (i) be submitted in writing so as to be actually received by the Notice Parties (as defined below) prior to **4:00 p.m.**

---

[4] This summary of the Bidding Procedures is qualified in its entirety by the actual Bidding Procedures attached as **Exhibit 1** to the Sale Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed to such terms in the Bidding Procedures.  To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

01:23937916.1

**(Eastern Time) on February 27, 2019** (the "Bid Deadline"), and (ii) satisfy the following requirements, as determined by the Debtors in their reasonable business judgment after consultation with Riverstone and any Committee (collectively, the "Bid Requirements"):

a)  Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Form PA (as defined below)) (a "Qualified PA") that shall: (i) identify the Assets the Bidder seeks to purchase; and (ii) contain the form of and total consideration to be paid by such Bidder, including the amount of proposed cash consideration and liabilities to be assumed (the "Assumed Liabilities").

b)  Not be subject to any: (i) financing contingency; (ii) contingency relating to due diligence after the Bid Deadline; (iii) contingency relating to the approval of the Bidder's board of directors or other internal approvals or non-governmental third-party consents or approvals; or (iv) any conditions precedent to the Bidder's obligation to purchase the Assets other than those included in the Form PA.

c)  Provide that the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtors, in consultation with Riverstone and any Committee.

d)  Be accompanied by the provision of a certified or bank check or wire transfer in the amount of at least 10% of the purchase price proposed in the Qualified PA as a good faith deposit (the "Good Faith Deposit"), which shall serve as liquidated damages if the Bidder defaults with respect to its Bid. Riverstone, or its designee, shall not be required to submit a Good Faith Deposit in connection with the submission of a Bid or the exercise of its credit bid rights.

e)  Not be conditioned upon the Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of agreement.

f)  Contain a written statement that the Bidder agrees to be bound by the terms of the Bidding Procedures and the Sale Procedures Order and include a commitment that the Bidder shall (i) commence and complete all filings with respect to necessary government and other approvals within three (3) days following the entry of the Sale Order with respect to the relevant assets, and (ii) consummate the purchase of the relevant Assets by the later to occur of (a) twenty-one (21) days following entry of the Sale Order, or (b) the date on which all required consents, approvals, or other transfer requirements are obtained.

g)  Identify each and every executory contract ("Contract") and unexpired lease ("Lease") it intends to assume; provided, however, that such list of contracts

may be later modified to the extent permitted under the Qualified PA or Sale Procedures Order.

h) Be accompanied by evidence satisfactory to the Debtors, in consultation with Riverstone and any Committee, that the Bidder is willing, authorized (including by such Bidder's board of directors or comparable governing body), capable and qualified financially, operationally, legally and otherwise, of unconditionally performing all obligations under the Qualified PA, including, without limitation, (i) all Assumed Liabilities with respect to the relevant Assets, and (ii) the ability to provide adequate assurance of future performance under Contracts and Leases to be assumed pursuant to Section 365 of the Bankruptcy Code.  The Bid will also contain written evidence of a firm commitment for financing or other evidence of ability to consummate the proposed transaction without financing; provided however, that the Debtors will determine in their business judgment and in consultation with Riverstone and any Committee whether the written evidence of such financial wherewithal is acceptable; provided further, that such evidence need not be provided by Riverstone, or its designee, in connection with its Bid or the exercise of its credit bid rights.

i) Provide (i) that the Bidder agrees to serve as the Backup Successful Bid (as defined below) if it is selected as the next highest and best bid for the Assets after the Successful Bid is determined in accordance with the Bidding Procedures, and (ii) that such Bid shall remain open and irrevocable until the later of (a) sixty (60) days after the entry of the Sale Order, or (b) the date on which all required consents, approvals, and other transfer requirements are obtained.

j) Fully disclose the identity of each entity that will be bidding in any Auction scheduled by the Debtors (and any equity holders in the case of a Bidder which is an entity specially formed for the purposes of effectuating the contemplated transaction) and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

k) Expressly acknowledge and represent that the Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents, or that of any of its legal, financial, or other advisors, in making its Bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors, the Assets, or the proposed Sale, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in a Purchase and Sale Agreement accepted and executed by the Debtors; and (iv) accepts

and consents to the Bidding Procedures and acknowledges the Court's exclusive jurisdiction to resolve issues related thereto.

l)  Be submitted to (collectively, the "<u>Notice Parties</u>"): (i) the Debtors, Fairway Energy, LP, Attn.: Robert Flavin, 3 Riverway, Suite 1550, Houston, TX 77056, Email: robert.flavin@fairway midstream.com; (ii) Piper Jaffray & Co., Attn.: Spencer Rippstein and Richard Shinder, 345 Park Avenue, Suite 1200, New York, NY 10154, E-mail: spencer.w.rippstein@pjc.com and richard.j.shinder@pjc.com; (iii) counsel for the Debtors, Haynes and Boone, LLP, Attn.: Patrick L. Hughes, 1221 McKinney, Suite 2100, Houston, TX, 77010, Email: patrick.hughes@haynesboone.com and Young Conaway Stargatt & Taylor, LLP, Attn.: Edmon Morton, 1000 North King Street, Wilmington, DE 19801, Email: EMorton@ycst.com; and (iv) counsel to Riverstone, White & Case LLP, Attn.: David Turetsky and Andrew Zatz, 1221 Avenue of the Americas, New York, NY 10020, Email: david.turetsky@whitecase.com and azatz@whitecase.com.

m)  The Debtors, with the prior written consent of Riverstone, may extend the Bid Deadline until up to the start of the Auction without further notice, but shall not be obligated to do so.

3)  <u>Notice of Qualified Bidders</u>.  A Bid that satisfies each of the Bid Requirements, as determined in the Debtors' reasonable business judgment after consultation with Riverstone and any Committee, shall constitute a "<u>Qualified Bid</u>," and the Bidder submitting such Bid shall be a "<u>Qualified Bidder</u>."  The Debtors shall notify each Qualified Bidder that such party is a Qualified Bidder within two (2) business days after the Bid Deadline.

4)  <u>Bids on Less than All Equity or Assets Permitted.</u> Bids may be submitted for any part of the Assets.  There is no requirement that a Bid be made solely for the entirety of the Assets.  Bidders may also submit multiple Bids for different Assets or groups of Assets.

5)  <u>Credit Bidding</u>.  Riverstone, or its designee, is deemed a Qualified Bidder for all purposes under the Bidding Procedures and shall have the right to make a credit bid on behalf of Riverstone of all or a portion of any outstanding amounts owing under the DIP Loan Documents and the Prepetition Loan Documents (each as defined in the DIP Order) pursuant to Section 363(k) of the Bankruptcy Code, which such bid or bids shall be deemed to be a Qualified Bid(s) regardless of whether it submits a Bid by the Bid Deadline.

6)  <u>Evaluation of Competing Bids</u>.  The Bidding Procedures set forth various factors that will be considered by the Debtors, in consultation with Riverstone and any Committee, in evaluating each Qualified Bid. The Debtors may evaluate competing bids in a manner that will maximize the aggregate value to the Debtors' estates.

7) <u>One/No Qualified Bids</u>. If only one Qualified Bid is received by the Debtors with respect to the Assets, the Debtors shall, subject to Riverstone's consent, not hold an Auction, and the Debtors will determine, in their business judgment, whether such Qualified Bid shall be the Successful Bid. If no Qualified Bids are received by the Debtors for the Assets, the Debtors shall not hold an Auction with respect to such Assets and shall not request approval for the Sale at the Sale Hearing. If the Debtors do not receive any Qualified Bids with for the Assets other than a Bid by Riverstone or its designee, the Debtors shall report the same to the Court, and shall promptly proceed to seek entry of a Sale Order approving such Bid by Riverstone or its designee, except as may be otherwise agreed to by the Debtors and Riverstone.

8) <u>Baseline Bids</u>. In the event the Debtors receive two (2) or more Qualified Bids for the Assets, the Debtors and their professionals will conduct the Auction (as described in further detail below). Prior to the commencement of the Auction, the Debtors, in consultation with Riverstone and any Committee, shall determine which Qualified Bids constitute the highest or otherwise best Bids (the "<u>Baseline Bids</u>" and, each, a "<u>Baseline Bid</u>") for the Assets. At least one (1) business day prior to the Auction, the Debtors shall notify each Qualified Bidder of the contents of the Baseline Bid(s). The Baseline Bid(s) shall be subject to higher and better Bids at the Auction.

9) <u>Stalking Horse Bidder</u>. Following entry of the Sale Procedures Order, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment with the prior written consent of Riverstone, to select one or more potential bidders to act as a stalking horse bidder (a "<u>Stalking Horse Bidder</u>") for all or any portion of the Assets (which Stalking Horse Bidder may be Riverstone pursuant to a credit bid or otherwise), and may agree to provide such Stalking Horse Bidder(s) certain bid protections, including an expense reimbursement and/or a break-up fee (the "<u>Bid Protections</u>"); provided that any such Bid Protections shall be subject to approval by the Court, which the Debtors may seek on an expedited basis pursuant to Section 105(a) of the Bankruptcy Code and Local Rule 9006-1(e).

### *Auction*

1) <u>Auction</u>. In the event the Debtors determine, in consultation with Riverstone and any Committee, to conduct an Auction, the Auction shall take place on **March 7, 2019 at 10:00 a.m. (Central Time)** at the offices of Haynes and Boone, LLP, 1221 McKinney, Suite 2100, Houston, Texas 77010, or such later date and time or such other location as may be established by the Court in the Sale Procedures Order or designated by the Debtors pursuant to the Bidding Procedures to determine the highest or otherwise best Bid for the Assets. The Auction shall be conducted in a timely fashion according to the following procedures.

2) <u>Auction Procedures</u>. In order to participate in the Auction, each prospective purchaser must be a Qualified Bidder. Each Qualified Bidder must have at least

one individual representative with authority to bind the Qualified Bidder attend the Auction in person. Only Qualified Bidders may bid at the Auction. Only representatives of the Debtors, representatives of Riverstone or its designee (regardless of whether Riverstone submits a Bid), the U.S. Trustee, any Committee, Qualified Bidders, those creditors of the Debtors that provide one (1) business day's advance written notice to counsel for the Debtors, and each of their legal and financial advisors shall be entitled to attend the Auction. The Auction shall be conducted in the presence of a certified court reporter who shall transcribe the Auction.

a) Each Qualified Bidder participating in the Auction will be required to represent that it has not engaged in any collusion with respect to the bidding or the Sale.

b) The Debtors may, after consulting with Riverstone and any Committee, employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Overbids (as defined below)) for conducting the Auction, provided that such rules are (i) not inconsistent with the order entered by the Court approving these Bidding Procedures, the Bankruptcy Code or any other order of the Court entered in connection herewith and (ii) disclosed to each Qualified Bidder.

c) Bidding at the Auction will begin with the Baseline Bid(s) and continue, in one or more rounds of bidding, so long as, during each round, at least one subsequent bid is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (an "Overbid") and (ii) the Debtors determine, in consultation with Riverstone and any Committee, that such Overbid or combination of Overbids is (a) for the first round, a higher or otherwise better offer than the Baseline Bid(s) (taking into account, if applicable, the Bid Protections granted to the Stalking Horse Bidder) and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). All bids shall be made openly, in the presence of all parties at the Auction. The Debtors, in their sole discretion (in consultation with Riverstone and any Committee), may determine appropriate minimum bid increments or requirements for each round of bidding. In the event of a dispute relating to the conduct of the Auction, such dispute will be heard by the Court.

d) During the course of the Auction, the Debtors shall, after the submission of each Overbid, promptly inform each Qualified Bidder which Overbid reflects, in the Debtors' view, after consultation with Riverstone and any Committee, the highest or otherwise best Bid for the applicable Assets (the "Leading Bid").

e) The Auction shall continue until there is only one Bid that the Debtors determine, in consultation with Riverstone and any Committee, subject to

Court approval, is the highest and/or best offer for the purchase of the Assets (whether in an aggregate sale to a single Purchaser (as such term shall be defined in the Sale Order) or on an asset by asset basis (each a "<u>Successful Bid</u>" and such Bidder, the "<u>Successful Bidder</u>")), at which point, the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then existing Overbid(s). Such acceptance by the Debtors of the Successful Bid(s) is conditioned upon approval by the Court of the Successful Bid(s). The second highest bid, to the extent determined to be acceptable to the Debtors in consultation with Riverstone and any Committee, shall be deemed to be the backup bid (the "<u>Backup Successful Bid</u>" and such Bidder, the "<u>Backup Successful Bidder</u>"), provided, however, that Riverstone shall not be required to serve as the Backup Successful Bidder in connection with a credit bid. In the event that Riverstone makes a determination not to serve as the Backup Successful Bidder (whether before or after submitting any credit bid or other bid), Riverstone shall provide notice to the Debtors no later than two (2) business days after the Auction, and the third highest bidder, to the extent determined to be acceptable to the Debtors shall be deemed to be the Backup Successful Bidder.

f)  All Bids made at the Auction shall remain open until the earlier of  (i) if the Bidder submits the Successful Bid or is deemed to be the Backup Successful Bidder, the later of (a) sixty (60) days after the entry of the Sale Order, or (b) the date on which all required consents, approvals, or other transfer requirements are obtained, and (ii) if the Qualified Bidder is not selected as a Successful Bidder or the Backup Successful Bidder, three (3) business days after the end of the Auction with respect to the relevant Assets on which it has bid.

3)  <u>Highest and/or Best Bid</u>.  At all times during the Sale process, the Debtors shall retain full discretion and right, in consultation with Riverstone and any Committee, to determine which Bid or Bids constitutes the highest or otherwise best offer for the purchase of the Assets, and which Bid or Bids should be selected as the Successful Bid(s), if any, all subject to final approval by the Court pursuant Section 363(b) of the Bankruptcy Code. The Debtors, in consultation with Riverstone and any Committee, may adopt rules for the Auction that, in their judgment, will better promote the goals of the Auction and that are not otherwise inconsistent in any material respect with any of the other material provisions hereof or of any Court order.

4)  <u>Proceeds</u>.  Except with respect to Assumed Liabilities, all valid and properly perfected liens against the Assets shall attach to the net cash proceeds ultimately attributable to the Assets against which such liens are asserted with the same validity, enforceability, priority, and force and effect as they had against such assets or their proceeds as of the Petition Date (except to the extent such liens are assumed under the applicable asset purchase agreement).

01:23937916.1

5) <u>Reservation of Rights</u>.  The Debtors reserve the right, with the prior written consent of Riverstone, to modify these Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth herein with respect to any or all Bidders, imposing additional terms and conditions with respect to any or all Bidders, adjourning or cancelling the Auction at or prior to the Auction and/or adjourning the Sale Hearing.

### *Notice Procedures*

1) <u>Notice of Auction and Sale Hearing</u>.  After entry of the Sale Procedures Order, the Debtors will cause the Notice of Auction and Sale Hearing, substantially in the form attached as **Exhibit 2** to the Sale Procedures Order (the "<u>Sale Notice</u>"), to be served by first-class mail, postage prepaid, facsimile, electronic transmission, or overnight mail upon: (i) all entities contacted by Piper or reasonably believed by the Debtors to have expressed an interest in a Proposed Transaction with respect to the Assets during the past fifteen (15) months; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all of the Debtors' insurers; (iv) all non-Debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interests in the Assets; (vi) the parties that have filed proofs of claim in the Debtors' Cases as of the date of entry of the Sale Procedures Order; (vii) the parties who have filed written request for notice in the Debtors' Cases pursuant to Bankruptcy Rule 2002; (viii) the office of the U.S. Trustee; and (ix) all parties set forth in the Debtors' Master Service List maintained in the Chapter 11 Cases (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (viii) above). In addition, the Debtors will publish an abbreviated Sale Notice in The Wall Street Journal and The Houston Chronicle at least ten (10) days prior to the Auction. The Debtors will also post the Sale Notice and the Sale Procedures Order on the website of the Debtors' claims and noticing agent, at https://cases.primeclerk.com/fairwayenergy/.

2) <u>Assumption and Assignment Notice</u>.  Promptly after entry of the Sale Procedures Order, the Debtors will serve the completed Assumption and Assignment Notice in the form attached as **Exhibit 3** to the Sale Procedures Order (the "<u>Assumption and Assignment Notice</u>"), by first class mail, facsimile, electronic transmission, or overnight mail on (a) each counterparty to the Debtors' Contracts and Leases (a "<u>Contract Counterparty</u>") and (b) its attorney, if known, in each case, at the last known address available to the Debtor.  The Assumption and Assignment Notice shall set forth the following information:  (i) the Contract(s) and/or Lease(s) that may be assumed by the Debtors and assigned to the Successful Bidder(s) (collectively, the "<u>Assumed and Assigned Contracts</u>"); (ii) the name and address of the Contract Counterparty thereto; (iii) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "<u>Cure Amount</u>"); and (iv) the deadlines by which any such Contract Counterparty must file an objection

to the proposed assumption and assignment of any Assumed and Assigned Contract, provided, however, that the presence of any Contract or Lease on an Assumption and Assignment Notice does not constitute an admission that such Contract or Lease is an executory contract or unexpired lease.

### *Sale Hearing*

1) <u>Sale Hearing</u>.  As soon as reasonably practicable after closing the Auction, the Debtors shall cause the definitive purchase and sale agreement for the Successful Bid(s) to be filed with the Court.  The Debtors intend to present the Successful Bid(s) for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code at the Sale Hearing.  The Debtors shall be deemed to have accepted a Bid only when the Bid has been approved by order of the Court following the Sale Hearing.  Upon the failure to consummate a Sale after the Sale Hearing because of the occurrence of a breach or default by the proposed purchaser under the terms of the Successful Bid, the Backup Successful Bid shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Backup Successful Bid.

2) <u>Sale Implementation</u>.  Following the approval of the Successful Bid(s) at the Sale Hearing, the Debtors will be authorized to take any and all actions necessary and appropriate to complete and implement the Sale(s) contemplated by the Successful Bid(s).

3) <u>Objections to Auction and Successful Bidder</u>.  Objections to the conduct of the Auction or proceeding with the Sale to the Successful Bidder(s) or any Backup Successful Bidder(s) must be filed and served by **4:00 p.m. (Eastern Time) on March 11, 2019** and must otherwise comply with the General Objection Procedures.

### *Good Faith Deposits*

1) The Good Faith Deposit of the Successful Bidder(s) shall be applied to the purchase price of such Sale transaction at closing.  The Good Faith Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder(s) and the Backup Successful Bidder(s)) on or within three (3) business days after the Auction.  The Good Faith Deposits of the Backup Successful Bidder(s) shall be released by the Debtors three (3) business days after the closing of the Successful Bid.  Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

2) If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, which may

be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, and/or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Successful Bidder without the need for an additional hearing or order of the Court.

**C.    Motion for Approval of the Sale**

25.    The Debtors further request the Court schedule the Sale Hearing on March 13, 2019 or as soon thereafter as the Court's schedule permits.  At the Sale Hearing, the Debtors will seek an Order approving the Sale or Sales free and clear of (a) all liens, interests, charges, assessments, or encumbrances of any kind (collectively, "Liens") relating to, accruing, or arising any time prior to the closing date of the Sale, including, without limitation, any such liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination of, the Debtors' or the Purchaser's  interests in the Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (with such liens attaching to the net cash proceeds of the Sale or Sales ultimately attributable to the Assets against which such liens are asserted with the same validity, enforceability, priority, and force and effect as they had against such Assets or their proceeds as of the Petition Date), and (b) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in Section 101(5) of the Bankruptcy Code), liabilities (including any successor liabilities), obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise relating to, or accruing or arising any time prior to, the closing date of the Sale(s) (collectively in

01:23937916.1

this clause (b), the "Claims" and together with the Liens, the "Claims and Interests"), with the exception of any Assumed Liabilities and Permitted Encumbrances, as such terms are defined in the Form PA (as hereinafter defined), to the Successful Bidder(s), and authorizing the Debtors to assume and assign the Assumed and Assigned Contracts.

**D.      Form of Purchase and Sale Agreement**

26.      The Debtors will prepare two forms of Purchase Agreements for the sale of the Assets (collectively, the "Form PA"), a copy of which will be filed on or before the date of the hearing to consider approval of the Bidding Procedures (the "Sale Procedures Hearing") and which shall thereafter be provided to prospective purchasers, pursuant to which a prospective purchaser would acquire the equity interests in FEP LLC or the other Assets.  The Debtors believe that distributing the Form PA to interested parties provides the best available platform for conducting the Sale process.  However, as set forth in the Bidding Procedures, if a Bid requires, as a condition to such Bid, any alterations to the Form PA, such Bid must include a mark-up of the Form PA to reflect such requested alterations in order to be a Qualified Bid (in addition to the other requirements set forth in the Bidding Procedures).

**E.      The Sale Notice**

27.      Within three (3) business days after entry of the Sale Procedures Order, the Debtors will provide notice, substantially in the form of the Sale Notice attached as **Exhibit 2** to the Sale Procedures Order, of the entry of the Sale Procedures Order, approval of the Bidding Procedures, the time and place of the Auction, the Sale Hearing, and the General Objection Deadline and the Supplemental Objection Deadline (each as hereinafter defined).  The Debtors will cause the Sale Notice to be served by first-class mail, postage prepaid, facsimile, electronic transmission, or overnight mail upon: (a) all entities contacted by Piper or reasonably believed by the Debtors to have expressed an interest in a Proposed Transaction with respect to the Assets

during the past fifteen (15) months, including all Qualified Bidders; (b) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (c) all of the Debtors' insurers; (d) all non-debtor parties to relevant contracts or leases (executory or otherwise); (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interests in the Assets; (f) the parties that have filed proofs of claim in the Debtors' Cases; (g) the parties that have filed a written request for notice in the Debtors' Cases pursuant to Bankruptcy Rule 2002; (h) the office of the United States Trustee; and (i) all parties set forth in the Debtors' Master Service List maintained in the Chapter 11 Cases (to the extent any party to receive notice thereby has not received notice pursuant to sections (a) through (h) above).  In addition, the Debtors will publish an abbreviated Sale Notice in The Wall Street Journal and The Houston Chronicle at least ten (10) days prior to the Auction. The Debtors will also post the Sale Notice and the Sale Procedures Order on the website of the Debtors' claims and noticing agent, at https://cases.primeclerk.com/fairwayenergy/.

28.     The Debtors assert that service and publication of the Sale Notice as proposed herein is sufficient notice of the entry of the Sale Procedures Order, the Bidding Procedures, the time and place of the Auction, the Sale Hearing, and the Proposed Transaction, including, without limitation, the Sale, and the procedure for objecting thereto (including the Objection Deadline), and no other or further notice is necessary or required.

29.     The Debtors further note that, as soon as practicable after the conclusion of the Auction (if applicable), the Debtors shall file a notice identifying the Successful Bidder(s) and Backup Successful Bidder(s).

**F.      Notice Relating to Potential Assumption and Assignment of Executory Contracts and Unexpired Leases**

30.      As part of the Sale, the Debtors seek authority to assume and assign the Assumed and Assigned Contracts to the Successful Bidder(s).   The Debtors propose to serve the Assumption and Assignment Notice as soon as practicable after the entry of the Sale Procedures Order and request that the Court approve the following notice procedures (the "Assumption and Assignment Procedures"):

a.   As promptly as possible after the entry of the Sale Procedures Order, the Debtors will file with the Court and serve on each party to a potential Assumed and Assigned Contract a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "Cure Notice").  The Cure Notice shall (i) state the Cure Amount, and (ii) notify each party that such party's lease or contract may be assumed and assigned to the Successful Bidder(s) to be identified at the conclusion of the Auction.

b.   Any objection to the Debtors' assumption and assignment of any potential Assumed and Assigned Contracts (each, an "Assignment Objection"), must:  (i) be made in writing and filed with the Court on or before the General Objection Deadline; (ii) state with specificity the basis of such objection; (iii) comply with the Bankruptcy Code, Bankruptcy Rules and the Local Rules; and (iv) be served on the Notice Parties.   If no Assignment Objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assumed and Assigned Contract or other document as of the date of the Cure Notice; the non-debtors party to the Assumed and Assigned Contract shall be deemed to have stipulated that the Cure Amount set forth in the Cure Notice is correct; the non-debtors party shall be forever barred, estopped and enjoined from asserting or claiming against the Debtors that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Contract or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Contract, including any argument that there exist conditions to assumption and assignment that must be satisfied under such Assumed and Assigned Contract or that any required consent to assignment has not been given; and the non-debtors party to such Assumed and Assigned Contract shall be forever barred from objecting to the adequacy of the Successful Bidder's assurance of future performance and that there exists any other basis on which to object to such assumption and assignment.

31.     While the Debtors have made a good faith effort to identify all Contracts and Leases to be assumed and assigned in connection with the Sale, they may discover additional Contracts and/or Leases that the Debtors and the Purchaser desire to assume and assign in connection therewith.  Accordingly, if at any time after the entry of the Sale Procedures Order, the Debtors identify additional prepetition executory Contracts and/or Leases to potentially be assumed and assigned to the Purchaser as Assumed and Assigned Contracts (whether before or after closing of any Sale(s)), the Debtors shall serve a supplemental Assumption and Assignment Notice by first class mail, facsimile, electronic transmission, or overnight mail on the Contract Counterparty (and its attorney, if known) to each supplemental Assumed and Assigned Contract at the last known address available to the Debtors by no later than ten (10) days before the proposed effective date of the assignment. Each supplemental Assumption and Assignment Notice shall set forth the following information:  (a) the name and address of the Contract Counterparty; (b) notice of the proposed effective date of the assignment (subject to the right of the Debtors and the Purchaser to withdraw such request for assumption and assignment of the Assumed and Assigned Contract prior to the Closing (as defined below)); (c) identification of the Assumed and Assigned Contract; and (d) the Cure Amount, if any.

32.     Unless the Contract Counterparty or any other entity properly files an objection to the supplemental Assumption and Assignment Notice in accordance with the General Objection Procedures (as defined below) within ten (10) days of the date of the supplemental Assumption and Assignment Notice, the Debtors may assume and assign the Assumed and Assigned Contract, subject to the occurrence of the closing of the Sale(s) (the "Closing"), without further order or hearing. If an objection is filed and served in accordance with the General Objection Procedures within ten (10) days of the date of the supplemental Assumption and Assignment

Notice, and the objection cannot be resolved consensually, then the Debtors will request that the Court schedule a hearing to consider the objection.

**G.    Objections**

33.    All objections to the Sale, the assumption and assignment of the Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief granted by this Court in the Sale Procedures Order, including that any property or right (including an Assumed and Assigned Contract) cannot be transferred, sold, assumed, and/or assigned free and clear of all liens, encumbrances, claims and other interests, must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules of the Court; (d) filed with the Court, by no later than **4:00 p.m. (Eastern Time) on February 12, 2019** (the "<u>General Objection Deadline</u>"); and (e) served in accordance with the Local Rules so as to be received on or before the General Objection Deadline by the following: (i) the Debtors, Fairway Energy, LP, Attn.: Robert Flavin, 3 Riverway, Suite 1550, Houston, TX 77056, Email: robert.flavin@fairway midstream.com; (ii) Piper Jaffray & Co., Attn.: Spencer Rippstein and Richard Shinder, 345 Park Avenue, Suite 1200, New York, NY 10154, E-mail: spencer.w.rippstein@pjc.com and richard.j.shinder@pjc.com; (iii) counsel for the Debtors, Haynes and Boone, LLP, Attn.: Patrick L. Hughes, 1221 McKinney, Suite 2100, Houston, TX, 77010, Email: patrick.hughes@ haynesboone.com and Young Conaway Stargatt & Taylor, LLP, Attn.: Edmon Morton, 1000 North King Street, Wilmington, DE 19801, Email: EMorton@ycst.com; and (iv) counsel to Riverstone, White & Case LLP, Attn.: David Turetsky and Andrew Zatz, 1221 Avenue of the Americas, New York, NY 10020, Email: david.turetsky@whitecase.com and azatz@whitecase.com; and (v) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35,

Wilmington, DE 19801 (these procedures are collectively referred to as the "General Objection Procedures"). Each objection shall state the legal and factual basis of such objection.

34.     Further, objections to the conduct of the Auction or proceeding with the Sale to the Successful Bidder(s) or any Backup Successful Bidder(s) must be filed and served by **4:00 p.m. (Eastern Time) on March 11, 2019** (the "Supplemental Objection Deadline") and must otherwise comply with the General Objection Procedures.

**H.     Sale Free and Clear of Interests; Good Faith Sale**

35.     The Debtors have determined in their sound business judgment that the Proposed Transaction is in the best interest of their estates and creditors.  Therefore, the Debtors hereby request that this Court approve the Sale or Sales of the Debtors' Assets to the Successful Bidder(s) (or Backup Successful Bidder(s), as the case may be) free and clear of all Claims and Interests.  For purposes of full disclosure, in the Sale Order, the Debtors will seek to sell their Assets free and clear of all liens, interests, claims and encumbrances to the fullest extent possible pursuant to Section 363(f) of the Bankruptcy Code, including, without limitation, successor liability or similar theories (except for those assumed liabilities and obligations expressly assumed pursuant to the applicable purchase and sale agreement), and the Successful Bidder will be protected from liability for and cannot be pursued for any claims owed by the Debtors.  The proceeds from the Sale shall remain subject to the Claims and Interests.  In addition, the Sale Order will contain findings that the Sale is not a fraudulent conveyance.  It is expected that the applicable purchase and sale agreement will contain these, and other standard provisions, as conditions to the closing of the Sale.

36.     The Debtors submit that any Successful Bidder will have participated in a good faith manner in the Auction in accordance with the Bidding Procedures, which require that, among other things, the Auction be recorded by an authorized court reporter, the Auction

participants must represent that they have not engaged in any collusion, and that bidding at the Auction be conducted openly.  Therefore, the Debtors will present evidence at the Sale Hearing in support of their request that this Court find that the Successful Bidder is a good faith purchaser entitled to the full protection afforded by Section 363(m) of the Bankruptcy Code.

## BASIS FOR RELIEF

### A.    The Bidding Procedures are Reasonable, Appropriate Under the Circumstances, and Will Maximize Value

37.    Under Section 363 of the Bankruptcy Code, a debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. *See, e.g.*, *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co., Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

38.    The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the Bidding Procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Assets and should, therefore, be approved by this Court.

39.    Given the significant prepetition marketing process undertaken by the Debtors for more than a year, the Debtors' current liquidity constraints and their significant debt obligations, the Debtors believe that a prompt sale process is the best way to maximize the value of the

Assets for the benefit of the Debtors' estates, creditors, and other stakeholders (including, to the extent possible, the Debtors' equity holders).  The Debtors, with the assistance of Piper, will conduct a robust marketing process for the Assets that will supplement the Debtors' already extensive prepetition marketing process, and believe they are well positioned to conduct an auction of the Assets on the timetable set forth herein.  The Debtors submit that the Bidding Procedures and Auction should promote active bidding from interested parties, which will increase the likelihood that the Debtors will receive the best possible consideration for the Assets.  Additionally, the Bidding Procedures will allow the Debtors to conduct an Auction in a fair and open fashion that will encourage participation by financially capable bidders that have the ability to close the Sale transaction.  The process is designed to maximize the value of the Debtors' estates for the benefit of all stakeholders.

40.     Accordingly, in the exercise of their reasonable business judgment, the Debtors have concluded that: (a) a prompt sale of the Assets is the best way to maximize value for their estates, and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Assets and maximizing value.

**B.     The Sale is an Exercise of the Debtors' Sound Business Judgment**

41.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

42.     Courts have permitted a proposed sale of all or substantially all assets of a debtor outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d

01:23937916.1

143, 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) (passim); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value."); *In re Stroud Ford, Inc.*, 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a Section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

43.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good faith. *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.*, 82 B.R. at 335–36; *see also Stephens Indus.*, 789 F.2d at 390; *In re Lionel Corp.*, 722 F.2d at 1071.

44.    The Bidding Procedures meet the "sound business reason" test.  First, sound business purposes justify the Sale.  The Debtors believe that a prompt sale of the Assets by Auction presents the best opportunity to realize the maximum value of the Assets for distribution to creditors (and, if appropriate, equity holders).  The Debtors have been sustaining significant losses, have limited liquidity and lack financing beyond the DIP Facility.    Delays in implementing a Sale in circumstances such as these may exhaust the financing resources they have been able to procure.  The Debtors further believe that their estates and creditors will be adversely affected absent the immediate commencement of a sale process. Finally, the Debtors continue to incur costs that, if a sale is not consummated promptly, will erode the proceeds that can be realized for creditors (and, if appropriate, equity holders) from a sale of the Assets, including such costs as maintenance, utility charges, and overhead expenses. *See In re Lionel Corp*., 722 F.2d at 1071 (of factors for court to evaluate on motion under Section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

45.    The proposed notice of the Bidding Procedures, Auction, Sale, Sale Hearing, and related deadlines also meets the other factors of the "sound business reason" test and are reasonably calculated to provide timely and adequate notice to creditors and parties in interest. As part of this Motion, the Debtors have sought to establish procedures for notice to creditors, other prospective bidders, and other parties in interest.  Under the circumstances of these Chapter 11 Cases, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, including Bankruptcy Rule 2002, and provide sufficient time for parties in interest to submit objections to the proposed Sale and for Bidders to formulate and submit competing proposals.

46.     Finally, the Debtors submit that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the Sale(s) of the Assets between the Debtors and highest and best Bidder(s) at the conclusion of the Auction.

47.     As set forth above, the Debtors have determined, in the exercise of their sound business judgment, that the Sale to the highest and best Bidder(s) is appropriate and in the best interests of their estates and creditors.  The Sale will afford the Debtors' estates an opportunity to maximize the recoveries of creditors and, to the extent possible, holders of equity interests.  The Debtors therefore request that the Court approve the Bidding Procedures and approve the Sale(s) presented to the Court at the Sale Hearing.

**C.     Request to Grant Successful Bidder Protections of Section 363(m) of the Bankruptcy Code**

48.     As will be set forth in further detail at the Sale Hearing, the Debtors also maintain that the Successful Bidder should be entitled to the protections afforded by Bankruptcy Code § 363(m).  Specifically, Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

49.     While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*,

788 F.2d at 147 (citations omitted); *see generally Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.)*, No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that a party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

50.     As the Debtors will demonstrate at the Sale Hearing, the Successful Bidder(s) shall have negotiated and dealt with the Debtors at arm's length and without collusion.  Under these circumstances, the Debtors respectfully submit the Sale Order should include findings that the Successful Bidder is entitled to all of the protections of Section 363(m) of the Bankruptcy Code.

**D.     The Purchase and Sale Agreement is not the Result of Collusive Bidding Under Section 363(n) of the Bankruptcy Code**

51.     As set forth above, the Debtors will select the Successful Bidder at arm's length and in good faith.  Moreover, the Debtors do not believe that any such sale will be the result of collusion or other bad faith between Bidders or that the sale price under a definitive purchase and sale agreement of a Successful Bidder will be controlled by an agreement between potential or actual Bidders within the meaning of Bankruptcy Code Section 363(n).

52.     As the Debtors will demonstrate at the Sale Hearing, a definitive purchase and sale agreement with a Successful Bidder will be negotiated, proposed, and entered into by the Debtors and the Successful Bidder without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor a Successful Bidder will have engaged in any

conduct that would cause or permit a definitive purchase and sale agreement of a Successful

Bidder to be avoided under Bankruptcy Code Section 363(n).

**E.        Request to Approve Sale Free and Clear Pursuant to 11 U.S.C. § 363(f)**

53.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtors seek authority to

sell and transfer the Assets free and clear of all Claims and Interests, with such Claims and

Interests to attach to the proceeds of the Sale, subject to any rights and defenses of the Debtors

and other parties in interest with respect thereto.    Section 363(f) of the Bankruptcy Code

provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>> (1) applicable nonbankruptcy law permits sale of such
>> property free and clear of such interest;
>> (2) such entity consents;
>> (3) such interest is a lien and the price at which such
>> property is to be sold is greater than the aggregate value of
>> all liens on such property;
>> (4) such interest is in bona fide dispute; or
>> (5) such entity could be compelled, in a legal or equitable
>> proceeding, to accept a money satisfaction of such interest

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that because

Section 363(f) is written in the disjunctive, a court may approve a sale "free and clear" if at least

one of the requirements is met).    In evaluating such a sale, a court must balance the need for

flexibility with the concern of affected creditors.  *In re Terrace Gardens Park P'ship*, 96 B.R.

707, 715 (Bankr. W.D. Tex. 1989).  The Court must also determine that creditors' lien rights are

adequately protected and that the offered price is the highest price and/or best terms obtainable

under the circumstances in the particular case.  *Id.*; *In re Beker Indus. Corp.*, 63 B.R. 474, 477–

78 (Bankr. S.D.N.Y. 1986).

54.     The Debtors maintain that one of the five subsections of Section 363(f) will be satisfied and, therefore, the Debtors may sell the Assets free and clear of all liens, claims, and encumbrances.  Specifically, the Debtors submit that (a) any such lien, claim, or encumbrance will be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto, and/or (b) the Debtors will obtain the consent to the Sale of the party holding the lien, claim, or encumbrance.

55.     The Debtors submit that a sale free and clear of all Claims and Interest is necessary to maximize the value of the Assets.  A sale subject to Claims and Interests would result in a lower purchase price and be of substantially less benefit to the Debtors' estates.  A sale free and clear of Liens is particularly appropriate under the circumstances because any Lien in, to, or against the Assets that exists immediately prior to the closing of any sale will attach to the net sale proceeds attributable to such Assets with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party-in-interest. The Debtors submit that holders of Liens will be adequately protected by the availability of the net cash proceeds of the Sale to satisfy their Liens.  Thus, the proposed Sale satisfies Section 363(f) of the Bankruptcy Code.  Moreover, any holder of a Claim or Interest that receives notice of the Sale and which fails to object, should be deemed to consent to the Sale thereby complying with Section 363(f)(2) of the Bankruptcy Code.

56.     Accordingly, the Debtors request that the Assets be sold to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching to the proceeds of the Sale.

**F.     Notice of the Proposed Sale is Reasonable Under the Circumstances**

57.     In order to receive the highest and best price in return for the Assets under the circumstances, the Debtors have filed this Motion seeking to conduct the Auction and hold the

Sale Hearing on or before March 13, 2019, within the DIP Order milestone of 120 days from the Petition Date.  The Debtors will continue to incur costs associated with preserving the value of the Assets until consummation of the Sale.  In order to yield the greatest possible return for the benefit of creditors and to minimize potential administrative expenses, the Debtors believe that the proposed timing of the Auction and Sale process is not only reasonable but is warranted and necessary in light of the nature of the Debtors' business and financial condition.  Moreover, the Sale process requested herein is intended to be a supplement to the comprehensive marketing process that the Debtors and their advisors have been engaged in for over a year prepetition.  Further, the Debtors submit that more than 95 days (a) will provide the Debtors with ample time to ensure an extensive and robust marketing process and (b) is well within the range of sale hearing milestones approved by the Court. *See, e.g.*, *In re Activecare, Inc.*, Case No. 18-11659 (LSS) (Bankr. D. Del. Aug. 17, 2018) (bid procedures order providing for a sale hearing date approximately 74 days following the petition date); *In re The Rockport Company, LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. Jun. 5, 2018) (approximately 63 days); *In re GST Autoleather, Inc.*, Case No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017) (approximately 106 days).

58.     Accordingly, the Debtors submit that the notice to be provided is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Assets and/or to object to the proposed Sale.

**G.     Authorization of Assumption and Assignment of Executory Contracts and Unexpired Leases**

59.     Under Bankruptcy Code Section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code Section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor.  This subsection provides:

(b)(1) If there has been a default in an executory contract or unexpired lease of the Debtors, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtors to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the debtors only if –

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease

11 U.S.C. § 365(f)(2).

60.    Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

61.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property

01:23937916.1

35

assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 60506 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

62.     To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment as set forth in this Motion.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial capability of the Purchaser and the Purchaser's willingness and ability to perform under the Assumed and Assigned Contracts. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under Section 365(b)(1)(C) of the Bankruptcy Code.

63.     In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption, assignment, and sale of Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest.  The Assumed and Assigned Contracts are an integral part of the Assets being marketed for sale, and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates. Further, as set forth above, the Debtors will give notice to all parties to the Assumed and Assigned Contracts of their intention to assume the Assumed and Assigned Contracts and what

the Debtors believe are the Cure Amounts.  Accordingly, the Court should authorize the Debtors

to assume and assign the Assumed and Assigned Contracts to the Successful Bidder(s).

<u>**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**</u>

64.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are

automatically stayed for fourteen (14) days after entry of such order. Similarly, under

Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the

assignment of contracts or unexpired leases are automatically stayed for fourteen (14) days after

entry of such order. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide

sufficient time for an objecting party to request a stay pending appeal before the order can be

implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee

Notes to Fed. R. Bankr. P. 6006(d).

65.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day

stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale

or other transaction to close immediately where there has been no objection to the procedure.

*See generally* 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection

is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay

may be reduced to the amount of time necessary to file such appeal. *Id.*

66.    Here, an expeditious closing of the Sale is necessary and appropriate to maximize

value for the estates.  Accordingly, good cause exists for the Court to waive the fourteen-day stay

period under Bankruptcy Rules 6004(h) and 6006(d).

01:23937916.1

## NOTICE

67.      Notice of this Motion has been provided to:  (a) the Office of the U.S. Trustee for this District; (b) those parties listed as holding the twenty (20) largest unsecured claims against the Debtors' estates on a consolidated basis; (c) Riverstone and its counsel; (d) any other secured parties of record or parties that, to the Debtors' knowledge, may assert a security interest in property of the Debtors' estates; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for the District of Delaware; and (g) any party that has requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  Due to the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court (i) enter the Sale Procedures Order: (a) authorizing and approving the Bidding Procedures; (b) approving the form and manner of the Sale Notice; (c) scheduling the Auction and Sale Hearing; (d) approving the Assumption and Assignment Procedures and the Assumption and Assignment Notice; and (e) granting such other and further relief as it deems just and proper, and (ii) at the conclusion of the Sale Hearing, enter the Sale Order: (a) approving the Sale(s) free and clear of all liens, encumbrances, claims and other interests pursuant to a Qualified PA; (b) authorizing the assumption and assignment of any Assumed and Assigned Contracts; and (c) granting such other and further relief as it deems just and proper.

Dated:  Wilmington, Delaware  
         December 6, 2018

HAYNES AND BOONE, LLP  
Patrick L. Hughes (*admitted pro hac vice*)  
Kelli S. Norfleet (*pro hac vice* admission pending)  
Martha Wyrick (*admitted pro hac vice*)  
1221 McKinney Street, Suite 2100  
Houston, Texas 77010  
Telephone: (713) 547-2000  
Facsimile: (713) 547-2600

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Elizabeth S. Justison*
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

PROPOSED ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION

01:23937916.1