## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| **FAIRWAY ENERGY, LP, *et al.*,**[1] | § | **Case No. 18-12684 (LSS)** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |
| | § | |

---

## DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF THE FIRST AMENDED JOINT PLAN OF LIQUIDATION OF THE DEBTORS AND DEBTORS-IN-POSSESSION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**HAYNES AND BOONE, LLP**
**1221 McKinney Street, Ste. 2100**
**Houston, Texas 77010**
**Telephone: (713) 547-2000**
**Facsimile: (713) 547-2600**

**-AND-**

**YOUNG CONAWAY**
**STARGATT & TAYLOR, LLP**
**1000 North King Street**
**Wilmington, Delaware 19801**
**Telephone:  (302) 571-6600**
**Facsimile:  (302) 571-1253**
  **ATTORNEYS FOR DEBTORS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, include: Fairway Energy, LP (4200); Fairway Energy Partners, LLC (7914); and Fairway Energy GP, LLC (7808).  The location of the Debtors' service address is 1000 Louisiana, Suite 1400, Houston TX 77002.

**TABLE OF CONTENTS**

**Page**

**ARTICLE I. INTRODUCTION**................................................................................1

    **A.**  **Filing of the Debtors' Bankruptcy Cases**.........................................1

    **B.**  **Purpose of the Disclosure Statement**..............................................2

    **C.**  **Overview of the Plan** ........................................................................2

    **D.**  **Votes Required for Acceptance; Confirmation** ...............................3

    **E.**  **Hearing on Confirmation of the Plan** .............................................3

    **F.**  **Recommendation** ..............................................................................3

    **G.**  **Disclaimers** .......................................................................................4

**ARTICLE II. EXPLANATION OF CHAPTER 11**.................................................6

    **A.**  **Overview of Chapter 11** ..................................................................6

    **B.**  **Chapter 11 Plan** ...............................................................................6

    **C.**  **The Disclosure Statement**................................................................7

**ARTICLE III. BACKGROUND OF THE DEBTORS** ...........................................8

    **A.**  **Overview of the Debtors' Businesses** .............................................8

    **B.**  **Fairway's Underground Storage Facility** ......................................9

    **C.**  **The Bankruptcy Filing** ...................................................................9

**ARTICLE IV. DEBTORS' ASSETS AND LIABILITIES** ...................................10

    **A.**  **Assets** ...............................................................................................10

    **B.**  **Liabilities** ........................................................................................12

    **C.**  **Equity Interests in Fairway LP** ....................................................13

**ARTICLE V. LEGAL PROCEEDINGS** ..............................................................13

    **A.**  **Prepetition Filed Litigation Proceedings** ....................................13

    **B.**  **No Other Affirmative Claims and Causes of Action Belonging to the Estates** ..................................................................14

**ARTICLE VI. POST-BANKRUPTCY CASE ADMINISTRATION**....................15

    **A.**  **First and Second Day Motions**......................................................15

    **B.**  **Schedules of Assets and Liabilities** ...............................................15

    **C.**  **Meeting of Creditors**......................................................................16

    **D.**  **Bar Date for Filing Proofs of Claim**.............................................16

| | | |
|---|---|---|
| E. | Official Committees | 16 |
| F. | The DIP Facility and Use of Cash Collateral | 16 |
| G. | The Post-Petition Sale Process, The Sale of the Debtors' Businesses and Assets and Creditor Recovery | 17 |
| H. | Rejection of Executory Contracts | 18 |
| I. | Exclusivity Extension | 18 |

**ARTICLE VII. DESCRIPTION OF THE PLAN** ..................................................... 18

| | | |
|---|---|---|
| A. | Introduction | 18 |
| B. | Classification and Treatment of Claims and Interests Generally | 18 |
| C. | Unclassified Claims | 19 |
| D. | Classification and Treatment of Claims and Interests Under the Plan | 21 |
| E. | Continuing Existence; Vesting of Assets | 25 |

**ARTICLE VIII. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN** ......................................................................................................... 26

| | | |
|---|---|---|
| A. | The Plan Administrator. | 26 |
| B. | Exculpation of Plan Administrator. | 28 |
| C. | Source of Funding. | 28 |
| D. | Payment of Plan Expenses. | 28 |
| E. | Plan Administrator Indemnification | 28 |
| F. | Resignation, Replacement, or Termination of Plan Administrator | 29 |
| G. | Effectiveness of Securities, Instruments, and Agreements. | 29 |
| H. | Approval of Agreements. | 29 |
| I. | Further Transactions. | 29 |
| J. | Ultimate Dissolution of the Debtors; Entry of Final Decree. | 29 |
| K. | No Retention of Rights to Pursue Causes of Action. | 30 |
| L. | Assumption and Rejection of Executory Contracts Under the Plan | 30 |
| M. | Post-Effective Date Governance | 31 |
| N. | Conditions Precedent to Occurrence of the Effective Date of the Plan. | 31 |
| O. | Effect of Confirmation of the Plan. | 32 |
| P. | Distributions Under the Plan. | 35 |

| | | |
|---|---|---|
| Q. | Other Provisions of the Plan. | 36 |
| R. | Retention of Jurisdiction | 37 |
| S. | Defects, Omissions and Amendment of the Plan | 38 |
| **ARTICLE IX. RISK FACTORS** | | 39 |
| A. | Risks Related to Projections and Estimates. | 39 |
| B. | Objection to Classifications. | 39 |
| C. | Risk of Non-Confirmation of the Plan. | 40 |
| D. | Nonoccurrence of Effective Date of the Plan. | 40 |
| **ARTICLE X. CONFIRMATION OF THE PLAN** | | 40 |
| A. | Confirmation Procedure. | 40 |
| B. | Procedure for Objections. | 40 |
| C. | Voting Procedures and Requirements. | 41 |
| D. | Solicitation Materials | 41 |
| E. | Acceptance. | 42 |
| F. | Confirmation of the Plan. | 42 |
| G. | Non-Acceptance and Cram down. | 44 |
| **ARTICLE XI. ALTERNATIVES TO THE PLAN** | | 45 |
| A. | Chapter 7 Liquidation | 45 |
| B. | Dismissal | 47 |
| C. | Exclusivity and Alternative Plan Potential. | 47 |
| **ARTICLE XII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.** | | 47 |
| **ARTICLE XIII. CONCLUSION.** | | 48 |

# ARTICLE I.
## INTRODUCTION

Fairway Energy, LP ("Fairway LP"), Fairway Energy Partners, LLC ("FEP LLC"), and Fairway Energy GP, LLC ("Fairway GP") (*i.e.*, each, a "Debtor" and together, the "Debtors" or "Fairway")[2] submit this Disclosure Statement for use in the solicitation of votes on the Debtors' chapter 11 plan, annexed as <u>Exhibit 1</u> to this Disclosure Statement (the "Plan").

This Disclosure Statement sets forth certain relevant information regarding the Debtors' prepetition operations and financial history, the need to seek chapter 11 protection, significant events that have occurred during these chapter 11 cases (the "Bankruptcy Cases"), including the Sale of the Assets to the Purchaser (defined below) and the resultant analysis of the expected return to the Debtors' Creditors. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims must follow for their votes to be counted.

All descriptions of the Plan set forth in this Disclosure Statement are for summary purposes only. To the extent of any inconsistency between this Disclosure Statement and the Plan, the Plan shall control in all respects. You are encouraged to review the Plan in full.

YOU ARE BEING SENT THIS DISCLOSURE STATEMENT BECAUSE YOU ARE A CREDITOR OR OTHER PARTY IN INTEREST OF THE DEBTORS. THIS DOCUMENT DESCRIBES A CHAPTER 11 PLAN WHICH, WHEN CONFIRMED BY THE BANKRUPTCY COURT, WILL GOVERN HOW YOUR CLAIM OR INTEREST WILL BE TREATED. THE DEBTORS URGE YOU TO REVIEW THE DISCLOSURE STATEMENT AND THE PLAN CAREFULLY. THE DEBTORS BELIEVE THAT ALL CREDITORS SHOULD VOTE IN FAVOR OF THE PLAN.

## A.    Filing of the Debtors' Bankruptcy Cases

On November 26, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors filed the Bankruptcy Cases to preserve the value of their Assets, to implement a market-oriented sale process, and to restructure their financial affairs. To such end, the Debtors managed their properties and, until the Sale closed, were operating and managing their businesses as debtors in possession in accordance with Bankruptcy Code Sections 1107 and 1108. No trustee or examiner has been appointed in the Bankruptcy Cases.

---

[2]Except as otherwise provided in this Disclosure Statement, capitalized terms herein have the meaning ascribed to them in the Plan. Any capitalized term used herein that is not defined in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

**B.      Purpose of the Disclosure Statement**

Bankruptcy Code Section 1125 requires the Debtors to prepare and obtain court approval of a Disclosure Statement as a prerequisite to soliciting votes on the Plan.  The purpose of the Disclosure Statement is to provide information to those Creditors entitled to vote on the Plan that will assist them in deciding how to vote on the Plan.

Approval of this Disclosure Statement does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereunder.  The Bankruptcy Court's approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement contains adequate information to permit you to make an informed judgment regarding acceptance or rejection of the Plan.  This Disclosure Statement has not yet been approved by the Bankruptcy Court.

**C.      Overview of the Plan**

Substantially all of the Debtors' Assets were sold pursuant to Sections 363 and 365 of the Bankruptcy Code by order of the Bankruptcy Court.  Pursuant to the terms of that sale, the purchaser funded the Wind Down Amount for distributions under the Plan.  The Plan is a plan of liquidation, that, among other things, provides for (a) payment in full of Prepetition Secured Tax Claims, Allowed Administrative Expense Claims, Allowed Priority Claims, and associated Plan Expenses, (b) a projected distribution to Holders of Unsecured Claims against the Debtors, and (c) the appointment of a Plan Administrator to distribute all net proceeds provided by the Plan to Holders of Allowed Claims and to wind up the Debtors' business and organizational affairs.  The Plan includes the exchange of releases.  The Debtors believe that the Plan accomplishes this objective and is in the best interests of the Estates.

The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making Distributions to Creditors.  Unless set forth in the Plan, this grouping shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets.  The Plan is not premised upon and shall not cause the substantive consolidation of the Debtors or any non-Debtor affiliate, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

Under the Plan, all known or projected Allowed Administrative Expense Claims and Allowed Priority Claims against the Debtors will be paid in full on or as soon as practicable after the Effective Date out of the Wind Down Amount.  It is anticipated that, upon resolution of the foregoing Claims, a distribution to Allowed Unsecured Claims will occur.

The Debtors by the Plan seek to fully wind up their business and legal existence.  Other than the funding provided by the DIP Lender and the Purchaser, it is not anticipated that there will be other Assets to administer.

From and after the Effective Date, the Plan Administrator will act for the Liquidating Debtors in the same fiduciary capacity as applicable to the Debtors' board of directors in implementing any further liquidation and wind-down as contemplated under the Plan, subject to

the provisions thereof.  The initial Plan Administrator will be Gary Barton, a managing director of Alvarez & Marsal North America, LLC.

ARTICLE VII of this Disclosure Statement provides a detailed description of the Plan.

**D.      Votes Required for Acceptance; Confirmation**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number of the claims of that class that actually cast ballots.  The vote of a creditor may be disregarded if the Bankruptcy Court determines, after notice and hearing, that the acceptance or rejection was not solicited or procured in good faith.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that (i) with respect to each impaired class of claims or interests, a plan be accepted by each holder of a claim or interest of such class, or (ii) that the Bankruptcy Court finds that the plan provides the holder of such claim or interest with at least as much value on account of its claim or interest as it would receive in a liquidation under chapter 7 of the Bankruptcy Code.

Confirmation will make the Plan binding upon the Liquidating Debtors, Holders of Claims against and Interests in the Debtors, and all other parties in interest regardless of whether they have accepted the Plan, and such Holders of Claims and Interests will be prohibited from receiving payment from, or seeking recourse against, any Assets that are distributed to other Holders of Claims or Interests under the confirmed Plan.  In addition, Confirmation will serve to enjoin Holders of Claims or Interests from taking a wide variety of actions on account of any debt, Claim, liability, Interest or right that arose prior to the Confirmation Date.

Confirmation of the Plan will enjoin Holders of Claims and Interests from seeking to enforce Claims against and Interests in the Debtors, whether or not a proof of Claim based on such debt is Filed or deemed Filed, whether or not such Claim is Allowed, and whether or not the Holder of such Claim accepted the Plan.

**E.      Hearing on Confirmation of the Plan**

The Bankruptcy Court has set July 17, 2019 at 11:00 a.m.   (Eastern Time) (the "Confirmation Hearing"), as the time and date for the hearing to determine whether the Plan has been accepted by the requisite number of Holders of Claims, and whether the other standards for confirmation of the Plan have been satisfied.  Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice.   The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for filing objections to confirmation of the Plan.

**F.      Recommendation**

THE DEBTORS URGE ALL CREDITORS TO VOTE TO ACCEPT THE PLAN.

The Debtors believe that, with respect to each Impaired Class of Claims, the Distributions under the Plan are greater than the amounts that would be received if the Debtors were to

liquidate under chapter 7 of the Bankruptcy Code and acceptance of the Plan is in the best interest of Holders of Claims.

In arriving at their conclusions, the Debtors considered (i) the limited alternatives available to the Debtors to provide value to Creditors; (ii) satisfying Administrative Expense Claims; (iii) properly winding up the Debtors' affairs; (iv) the Debtors' *de minimus* liquidation value absent the Plan; and (v) the rights, in both payment and security position, of the Debtors' Creditors.

### G.    Disclaimers

THE DEBTORS HAVE SOUGHT APPROVAL OF THIS DISCLOSURE STATEMENT ON AN INTERIM BASIS FOR PURPOSES OF SOLICITING VOTES ON THE PLAN. THE DEBTORS WILL BE SEEKING APPROVAL OF THIS DISCLOSURE STATEMENT ON A FINAL BASIS AT THE SAME HEARING AT WHICH THE DEBTORS WILL SEEK ENTRY OF AN ORDER OF THE BANKRUPTCY COURT CONFIRMING THE PLAN.    THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

THIS DISCLOSURE STATEMENT IS PROVIDED FOR USE SOLELY BY HOLDERS OF CLAIMS AND THEIR ADVISERS IN CONNECTION WITH THEIR DETERMINATION TO ACCEPT OR REJECT THE PLAN.THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR ON YOUR DECISION REGARDING ACCEPTING THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.

FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE REPRESENTATION OF THE DEBTORS ONLY AND NOT OF THEIR ATTORNEYS, ACCOUNTANTS OR OTHER PROFESSIONALS.    FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECTED TO AN AUDIT BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT.  THE DEBTORS ARE NOT ABLE TO CONFIRM THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT INCLUDE ANY INACCURACIES.  HOWEVER, THE DEBTORS HAVE MADE THEIR BEST EFFORT TO PROVIDE ACCURATE INFORMATION AND ARE NOT AWARE OF ANY INACCURACY IN THIS DISCLOSURE STATEMENT.

THE ONLY REPRESENTATIONS THAT ARE AUTHORIZED BY THE DEBTORS CONCERNING THE DEBTORS, THE VALUE OF THEIR ASSETS, THE EXTENT OF THEIR LIABILITIES, OR ANY OTHER FACTS MATERIAL TO THE PLAN ARE THE REPRESENTATIONS MADE IN THIS DISCLOSURE STATEMENT.  REPRESENTATIONS CONCERNING THE PLAN OR THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT ARE NOT AUTHORIZED BY THE DEBTORS.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL,

BUSINESS, FINANCIAL, OR TAX ADVICE AND ALL SUCH HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN ADVISERS.

THE DEBTORS HAVE NO ARRANGEMENT OR UNDERSTANDING WITH ANY BROKER, SALESMAN, OR OTHER PERSON TO SOLICIT VOTES FOR THE PLAN.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.   THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME AFTER THE DATE HEREOF OR THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN OR IN THE AFFAIRS OF THE DEBTORS SINCE THE DATE HEREOF.  ANY ESTIMATES OF CLAIMS AND INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS OR INTERESTS ALLOWED BY THE BANKRUPTCY COURT. SIMILARLY, THE ANALYSIS OF ASSETS IN THE DISCLOSURE STATEMENT AND THE AMOUNT ULTIMATELY REALIZED FROM THEM MAY DIFFER MATERIALLY.

THE DESCRIPTION OF THE PLAN CONTAINED HEREIN IS INTENDED TO SUMMARIZE THE MATERIAL PROVISIONS OF THE PLAN AND IS SUBJECT TO AND QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THE DEBTORS RESERVE THE RIGHT TO ARGUE THAT THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.   THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.

THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DOCUMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, INTEREST HOLDERS, AND ALL OTHER PARTIES IN INTEREST. ACCORDINGLY, THE DEBTORS RECOMMEND THAT YOU VOTE IN FAVOR OF THE PLAN.

## ARTICLE II.
## EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor in possession may seek to reorganize its business or to sell the business for the benefit of the debtor's creditors and other interested parties.

The commencement of a chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the petition is filed.  Unless the bankruptcy court orders the appointment of a trustee, a chapter 11 debtor may continue to manage and control the assets of its estate as a "debtor in possession," as the Debtors have done in the Bankruptcy Cases since the Petition Date.

Formulation of a chapter 11 plan is the principal purpose of a chapter 11 case.  Such plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, chapter 11 debtors.  It also allows, in this liquidation context, the best means of winding up the Debtors' legal entities in compliance with the applicable law.

### B.    Chapter 11 Plan

After a plan has been filed, the holders of claims against, or equity interests in, a debtor are generally permitted to vote on whether to accept or reject the plan.  However, chapter 11 does not require that each holder of a claim against, or equity interest in, a debtor vote in favor of a plan in order for the plan to be confirmed.  At a minimum, a plan must be accepted by a majority in number and two-thirds in dollar amount of those claims actually voting from at least one class of claims impaired under the plan.  The Bankruptcy Code also defines acceptance of a plan by a class of equity interests as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan, and therefore are not entitled to vote.  A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or equity interests of that class.  Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash.  Conversely, classes of claims or equity interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore are not entitled to vote.

Even if all classes of claims and equity interests accept a chapter 11 plan, the Bankruptcy Court may nonetheless deny confirmation.  Bankruptcy Code Section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interest" of impaired and dissenting creditors and interest holders and that the plan be feasible.  The "best interest" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.

01:24476781.8

The Bankruptcy Court may confirm a chapter 11 plan even though fewer than all of the classes of impaired claims and equity interests accept it.  The Bankruptcy Court may do so under the "cramdown" provisions of Bankruptcy Code Section 1129(b).  In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or equity interests that has not accepted the plan.

The Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code Section 1129(b) with respect to the subject objecting class.  If the proponent of the plan proposes to seek confirmation of the plan under the provisions of Bankruptcy Code Section 1129(b), the proponent must also meet all applicable requirements of Bankruptcy Code Section 1129(a) (except Section 1129(a)(8)).  Those requirements include the requirements that (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law, (ii) the plan be proposed in good faith, and (iii) at least one impaired class of creditors or interest holders has voted to accept the plan.

### C.    The Disclosure Statement

The Debtors have prepared this Disclosure Statement pursuant to Bankruptcy Code Section 1125, which requires that a copy of the Plan, or a summary thereof, be submitted to all Holders of Claims against and Interests in the Debtors that are entitled to vote, along with a written disclosure statement containing adequate information about the Debtors of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of the Holders of Claims and Interests to make an informed judgment in exercising their right to vote on the Plan.

This Disclosure Statement sets forth certain relevant information regarding the Debtors' prepetition operations and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Bankruptcy Cases, including the Sale of Assets to the Purchaser, and the resultant analysis of the expected return to Creditors.

If you are entitled to vote on the Plan, accompanying this Disclosure Statement is a ballot (the "Ballot") and return envelope for voting to accept or reject the Plan.  Holders of Claims entitled to vote on the Plan (collectively, the "Voting Claims") must return a Ballot to Prime Clerk LLC (the "Solicitation Agent") prior to 4:00 p.m. (prevailing Eastern Time) on July 8, 2019 (the "Voting Deadline") for their Ballots to be counted.  *See* ARTICLE X of this Disclosure Statement for a more detailed description of the voting procedures and deadline.

This Disclosure Statement contains important information, and Holders of Voting Claims are advised and encouraged to read it and the attached Plan in their entirety, including, without limitation, the risk factors set forth in ARTICLE IX herein, before voting to accept or reject the Plan.

The exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.  The terms of the Plan control over any other descriptions of the Plan.

01:24476781.8

## ARTICLE III.
## BACKGROUND OF THE DEBTORS

### A.    Overview of the Debtors' Businesses

The Debtors comprise three (3) affiliated companies that operate as an integrated business which owned and operated an underground crude oil storage facility located in Houston, Texas, together with pipelines and related assets and rights of way providing access into and out of the facility. Fairway GP is a Delaware limited liability company which is the general partner of Fairway LP, a Delaware limited partnership. It provided management, insurance, regulatory compliance, and general and administrative operations. FEP LLC, a Delaware limited liability company, is wholly owned by Fairway LP. FEP LLC owned and operated the Assets which the Debtors sold during the Bankruptcy Cases. Fairway LP is the owner of FEP LLC. All the Debtors are headquartered in Houston, Texas.

FEP LLC originally invested insignificant amounts to form Fairway LP and Fairway GP, in March 2016. As a result, Fairway LP and Fairway GP became wholly-owned subsidiaries of FEP LLC. There were no transactions, other than formation, involving Fairway LP or Fairway GP prior to April 6, 2016. Prior to the formation of Fairway LP and Fairway GP, the financial statements of FEP LLC were reported on a standalone basis. FEP LLC completed the reorganization of entities under common control on April 6, 2016 and the common units and warrants of FEP LLC were converted into common units and warrants of Fairway LP resulting in Fairway LP becoming the parent of FEP LLC and Fairway GP. In connection with the reorganization, the employees of FEP LLC became employees of Fairway GP. The purpose of the reorganization was to establish the limited partnership as the ultimate parent entity. The consolidated financial statements of Fairway LP have been retrospectively recast for all periods to reflect the reorganization of entities under common control as if the Debtors had always operated as a limited partnership. The results of operations prior to April 6, 2016 reflect the results of operations for FEP LLC.

Through closing of the Sale, the Debtors have three (3) executive officers: (i) Dana Grams, Chief Executive Officer; (ii) Robert Flavin, Chief Financial Officer; and (iii) James Scandola, Chief Operating Officer. The Debtors have twelve (12) employees and six (6) contract employees. Following the closing of the Court-approved Sale to Converge Midstream, LLC, the purchaser ("Purchaser") under the Sale Order, the Debtors have one responsible officer, Mr. Flavin. Shortly before the solicitation of the Plan commenced and before the closing of the Sale the assignee of the Purchaser made offers to employ the Debtors' executive officers and most of the employees. The terms of any employment have not been finalized, including any potential for vesting of minority equity rights in the Purchaser's parent entity.

Fairway's business provided underground storage, throughput and ancillary services for third-party companies engaged in the production, distribution and marketing of crude oil. The Debtors made such services available at the Pierce Junction Crude Oil Storage Facility and associated bi-directional pipelines (the "Facility"), which they developed, constructed, and operated through certain leasehold interests and ownership interests.

### B.    Fairway's Underground Storage Facility

The Facility is a 10 million-barrel maximum capacity salt dome crude oil storage facility located in Houston, Texas, just south of the NRG/Astrodome sports complex. The Facility is the only independent salt dome crude oil storage terminal in the region. The Debtors began construction on the Facility in 2015 after they obtained the exclusive rights to store crude oil in the Pierce Junction Salt Dome and entered into certain leases for brine caverns and land. Fairway leased all of its caverns and obtained the rights to develop the caverns and exclusivity agreement from Underground Storage, LLC ("USL").

The Debtors planned to bring the Facility online in multiple phases. Phase 1A of the project was completed in April 2017 after Fairway converted three existing underground storage caverns into crude oil storage service and built out supporting infrastructure to put the Facility into commercial service, including central pumping and metering facilities, brine ponds with approximately 6.5 million barrels of capacity, and two bi-directional, 24-inch pipelines that traverse approximately twenty (20) miles across the Houston area to connect the Facility with interconnecting pipelines. The brine ponds are located on land leased from various parties. The use of the brine ponds is integral to the storage of the crude oil in the caverns. The Debtors planned to increase their storage capacity by an additional 2.6 million barrels in Phase 1B, followed by 9.0 million barrels of additional capacity in Phase 2; however, only Phase 1A was completed as of the Petition Date.

The caverns and associated pipelines enable Fairway to provide receipt capability from inbound crude oil pipelines from the Permian Basin, Eagle Ford Shale Basin, and Canada/Midcontinent. The pipelines also connect to hubs that provide downstream connectivity to terminals, refineries, and water outlets located in the vicinity of the Houston Ship Channel, Texas City, and to also supply the petrochemical facilities in the Beaumont/Port Arthur market areas.

As described in more detail below, the Debtors sold substantially all of their Assets, including their interests in the Facility, during the Bankruptcy Cases as part of their postpetition sale process. All interested buyers of every type were encouraged to participate. An Auction (defined below) did occur.

### C.    The Bankruptcy Filing

Prior to the Petition Date, the Debtors attempted for approximately 15 months to find one or more third-party equity investors and other lenders or, alternatively, to sell the Assets outside of bankruptcy. Those efforts, however, did not result in a binding offer and the Debtors lacked sufficient funds to continue the process. In the lead up to the filing for chapter 11 relief, the Debtors' prepetition secured lender, Riverstone Credit Partners, L.P., Riverstone Credit Partners—Direct, LLC, and Converge Midstream, LLC f/k/a Fairway New Co LLC ("Riverstone"), agreed to provide the Debtors with additional incremental term loans in the aggregate amount of $1,375,000, pursuant to certain amendments to the senior secured term loan credit agreement. The incremental term loans were provided to fund the Debtors' attempt to complete their prepetition marketing process and prepare for chapter 11, if necessary, with the understanding being that such financing was a "bridge" to either an equity investment or, if

necessary, a bankruptcy filing. The incremental term loans were scheduled to mature on November 26, 2018, and, failure to repay the incremental term loans as well as a filing by the Debtors for chapter 11 relief resulted in an event of default under the senior secured term loan credit agreement. On November 26, 2018, the incremental term loans matured and, as a result the Debtors voluntarily filed for reorganization under Chapter 11 of the Bankruptcy Code.

## ARTICLE IV.
## DEBTORS' ASSETS AND LIABILITIES

As of December 31, 2018, the Debtors' unaudited balance sheet reflected total book Assets of approximately $382,700,000, total book liabilities of approximately $94,000,000, and owner's book equity of approximately $288,700,000. Virtually all Assets were sold as a going concern (the "Sale") to the Purchaser as described elsewhere in this Disclosure Statement. Other than the amounts provided by the Purchaser, which included funding for the Plan, it is not anticipated that there will be any other Assets to be administered.

### A.    Assets

As of the Petition Date, the majority of the Assets were comprised of the Debtors' interests in the underground crude oil storage facility and the pipelines emanating from the Facility. In particular, the Debtors scheduled real property on Schedule A and personal property on Schedule B. The book value on the Schedules or as reported elsewhere does not equal market value. As disclosed elsewhere in this Disclosure Statement, the market value derived from the Sale was substantially less than book value, aggregating $77.5 million.

### (a)    *Bank Accounts and Deposits*

On the Petition Date, the Debtors maintained several bank accounts, all of which comprised cash collateral, and otherwise secured amounts borrowed under the DIP Credit Agreement. As of the Petition Date, the cumulative balance of Fairway LP's bank accounts was $1,065.00. As of the Petition Date, the cumulative balance of FEP LLC's bank accounts was $1,343,481.88. As of the Petition Date, the cumulative balance of Fairway GP's bank accounts was $178,395.96.

FEP LLC had a cash equivalent for its P-Card collateral account totaling $200,625.11. Fairway LP and Fairway GP did not have any cash equivalents.

FEP LLC had deposits and prepayments with certain vendors totaling $2,108,917.85. Fairway LP and Fairway GP did not have any deposits and prepayments. All of these Assets were sold to the Purchaser under the Sale Order.

### (b)    *Accounts Receivable*

None of the Debtors scheduled accounts receivable other than intercompany receivables arising from their integrated operation. As of the Petition Date, Fairway LP's intercompany receivables had a book value of $10,178,483.49. Most of this was owned by Fairway LP's affiliates and the Debtors had virtually no revenues in 2018 or 2019, meaning the likely recovery is negligible. All of these Assets were sold to the Purchaser under the Sale Order.

(c)    *Inventory*

As on the Petition Date, FEP LLC maintained inventory, including crude oil and oil inventory, with a market value of $3,446,588.18.Fairway LP and Fairway GP did not own any inventory.  All of FEP LLC's inventory was sold to the Purchaser under the Sale Order.

(d)    *Office Furniture, Fixtures, and Equipment*

On the Petition Date, FEP LLC had office furniture with a total net book value of $45,351.93.  FEP LLC also had computer equipment, communication systems equipment, and software with a total net book value of $46,969.20.  Fairway LP and Fairway GP did not own any office furniture.Any such property was sold to the Purchaser under the Sale Order.

(e)    *Machinery, Equipment, and Vehicles*

On the Petition Date, FEP LLC had vehicles and equipment with a total net book value of $205,883.32.  These were used at the Facility.  Fairway LP and Fairway GP did not have any machinery, equipment, or vehicles.  Any such property was sold to the Purchaser under the Sale Order.

(f)    *Real Property*

On the Petition Date, FEP LLC had real property that it leased or owned, and operated, including brine ponds, caverns, land, pipelines, pipeline interconnect junctions, rights of way, easements, and other property necessary to the operation of the Facility and pipelines.  FEP LLC valued the real property with a net book value of $344,114,055.68.  Fairway LP and Fairway GP did not schedule and do not own any real property.  Any such property was sold to the Purchaser under the Sale Order.

(g)    *Other Personal Property*

Fairway LP scheduled certain other miscellaneous personal property, including (i) contingent and unliquidated Claims or causes of action, and (ii) intercompany receivables from FEP LLC.  At the time the Fairway LP Schedules were prepared, the value of several of the causes of action were undetermined.  At the Auction, none of the bidders, other than the Purchaser, bid on these Assets.  As noted, all of these Assets were sold to the Purchaser under the Sale Order.

FEP LLC scheduled certain other miscellaneous personal property, including (i) interests in insurance policies or annuities, (ii) causes of action against third parties, (iii) contingent and unliquidated Claims or causes of action, and (iv) other property, including construction in progress, deferred interconnect, intercompany receivables, and leasehold improvements.  The total amounts for items (i) through (iii) are undetermined.  FEP LLC valued the other property, item (iv), with a net book value of $41,753,180.36.As noted, virtually all of these Assets relating to the operation of the Facility were sold to the Purchaser under the Sale Order.

Fairway GP scheduled certain other miscellaneous personal property, including (i) contingent and unliquidated Claims or causes of action, and (ii) intercompany receivables from

FEP LLC.  At the time the Fairway GP Schedules were prepared, the value of the causes of action were undetermined but are believed by Debtors to be substantial, even if vigorously disputed.  Fairway GP scheduled the intercompany receivables as having a book value of $15,978,142.76.  This primarily reflects historical operating expenses at Fairway GP.  Most of this was owned by Fairway GP's affiliates, meaning the likely recovery is negligible.  All of these Assets were sold to the Purchaser under the Sale Order.

### B.    Liabilities

#### (a)    Secured Claims

The majority of the Debtors' Secured Claims were the approximate $95.4 million principal secured debt liability arising under the Prepetition Credit Agreement.  As of December 31, 2018, the Debtors had the following debt obligations outstanding: (i) $94.1 million principal amount under their senior secured term loan credit agreement with Riverstone and (ii) obligations up to $20.0 million principal amount under their Debtor in Possession facility from Riverstone Credit Partners – Direct, LLC as the post-petition lender under the DIP Credit Agreement (the "DIP Lender").

The Secured Tax Claims include Claims aggregating approximately $4.6 million by the City of South Houston, Harris County, City of Houston, Houston Community College, Houston ISD, City of Pasadena, Pasadena ISD, and the Port of Houston Authority.  By the Sale Order, these Secured Tax Claims shall be paid on, or promptly following, the Sale.

#### (b)    Priority Non-Tax Claims

The Debtors' Schedules and filed proofs of Claim include Priority Non-Tax Claims totaling approximately $432,953.69 for severance, pre-petition wage obligation, and independent contractor obligation Claims.  For purposes of estimating the Priority Non-Tax Claims, the severance obligation Claims (i.e., $400,000.03) have been counted once.  Proofs of Claim have been filed against all three Debtors for these amounts.  The Debtors estimate the Allowed Priority Non-Tax Claims should not exceed $100,000 after taking into account (i) the elimination of duplicate Claims and (ii) the amounts allowed for priority status under the Bankruptcy Code.  This estimate, however, remains subject to further proceedings, negotiations and potentially, Claims resolution, before the Allowed Claims can be finalized for purposes of distribution.

#### (c)    General Unsecured Claims

Before taking into account claim allowance obligations, limitations or defenses under the Bankruptcy Code, the Debtors' Schedules and filed proofs of Claim include General Unsecured Claims for utilities, trade payables, potential litigation, asset retirement obligation liability, tort-property damages, intercompany payables, professional service fees, payments to shareholders, cure amounts due on contracts, governmental units, and regulatory Claims totaling approximately $60 million.  The Debtors believe these Claims ultimately may aggregate a much lower amount, approximately $3 million, after taking into account (i) the elimination of duplicate Claims, (ii) the amounts allowed for priority status under the Bankruptcy Code, (iii) all limitations or defenses under the Bankruptcy Code, (iv) offsetting Claims, (v) the elimination of cure Claims paid by the Sale, (vi) the elimination of Secured Tax Claims paid through the Sale,

and (vii) the credit bid of a significant portion of the Prepetition Secured Obligations under the Sale. These Claim estimates exclude unfiled executory contract rejection Claims.

## C.    Equity Interests in Fairway LP

As of September 30, 2018, the total number of outstanding units of common equity in Fairway LP was 39,266,019, held by approximately sixty-seven (67) investors (the "Unitholders"). The Unitholders consist mainly of investors that provided capital to fund the construction of the Facility and pipelines. The total equity capital raised was approximately $390 million.

# ARTICLE V.
# LEGAL PROCEEDINGS

The following is a summary of material litigation involving the Debtors that existed as of the Petition Date, including potential Claims and causes of action that arose as a result of the filing of the Bankruptcy Cases.

## A.    Prepetition Filed Litigation Proceedings

On March 4, 2019, the Bankruptcy Court entered an order extending the period within which the Debtors may remove actions to the Bankruptcy Court through and including June 25, 2019, without prejudice to the right to seek further extensions of the removal deadline [Docket No. 247]. At the time the Disclosure Statement was filed, no actions had been removed.

Below is a summary of the litigation involving the Debtors pending as of the Petition Date which includes administrative proceedings whether filed or asserted. All matters remain stayed.

| STYLE | COURT | NATURE OF CLAIM |
|---|---|---|
| *Fairway Energy Partners, LLC v. ISFI Constructors, LLC*, Cause No. 2017-72871 | 61st Judicial District Court, Houston, Texas | Breach of Contract/Breach of Express Warranty/Declaratory Relief/Attorneys' Fees and Costs. Construction defect case. FEP, LLC seeks damages exceeding $2 million; the Defendant asserts counterclaims. |
| *Victoria Hughes and Joel Fairfax v. Jan's Construction Company, Inc., D/B/A Janco, Rusty Burkett, Marcelino Rodriguez, Bill Rome, Fairway Energy Partners, L.L.C, Duphil, Inc., Contract Land Staff, Inc. and Contract Land Staff, L.L.C.*, Cause No. 2018-35286 | 190th Judicial District Court of Harris County, Texas | Tort – Property Damage<br><br>Certain of the debtors may have potential counterclaims, indemnity, and/or cross-claims against third-parties, including such third-parties' parents, subsidiaries, and/or affiliates, in connection with this action. To the extent insurance coverage is available, notice has been provided. |
| *Jacqueline Quinn v. Fairway Energy Partners, LLC, Duphil, Inc., Jan's* | 113th Judicial District Court | Tort – Personal Injury<br><br>Certain of the debtors may have potential |

| STYLE | COURT | NATURE OF CLAIM |
|---|---|---|
| *Construction, Point to Point Directional Inc.*, Cause No. 2018-59633 | of Harris County, Texas | counterclaims, indemnity, and/or cross-claims against third-parties, including such third-parties' parents, subsidiaries, and/or affiliates, in connection with this action.  To the extent insurance coverage is available, notice has been provided. |
| *Jamie Reyna, Jose Soliz, Rosario Moreno, and Yolanda Rodriguez v. Fairway Energy GP, LLC, and Duphil, Inc.*, Cause No. 2018-88323 | 157th Judicial District Court of Harris County, Texas | Tort – Property Damage<br><br>Certain of the debtors may have potential counterclaims, indemnity, and/or cross-claims against third-parties, including such third-parties' parents, subsidiaries, and/or affiliates, in connection with this action.  To the extent insurance coverage is available, notice has been provided. |
| *Lela Marlorough and Nekia Stewart v. Jan's Construction Company, Duphil, Inc., and Fairway Energy Partners, LLC*, Cause No. 2018-79557 | 215th Judicial District Court of Harris County, Texas | Tort – Property Damage<br><br>To the extent insurance coverage is available, notice has been provided. |
| Investigation Before the Texas Railroad Commission Regarding Certain Permits of Fairway Energy Partners, LLC | Texas Railroad Commission<br><br>Oil and Gas Division | Regulatory.  Matter appears to be dormant, and no administrative proceeding is filed. |
| Administrative Proceeding Regarding the Complaint of South Houston Concerned Citizens Coalition Regarding the Fairway Energy Partners, LLC (2597770) for the Pierce Junction Facility, Reddy Brine Permit (Permit No. P1012443), Harris County, Texas | Texas Railroad Commission<br><br>Oil and Gas Division | Regulatory.  Matter is dormant.  Appears to be moot given no current cavern expansion in process. |

## B.       No Other Affirmative Claims and Causes of Action Belonging to the Estates

Creditors and all other parties in interest should understand that all Causes of Action, legal rights, affirmative claims and causes of action for a recovery of money or other relief the Debtors may have against any person have been sold under the Sale Order.  There are no remaining litigation Assets comprising affirmative claims by the Debtors to administer.  Unless otherwise provided, this would include claims for contract breach, warranty claims, anticompetitive conduct, or any other actionable conduct against any person.

## ARTICLE VI.
## POST-BANKRUPTCY CASE ADMINISTRATION

### A.    First and Second Day Motions

On or shortly after the Petition Date, the Debtors filed a number of motions to administer the Bankruptcy Cases in a timely and efficient manner.  Pursuant to those motions, the Bankruptcy Court entered orders that, among other things:

- Permitted the joint administration of the Bankruptcy Cases;

- Prohibited on an interim basis utility companies from altering or discontinuing service on account of prepetition invoices;

- Authorized on an interim basis maintenance of existing corporate bank accounts and cash management systems;

- Authorized the payment of certain prepetition accrued wages, salaries, medical benefits, and reimbursable employee expenses;

- Established procedures for payment of estate Professionals;

- Authorized the Debtors to employ Professionals used in the ordinary course of business;

- Authorized the Debtors to employ Haynes and Boone, LLP (co-counsel), Young Conaway Stargatt & Taylor, LLP (co-counsel), Alvarez & Marsal North America, LLC (financial advisor), Piper Jaffray & Co. (investment banker), and Prime Clerk LLC (claims agent);

- Authorized the Debtors on an interim basis to use Cash Collateral and enter into the DIP Facility to borrow up to $20 million; and

- Extended the time within which the Debtors were required to file their Schedules and Statements of Financial Affairs.

### B.    Schedules of Assets and Liabilities

Pursuant to Bankruptcy Code Section 541 and Bankruptcy Rule 1007, a debtor seeking relief under the Bankruptcy Code must file schedules of assets and liabilities and statements of financial affairs.  Accordingly, on December 21, 2018, the Debtors filed their Schedules and Statements of Financial Affairs, reflecting the Assets and liabilities of the Debtors [Docket Nos. 101–106, 237].  The Debtors have thereafter filed amendments and supplements as reasonably necessary to reflect further information as it arose.  Copies of the Debtors' Schedules and Statements of Financial Affairs are available on the website for the Bankruptcy Cases at https://cases.primeclerk.com/fairwayenergy/Home-DocketInfo.

01:24476781.8

### C.    Meeting of Creditors

The meeting of Creditors required under Bankruptcy Code Section 341 was held in the Bankruptcy Cases on January 3, 2019.  The Debtors appeared and were examined.

### D.    Bar Date for Filing Proofs of Claim

The Bankruptcy Court established (i) March 7, 2019 as the general deadline for filing proofs of Claim in the Bankruptcy Cases,[3] including any Claims filed pursuant to Bankruptcy Code Section 503(b)(9), (ii) May 28, 2019 as the deadline for filing a proof of Claim by any governmental unit (as defined by Section 101(27) of the Bankruptcy Code); and (iii) June 7, 2019 as the deadline for filing Administrative Expense Claims that arose between the Petition Date and May 8, 2019.

To the extent funds are available for distribution, the Debtors and the Plan Administrator, after confirmation, will review Claims Filed and will develop and analyze a database of all Claims asserted against the Debtors.  The Debtors or the Plan Administrator, as applicable, will analyze proofs of Claim to determine whether to object to the allowance of such Claims.

### E.    Official Committees

The United States Trustee did not appoint an official committee of unsecured creditors (*i.e.,* the Committee) in the Bankruptcy Cases pursuant to Bankruptcy Code Section 1102.

The United States Trustee also did not appoint any other committee.

### F.    The DIP Facility and Use of Cash Collateral

As a result of the bankruptcy filing on November 26, 2018, the DIP Lender provided Debtor in Possession Financing to the Debtors of up to $20 million (the "DIP Facility").  The interest rate applicable to the DIP Facility was LIBOR plus 15%.  The proceeds from the DIP Facility were used for payment of vendors, payment of interest, payment of professional fees and general and administrative expenses.

On November 26, 2018, the Debtors filed the *Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors (I) Use Cash Collateral, (II) to Obtain Secured Superpriority Postpetition Financing and, Granting Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling a Final Hearing, and (C) Granting Related Relief* [Docket No. 8] (the "DIP Motion").  On November 29, 2018, the Bankruptcy Court approved the DIP Motion, on an interim basis, authorizing the Debtors to obtain post-petition financing in the form of a multiple-draw, term loan facility in an aggregate total principal amount of up to $6 million on an interim basis and up to $20 million on a final basis.

---

[3] This deadline was extended for the Supplemental Parties (as defined in the amended Fairway GP Schedules) to March 20, 2019.

01:24476781.8

On January 9, 2019, the Bankruptcy Court entered an order approving the DIP Motion on a final basis. Pursuant to the Final DIP Order, the DIP Agent was granted, for and on behalf of the DIP Lender, (i) liens on, and security interests in, substantially all of the Debtors' Assets, including proceeds of Causes of Action, and (ii) a superpriority administrative expense claim.

The Debtors and DIP Agent have since amended the DIP Credit Agreement. The first amendment reflected the extension of certain milestones related to the sale process. *See* [Docket No. 125].

The Debtors have subsequently filed the *Motion for an Order (I) Authorizing and Approving Waiver and Second Amendment to Senior Secured Superpriority Debtor-in-Possession Credit Agreement and (II) Amending the Final DIP Order on Account of Such Amendment* [Docket No. 319] (the "Supplemental DIP Motion"). On April 23, 2019, the Bankruptcy Court approved the Supplemental DIP Motion, authorizing the Debtors to obtain additional post-petition financing of up to $2 million, for an aggregate total principal amount of up to $22 million under the DIP facility. [Docket No. 354].

### G.     The Post-Petition Sale Process, The Sale of the Debtors' Businesses and Assets and Creditor Recovery

As discussed above, the Debtors sought to preserve the value of their businesses and maximize recoveries to their Creditors by continuing efforts to market and offer for sale substantially all of their Assets or Interests in FEP LLC, whether wholly or in parts, to a purchaser (*i.e.*, the Sale).

To such end, the Debtors filed a motion by which they proposed to conduct the Sale in accordance with certain procedures pursuant to Bankruptcy Code Section 363 (the "Bidding Procedures and Sale Motion"). The Debtors also retained Piper Jaffray & Co. ("Piper") as their investment banker and marketing agent to continue to assist them. Piper continued to coordinate its efforts with Simmons & Co., a Piper affiliate, to continue the extensive prepetition marketing efforts already undertaken.

There was one objection to entry of an order approving the Bidding Procedures and Sale Motion, which was filed by USL, the landlord on the long-term cavern leases. The Bankruptcy Court overruled the USL Objection, and on January 9, 2019, entered its Order approving the bidding procedures [Docket No. 141] (the "Bidding Procedures Order"). The Bidding Procedures Order established a series of dates for a marketing and sale process, including a date for the Auction, a date for the hearing to consider approval of the sale of the Assets to the prevailing bidder at the Auction (the "Sale Hearing"), and certain deadlines related thereto (collectively, the "Sale Timeline").

The Debtors and their professionals marketed the Assets pursuant to the procedures approved by the Bidding Procedures Order. The Debtors received bids from various parties, including Qualified Bids (as defined in the Bidding Procedures Order).

On March 25, 2019, the Debtors conducted an open auction pursuant the Bidding Procedures Order (the "Auction"). Representatives from the Qualified Bidders and others were

present.  Also present at the Auction were Debtors' representatives and representatives of, and counsel for, the DIP Lender.

Following multiple rounds of bidding, which included separately conducted Auctions for multiple configurations of the Assets, and ultimately in aggregate, the Purchaser's bid of $77.5 million (including a credit bid of the full amount of the obligations outstanding under the DIP Credit agreement and a portion of the Prepetition Secured Obligations) was selected as the high bid for all Assets.

On April 10, 2019, the Court conducted a hearing to confirm the results of the Auction, and it thereafter entered the *Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith, and (C) Granting Related Relief* [Docket No. 330] (the "Sale Order").The Sale is expected to close in May 2019.

### H.    Rejection of Executory Contracts

The Debtors are party to various unexpired leases and executory contracts related to their business operations.  Pursuant to the Plan, all Executory Contracts that were not assumed pursuant to a Final Order of the Bankruptcy Court during the Bankruptcy Cases, including under the Sale Order, or which previously have sought to be rejected, are all deemed rejected as of the Effective Date.  Further, the Plan provides that entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code Section 365(a), of the rejection of the Executory Contracts rejected pursuant to the Plan or otherwise during the Bankruptcy Cases.

### I.    Exclusivity Extension

On April 5, 2019, the Court entered its Order, *Pursuant to Section 1121(d) of the Bankruptcy Code, Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and the Solicitation and Acceptance Thereof.* [Docket No. 287].  The exclusive periods run through June 24, 2019 and August 26, 2019, respectively.

## ARTICLE VII.
## DESCRIPTION OF THE PLAN

### A.    Introduction

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims is outlined below.  The summary is entirely qualified by the Plan.  This Disclosure Statement is only a summary of the terms of the Plan.

### B.    Classification and Treatment of Claims and Interests Generally

Section 1123(a)(1) requires that the Plan classify all Claims (other than Administrative Expenses and Priority Tax Claims) and Interests.  Section 1122 provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or

Interests of such Class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of Section 1122.  If a Holder of a Claim or Interest challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make such reasonable modifications to the classification of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court.

Except to the extent such modification of classification adversely affects the treatment of a Holder of a Claim or Interest and requires re-solicitation, acceptance of the Plan by any Holder of a Claim or Interest pursuant to this solicitation will be deemed to be a consent to the Plan's treatment of such Holder of a Claim or Interest regardless of the Class to which such Holder of a Claim or Interest is ultimately deemed to belong.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest in a particular Class, unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe the Plan complies with this standard.  If the Bankruptcy Court finds the Plan does not comply with this standard, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

The Plan categorizes all Claims against and Interests in the Debtors under the Plan into separate Classes.  In accordance with the Bankruptcy Code, Administrative Expenses and Priority Tax Claims are not classified.  The Plan also provides that expenses properly incurred by the Debtors during the Bankruptcy Cases will be paid in full and specifies the treatment proposed for the Claims and Interests in each Class.

### C.    Unclassified Claims

Except as otherwise provided for in the Plan or any prior Order Establishing an Administrative Claims Bar Date, all requests for payment of Administrative Expense Claims arising on or before the Confirmation Date not previously filed must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date.  All requests for payment of Professional Claims must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date.  Any Administrative Expense Claims or Professional Claims for which a request for payment is not filed by the deadline specified by the Plan shall be discharged and forever barred.

The following are the Classes of Claims designated under the Plan.  As provided in Section 1123(a) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims, together with the DIP Administrative Claim, shall not be classified for purposes of voting or receiving Distributions under the Plan.  Rather, all such Claims shall be treated separately as unclassified claims on the terms set forth in the Plan.

### (a)    Treatment of Administrative Expense Claims.

Administrative Expense Claims are Claims for any cost or expense of the Bankruptcy Cases allowable under Bankruptcy Code Sections 503(b) and 507(a)(1).  These expenses include

01:24476781.8

all actual and necessary costs and expenses related to the preservation of the Estates or the operation of the Debtors' business and all United States Trustee quarterly fees. All applications or other requests for payment of Administrative Expense Claims arising on or before the Confirmation Date not previously filed must be filed with the Bankruptcy Court and served on the Debtors, the United States Trustee, the Prepetition Agent, and the Plan Administrator by the Administrative Expense Claims Bar Date.

The Debtors believe the Wind Down Amount provides sufficient amounts to provide that Allowed Administrative Expense Claims against the Debtors will be paid in full, in Cash, on the Effective Date, or as soon as practicable after the Effective Date, or when an Administrative Expense Claim becomes Allowed.

### (b)    *Claims Under the DIP Credit Agreement.*

The obligations with respect to the amounts due and funded under the DIP Credit Agreement and DIP Budget should be satisfied upon closing of the Sale because such obligations were credit bid to acquire the Debtors' Assets.

### (c)    *The Professional Claims.*

On or before the Effective Date, the Debtors shall pay or have deposited in trust all amounts owing to the Professionals for all outstanding Professional Claims that have been allowed by the Bankruptcy Court, but which were unpaid as of the Effective Date. On or prior to the applicable Administrative Expense Claim Bar Date, each Professional required to do so shall File with the Bankruptcy Court a final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date. Objections to Professional final fee applications must be Filed and served on the Plan Administrator and the Professionals to whose application the objections are addressed no later than twenty-four (24) days after filing of the relevant final fee application. The Liquidating Debtors shall pay any outstanding amounts owed to a Professional within three (3) days after entry of a Final Order with respect to such Professional's final fee application. Any amounts previously paid to a Professional, but not supported by the Final Order with respect to such Professional's final fee application, shall be paid directly to the Prepetition Secured Parties, on account of the Prepetition Credit Agreement Secured Claims, in accordance with Section 7.5 of the Plan.

### (d)    *Allowed Administrative Expense Claims, Other Than the Professionals Claims.*

Under the Plan, on or as soon as practicable after the Effective Date (to the extent payable on the Effective Date), each Holder of an Allowed Administrative Expense Claim, other than the Professional Claims, shall receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Administrative Expense Claim, Cash from the Liquidating Debtors equal to the full amount of such Allowed Administrative Expense Claim, or such other treatment as the Liquidating Debtors and such Holder shall have agreed to in writing. Notwithstanding the foregoing, if an Allowed Administrative Expense Claim represents an obligation incurred in the ordinary course of business, such Allowed Administrative Expense Claim will be paid by the Liquidating Debtors when due.

Holders of Administrative Expense Claims (including, without limitation, Holders of Professional Claims) that are required to File a request for payment of such Claims and that do not File such requests by the applicable Administrative Expense Claim Bar Date are forever barred from asserting such Claims against the Debtors, the Liquidating Debtors, or any of their respective property.

While there are filed and may still be filed unbudgeted Administrative Expense Claims that can affect Distributions to other Creditors holding Priority Claims and General Unsecured Claims, these are and will be disputed.[4]  Allowed Administrative Expense Claims shall be paid from the Wind Down Amount.

Professionals shall apply any retainer amounts remaining at the time of their final fee applications in satisfaction of their Professional Claims.  Notwithstanding any other provision of the Plan, all fees, expenses, and other compensation arising after the Effective Date and due and payable to Professionals retained by the Plan Administrator shall be paid (a) first, by the Plan Administrator from the Wind Down Amount in accordance with Wind Down Budget and (b) thereafter, by the Plan Administrator from the Remaining Assets of the Liquidating Debtors subject to the provisions of Section 7.5 of the Plan.

As of the Effective Date, the Debtors estimate Administrative Expense Claims asserted against the Debtors will be fully satisfied by the Wind Down Amount (after taking into account the amounts payable under the DIP Budget, as most recently amended).

### (e)    *Payment of Statutory Fees.*

All fees payable on or before the Effective Date pursuant to 28 U.S.C. § 1930, shall be paid by the Debtors as and when due from the Wind Down Amount.  All such fees payable after the Effective Date shall be paid by the Liquidating Debtors through the Plan Administrator. Notwithstanding anything to the contrary in the Plan, the United States Trustee shall not be required to file a proof of claim for administrative expenses.

### (f)    *Disallowance of Special Taxes.*

The issuance, transfer, or exchange of a security as defined under the Bankruptcy Code or applicable law, or the making or delivery of any instrument of transfer under the Plan shall not be taxed under any state or local law imposing a stamp tax or similar tax as provided in Section 1146 of the Bankruptcy Code.

### D.    Classification and Treatment of Claims and Interests Under the Plan

For purposes of organization, voting, distributions pursuant to the Plan, and all Confirmation matters, except as otherwise provided in the Plan, all Debtors shall be grouped together for purposes of voting, allowance and distribution, and classified together and treated as

---

[4]  This would include USL's asserted Administrative Expense Claim relating to a disputed brine well workover, which remains potentially in issue and disputed by the Debtors if definitive final documentation that provides for the amendment of the USL agreements is not completed.

provided below.  This will minimize further expense and streamline resolution and payment of the Wind Down Amount, which is finite.

The table below summarizes the classification and treatment of all classified Claims and Interests under the Plan

| Description and Amount of the Claims or Interests | Summary of Treatment |
|---|---|
| Class 1:  Allowed Priority Nontax Claims.<br><br>Estimated Aggregate Allowed Amount of Class 1 Claims:  $100,000. | Payment to be made once Allowed Claims in this Class are confirmed and the resolution of any Administrative Claims is finalized.<br><br>Estimated Recovery: 100% |
| Class 2:  Senior Secured Lender Allowed Prepetition Secured Claims<br><br>Estimated Aggregate Allowed Amount of Class 2 Claims: $750,000 | Return of Cash Collateral in excess of the Wind Down Budget once the Chapter 11 Cases are Closed.<br><br>Estimated Recovery: Return of Cash Collateral |
| Class 3: Allowed Other Secured Claims<br><br>Estimated Aggregate Allowed Amount of Class 3 Claims: $0.00 | Payment to be made once Allowed Claims in this Class are confirmed and the resolution of any Administrative Claims is finalized.<br><br>Estimated Recovery:  Return of the Collateral |
| Class 4:  Allowed General Unsecured Claims<br><br>Estimated Aggregate Allowed Amount of Class 4 Claims: $3.0 million, assuming (i) no rejection of long term contracts and leases and (ii) Class 4 votes to accept the Plan, which would exclude the Deficiency Claim from receiving a Distribution. | Payment to be made once Allowed Claims in this Class are confirmed and the resolution of any Administrative Claims is finalized.<br><br>Estimated Recovery: less than 1% to 12% |
| Class 5:  Interests<br><br>Estimated Aggregate Allowed Amount of Class 5 Interests: $0.00 | Cancellation of Interests.<br><br>Estimated Recovery: -0- |

01:24476781.8

(a)     *Allowed Class 1 Claims (Allowed Priority Non-Tax Claims) and Treatment.*

Class 1 shall consist of all Allowed Priority Non-Tax Claims.

Unless otherwise provided for pursuant to an order of the Bankruptcy Court, at the election of the Liquidating Debtors, the Holder of each Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Priority Non-Tax Claim, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (i) a Cash payment from the Liquidating Debtors equal to the Allowed amount of such Claim or (ii) such other treatment as may be agreed to by the Liquidating Debtors and the Holder of such Claim.

According to the Debtors' preliminary review of Claims as scheduled or filed, which remains subject to further updates and verification, this class is estimated to have Allowed Claims of approximately $100,000.00, excluding duplications or amounts not Allowed by the Bankruptcy Code.

Class 1 is not impaired under the Plan.  Class 1 is therefore presumed to accept the Plan.

(b)     *Allowed Class 2 Claims (Allowed Prepetition Credit Agreement Secured Claims) and Treatment.*

Class 2 consists of the Allowed Prepetition Credit Agreement Secured Claims of the Prepetition Lenders.

The Prepetition Agent shall receive, for and on behalf of the Prepetition Secured Parties, (i) on the Effective Date or as soon as reasonably practicable thereafter, payment in cash in full of all reasonable professional fees of the Prepetition Agent and (ii) on the date the Bankruptcy Cases are closed or as soon as reasonably practicable thereafter, any excess Cash from the Wind Down Amount, after the payment in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Plan Expenses, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims (each as set forth and in accordance with the Wind Down Budget).

According to the Debtors' current review, which remains subject to further updates and verification, this Class has one non-insider class member, who holds in aggregate Claims of up to the full balance owing following the payment of the purchase price upon closing the Sale. This remaining Claim amount exceeds $45 million, although some substantial portion of this is an Allowed Unsecured Claim in excess of the cash collateral remaining in the Estates.

Class 2 is Impaired under the Plan, and Holders of Claims in Class 2 are entitled to vote to accept or reject the Plan.

(c)     *Allowed Class 3 Claims (Allowed Other Secured Claims).*

Class 3 shall consist of all Allowed Other Secured Claims other than those in Class 2.

To the extent not otherwise paid in full by the closing of the transactions under the Sale Order, unless otherwise provided for pursuant to an order of the Bankruptcy Court, and except to the extent a Holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date, on the Effective Date, at the option of the Liquidating Debtors, (a) the Liquidating Debtors shall surrender all Collateral securing such Claim to the Holder thereof, in full satisfaction of such Holder's Allowed Other Secured Claim; (b) such Holder shall receive the proceeds from the liquidation of such Holder's Collateral under the closing of the transactions in the Sale Order; or (c) such Holder shall receive such other treatment as may be agreed to by the Liquidating Debtors and the Holder of such Allowed Other Secured Claim in writing. The Secured Tax Claim of the Secured Tax Entities for the year 2019 and subsequent years has each been assumed by the Purchaser under the PSA and the Sale Order and is therefore not entitled to a Distribution under the Plan.

According to the Debtors' current review, which remains subject to further updates and verification, the Debtors believe there are no Claims in this Class following the Sale.

Class 3 is Unimpaired under the Plan. Class 3 is therefore conclusively presumed to have accepted the Plan and Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

### (d)    *Allowed Class 4 Claims (General Unsecured Claims).*

Class 4 shall consist of Unsecured Claims that are not (i) Administrative Expense Claims, (ii) Priority Tax Claims, (iii) Secured Claims, or (iv) Priority Non-Tax Claims.

Unless otherwise provided for pursuant to an order of the Bankruptcy Court or in the paragraph below, except to the extent that the Holder of an Allowed General Unsecured Claim shall have agreed in writing to a different treatment, each Holder of an Allowed General Unsecured Claim in Class 4 shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, their pro rata share of (a) the Unsecured Claims Cash Pool, and (b) Net Distributable Assets until all Allowed General Unsecured Claims in Class 4 are paid in full or all of the Assets of the Liquidating Estates have been distributed. Distributions to Holders of Allowed General Unsecured Claims in Class 4 shall be made at such time or times that the Plan Administrator, in his discretion, determines that a Distribution to Holders of Allowed General Unsecured Claims in Class 4 is appropriate, taking into consideration the number and amount of General Unsecured Claims in Class 4 that remain in dispute.

Class 4 shall include the Deficiency Claim of the Prepetition Lenders not otherwise satisfied in Class 2. If Class 4 accepts the Plan, no Distributions shall be made to the Prepetition Agent on account of such Class 4 Deficiency Claim until such time as all Allowed General Unsecured Claims other than the Deficiency Claim of the Prepetition Lenders in Class 4 have received payment in full pursuant to Section 5.4.1 of the Plan.

Solely for the limited purposes of voting and Distribution, the Debtors are grouped together. Any duplicate claims against separate Debtors shall be deemed expunged and only one claim shall be an Allowed Claim in their Class without any further objection being filed.

According to the Debtors' current review, which remains subject to further updates and verification, this Class is estimated to have aggregate claims of approximately $3 million before taking into account (i) any Deficiency Claim by the Prepetition Lenders and (ii) any rejection of long-term leases or executory contracts relating to the lease of the Facility. This Class includes the Deficiency Claim, which shall not be diluting recoveries if Class 4 votes to accept the Plan. The estimates also do not include rejection claims for contracts and long-term leases on the Facility, which are viewed as reasonable to exclude based on the provisional agreement between USL and the Purchaser to amend the existing agreements. The higher range of Distributions estimated is based upon Class 4 being entitled to distributions; the lower range of the Distributions is based upon the potential for dilution arising from (i) Class 4 voting to reject the Plan, thereby resulting in the inclusion of the Deficiency Claim, and/or (ii) the Purchaser and USL failing to conclude definitive final documents for the amendment of the agreements such that one or more of the USL agreements revert to the Debtors for rejection.

Class 4 is Impaired under the Plan, and Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

*(e)     Class 5 Interests.*

Class 5 shall consist of the Holders of Interests in the Debtors. The Holders of Interests in the Debtors will receive no Distribution on account of their Interests and such Interests shall be deemed cancelled as of the Effective Date. Any Holder of Interest that has not delivered by the Voting Deadline a Release Opt Out Form in accordance with the procedures set forth in the Disclosure Statement Order shall be a Released Party and, as such, shall receive the releases set forth in Section 10.2 of the Plan.

According to the Debtors' current review, which remains subject to further updates and verification, this class has 67 class members comprising the Unitholders, while Fairway LP is the sole equity holder in FEP LLC and Fairway GP.

**E.     Continuing Existence; Vesting of Assets.**

Except as otherwise specifically provided in the Plan, upon the Effective Date, all Remaining Assets shall remain with the Liquidating Debtors to be administered and liquidated by the Plan Administrator pursuant to the terms of the Plan. Upon the occurrence of the Effective Date, except as otherwise specifically provided in the Plan, pursuant to Section 1141(b), all Remaining Assets of the Estates shall vest in the Liquidating Debtors free and clear of all Claims, Liens, encumbrances, and other Interests, subject only to the Liens of the Prepetition Secured Parties; provided that such Remaining Assets shall remain subject to the Liens of the Prepetition Secured Parties until the Allowed Prepetition Credit Agreement Secured Claims are satisfied in full.

Upon the Effective Date, the Debtors shall thereafter be referred to as the Liquidating Debtors and the Estates shall be referred to as the Liquidating Estates. From the Effective Date, the Liquidating Debtors shall continue in existence, to the extent necessary, for the purpose of facilitating the efforts of the Plan Administrator, including, but not limited to, the following: (a) wind up the remaining affairs of the Liquidating Debtors; (b) liquidate, by conversion to Cash or

other methods, any Remaining Assets of the Liquidating Estates as expeditiously as reasonably possible; (c) enforce and prosecute claims, interests, rights, and privileges of the Liquidating Debtors; (d) resolve Disputed Claims; (e) administer the Plan, including distributing all Cash to Holders of Allowed Claims in accordance with the Plan; and (f) file appropriate tax returns, if any.

On the Effective Date, the Amended Organizational Documents of the Debtors shall be deemed amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, and shall be deemed amended to, among other things: (i) provide, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a prohibition against the issuance of nonvoting equity securities, and (ii) limit the activities of the Liquidating Debtors to matters related to the implementation of the Plan. Any amendment or modification to the Amended Organizational Documents following the Confirmation Date, to the extent such modification or amendment changes the fundamental purpose of the entities, (x) must be pursuant to authority granted by order of the Bankruptcy Court and (y) no equity holder vote shall be required.

Unless otherwise set forth in the Plan, upon the date the Final Decree is entered by the Bankruptcy Court and the making of any Distributions payable under the Plan as of the closing of the Bankruptcy Cases, the Liquidating Debtors shall be deemed dissolved for all purposes without the necessity for any further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith; provided, however, that the Plan Administrator shall file with the appropriate state authority a certificate of cancellation. From and after the Effective Date, the Liquidating Debtors shall not be required to file any document, or take any other action, to withdraw their business operation from any state in which the Liquidating Debtors were previously conducting their business operations.

## ARTICLE VIII.
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.    The Plan Administrator.

The initial Plan Administrator shall be Gary Barton of Alvarez & Marsal. The Plan Administrator shall be deemed appointed upon entry of the Confirmation Order without further motion, application, notice, hearing, or other order of the Bankruptcy Court.

On and after the Effective Date, the Plan will be administered by the Plan Administrator on behalf of the Liquidating Debtors and all actions taken thereunder in the name of the Liquidating Debtors shall be taken through the Plan Administrator.

On and after the Effective Date, the Plan Administrator shall begin acting for the Liquidating Debtors in the same fiduciary capacity as applicable to the Debtors' existing board of directors.

After the Effective Date, the Plan and all Remaining Assets of the Liquidating Estates shall be managed under the direction of the Plan Administrator as provided by the terms of the Plan. In the performance of the Plan Administrator's duties hereunder, the Plan Administrator shall have the rights and powers of a debtor in possession under Section 1107 of the Bankruptcy Code, and such other rights, powers, and duties incident to causing performance of the

obligations under the Plan or otherwise as may be reasonably necessary, including, without limitation, the filing of any necessary tax returns.

The Confirmation Order shall provide the Plan Administrator with express authority to convey, transfer, and assign any and all property of the Liquidating Estates consistent with the terms of the Plan and the Plan Administration Agreement and to take all actions necessary to effectuate same; provided that any such conveyance, transfer or assignment shall require the consent of the Prepetition Secured Parties.

The Plan Administrator shall have sole responsibility for making Distributions under the Plan. Because they were sold to the Purchaser under the PSA, there are no Causes of Action (including Chapter 5 Causes of Action) on behalf of the Liquidating Debtors and their Estates that are the property of the Debtors. The Plan Administrator shall have standing to monitor and seek to enforce the performance of obligations under the Plan and the performance of other provisions of the Plan. The Plan Administrator shall use reasonable best efforts to promptly liquidate the Assets of the Liquidating Estates as soon as practicable at minimal cost and to distribute the proceeds thereof as soon as practicable pursuant to this Plan.

The Plan Administrator may not compromise and settle objections to Claims that exceed $500,000 without the consent of the Prepetition Secured Parties and an order of the Bankruptcy Court after opportunity for notice and a hearing.

The Bankruptcy Court shall retain jurisdiction to hear objections to the Plan Administrator's fees and expenses; provided, however, that the Plan Administrator and any professionals retained by the Plan Administrator shall not be required to file any applications for compensation with the Bankruptcy Court. The Plan Administrator shall, with the consent of the Prepetition Secured Parties, employ on behalf of himself, the Liquidating Debtors, and the Liquidating Estates, without Court order, professional persons, as such term is used in the Bankruptcy Code, to assist the Plan Administrator to carry out his duties under the Plan. Except as otherwise provided herein, the Plan Administrator and his professionals shall be entitled to receive compensation to be paid by the Liquidating Debtors (a) first, from the Wind Down Amount, and (b) thereafter, from the Remaining Assets of the Liquidating Estates, as set forth in the Plan Administrator Agreement. The Plan Administrator and his professionals shall be compensated at their respective standard hourly rates for time spent administering the implementation of the Plan and the resolution of objections to Claims, if any are asserted, without further motion or application to the Bankruptcy Court, subject until such time as the Prepetition Credit Agreement Secured Claims are paid in full, to review and approval of the Prepetition Agent.

The Plan Administrator shall not be required to provide any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. If otherwise so ordered, all costs and expenses of procuring any such bond shall be paid by the Liquidating Debtors.

01:24476781.8

B.      **Exculpation of Plan Administrator.**

From and after the Effective Date, the Plan Administrator and his representatives shall not have or incur any liability to any Entity, including any Holder of a Claim or Interest, for any act taken or omission made in good faith in connection with or related to his performance of the duties conferred upon him by the Plan and any orders of the Bankruptcy Court, except to the extent an act constitutes gross negligence, willful misconduct, or fraud.  The Plan Administrator shall be deemed a judicial officer for purposes of immunity from civil action.  No Holder of a Claim or Interest or representative thereof shall have or pursue any Cause of Action against the Plan Administrator or his representatives for taking any action in accordance with the Plan, to implement the provisions of the Plan or any order of the Bankruptcy Court.  In all respects the Plan Administrator and his representatives shall be entitled to rely upon the advice of counsel with respect to his duties and responsibilities under the Plan; provided, however, that the foregoing exculpation shall not apply to any act of gross negligence, willful misconduct or fraud.

C.      **Source of Funding.**

The source of all payments and Distributions under the Plan will be from the Net Distributable Assets and the Wind Down Amount and shall be subject to the Wind Down Budget, including amounts budgeted for May 2019, as needed to fund administrative expenses through May 2019.  Following the Effective Date, the Plan Administrator will use the Wind Down Amount for the purpose of administering and winding down these Bankruptcy Cases in accordance with the Wind Down Budget. The Plan Administrator may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Plan Expenses in accordance with the Wind Down Budget. All Plan Expenses shall be charged against and paid from the Wind Down Amount.  Upon satisfaction of all valid Plan Expenses and Allowed Administrative Expense Claims, Allowed Professional Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed General Unsecured Claims (each in accordance with the Wind Down Budget) and entry by the Bankruptcy Court of the Final Decree, any remaining balance of the Wind Down Amount shall be distributed by the Plan Administrator to the Prepetition Secured Parties in accordance with the Plan as soon as practicable thereafter.

D.      **Payment of Plan Expenses.**

The Plan Administrator may employ on behalf of himself and the Liquidating Debtors, without Court order, professional persons, as such term is used in the Bankruptcy Code, to assist the Plan Administrator to carry out the duties under the Plan.  Except as otherwise provided in the Plan, the Plan Administrator and his Professionals shall be compensated at their respective standard hourly rates for time spent administering the implementation of the Plan and the resolution of objections to Claims, if any are asserted, without further motion or application to the Bankruptcy Court.

E.      **Plan Administrator Indemnification.**

The Liquidating Debtors shall, to the fullest extent permitted by applicable law, indemnify and hold harmless the Plan Administrator and his agents, representatives, attorneys,

01:24476781.8

professionals, and employees (each an "Indemnified Party"), from and against any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees and costs, arising out of or due to their actions or omissions with respect to the implementation or administration of the Plan, if the Indemnified Party acted in good faith and in a reasonable manner.

**F.      Resignation, Replacement, or Termination of Plan Administrator.**

From and after the Effective Date the Plan Administrator or his successor shall continue to serve in his capacity as the sole officer, director, and responsible person of the Liquidating Debtors through the earlier of (a) the date the Liquidating Debtors are dissolved in accordance with the Plan; (b) the Final Resolution Date; and (c) the date the Plan Administrator resigns.  In the event that the Plan Administrator resigns, is terminated or is unable to serve, a successor shall be appointed by the Prepetition Secured Parties.

**G.      Effectiveness of Securities, Instruments, and Agreements.**

On the Effective Date, the Plan Administrator, on behalf of the Liquidating Debtors, shall be authorized to take all actions necessary to execute and deliver all Plan Documents issued or entered into pursuant to the Plan, including, without limitation, any agreement entered into or instrument issued or in connection with any of the foregoing or any other Plan Document.

**H.      Approval of Agreements.**

The Confirmation Notice and the solicitation of votes on the Plan shall be deemed a solicitation for the approval of all transactions contemplated by the Plan.  Entry of the Confirmation Order shall constitute approval of such transactions and authorization for the Plan Administrator and the Debtors, as appropriate, to execute and deliver any Plan Documents required thereby.

**I.      Further Transactions.**

On the Effective Date, the Plan Administrator and the Liquidating Debtors, as applicable, shall execute and deliver any Plan Documents necessary to effectuate and further evidence the terms and conditions of the Plan.

**J.      Ultimate Dissolution of the Debtors; Entry of Final Decree.**

As soon as practicable after the Effective Date, the Liquidating Debtors shall be dissolved for all purposes by the Plan Administrator without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith; *provided, however,* without the need of any further approval, the Plan Administrator in his discretion may execute and file documents and take all other actions as they deem appropriate relating to the dissolution of the Liquidating Debtors under the laws of Delaware and/or any other applicable states, and in such event, all applicable regulatory and governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the Liquidating Debtors as provided in the Plan, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates.

As soon as is practicable after the Effective Date, the Plan Administrator shall File a motion with the Clerk of the Bankruptcy Court requesting the entry of a Final Decree closing the Bankruptcy Cases; *provided, however*, the Plan Administrator shall not File a motion for Final Decree until and unless the conditions to the Plan becoming effective as set forth therein have been fully met, all pending Causes of Action have been resolved by Final Order of a court of competent jurisdiction or abandoned, and objections to Disputed Claims have been resolved by Final Order of the Bankruptcy Court.

### K.    No Retention of Rights to Pursue Causes of Action.

The Debtors marketed all of their Assets in the Sale process pursuant to the Bidding Procedures Order.  At the Auction, any person submitting a Qualified Bid was able to tender a bid to purchase all of the Debtors' affirmative claims against any person that arose prepetition or which arose postpetition.  The Purchaser was an affiliate of Riverstone.  A Closing of the Sale to the Purchaser will occur in May 2019, before the Plan is confirmed.

Because of the Sale, the nature and extent of Debtors' prepetition operations by which vendors and trade Creditors were paid current and in the ordinary course, and in view of the Wind Down Amount provided by the Purchaser to fund the Plan which provides for greater value than projected Chapter 5 Causes of Action, there is no perceived benefit or ability to further pursue any Chapter 5 Causes of Action.  As noted, all of these Assets were sold to the Purchaser under the Sale Order.

### L.    Assumption and Rejection of Executory Contracts Under the Plan

Only Executory Contracts specified as assumed by the Debtors and assigned to the Purchaser, including under the Sale Order, and any other Bankruptcy Court Order authorizing the assumption and assignment of Executory Contracts, shall be deemed assumed or assumed and assigned.All Executory Contracts that were not assumed pursuant to a Final Order of the Bankruptcy Court during the Bankruptcy Cases, including under the Sale Order, are deemed rejected as of the Effective Date.  Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code Section 365(a), of the rejection of the Executory Contracts rejected pursuant to the Plan or otherwise during the Bankruptcy Cases.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Rights of Action, or other rights of the Debtors under any executory or non-executory contract or any unexpired or expired lease, nor shall any provision of the Plan, increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors under any executory or non-executory contract or any unexpired or expired lease.

If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Rejection Claim by the other party or parties to such contract or lease, such Rejection Claim, to the extent that it is timely Filed, shall be classified as a General Unsecured Claim; provided, however, any Rejection Claim arising from the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtors, the Estates, or after the Effective Date, the Liquidating Debtors and the Liquidating Estates, unless a proof of Rejection Claim is Filed and served on the Debtors or the Plan Administrator, as applicable, by

the Rejection Damage Claim Bar Date (which Rejection Damage Claim Bar Date is [thirty (30) days] after the Effective Date). The Plan Administrator shall file any objection to a Rejection Claim on or before the Claims Objection Deadline.

Any obligation of the Debtors to indemnify, reimburse, or limit the liability of any Person, including, but not limited to any officer or director of Debtors, or any agent, professional, financial advisor, or underwriter of any securities issued by Debtors, relating to any acts or omissions occurring before the Petition Date, whether arising pursuant to charter, by-laws, contract or applicable state law, shall be deemed to be, and shall be treated as, an Executory Contract and (i) shall be deemed to be rejected, canceled, and discharged pursuant to the Plan as of the Effective Date and (ii) any and all Claims resulting from such obligations are disallowed under Bankruptcy Code Section 502(e).

## M. Post-Effective Date Governance

On the Effective Date, automatically and without further action, (a) any and all remaining officers or directors or managing partners of the Debtors shall be deemed to have resigned or withdrawn; and (b) the Plan Administrator shall have all right and authority necessary, as an officer or a representative of the Debtors and pursuant to the authority given to him in the Plan, to wind up the Debtors.

## N. Conditions Precedent to Occurrence of the Effective Date of the Plan.

The following are conditions precedent to the occurrence of the Effective Date:

- The transactions contemplated by the PSA and the Sale Order shall have been effectuated;

- The Confirmation Order shall have been entered and become a Final Order in form and substance satisfactory to the Debtors and the Prepetition Secured Parties;

- The Plan Documents (including the Plan Supplement) necessary or appropriate to implement the Plan shall have been executed and delivered; and

- All governmental and third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, including Bankruptcy Court approval, shall have been obtained, not subject to unfilled conditions, and be in full force and effect.

The Debtors may, with the consent of the Prepetition Secured Parties, waive one or more of the conditions to the occurrence of the Effective Date, without notice to any other parties in interest or hearing before the Bankruptcy Court.

The Debtors believe all conditions to the Effective Date of the Plan will likely be satisfied and the Effective Date of the Plan could occur no later than fifteen (15) days after entry of the Confirmation Order.

No later than three (3) Business Days after the day selected by the Debtors to be the Effective Date, the Debtors shall file a notice with the Bankruptcy Court announcing the occurrence of the Effective Date.

### O.    Effect of Confirmation of the Plan.

#### (a)    *Compromise and Release of All Claims*

The Plan comprises a compromise and release of all claims, if any and if not otherwise sold pursuant to the Sale, by the Debtors as against the following persons, in exchange for which each shall provide the consideration, benefits and services as provided under the Plan:   (I) Riverstone and its officers, directors, employees, partners and affiliates; (ii) Debtors' board of directors and officers; and (iii) any person holding a Claim or Interest and subject to the provisions in Section 10.2 of the Plan.

#### (b)    *Releases.*

Release of the Debtors, the Debtors' Management, and the Debtors' Present and Former Board Members.  Except as otherwise specifically provided by the Plan, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, of (a) all Claims and Causes of Action against, liabilities of, Liens on, obligations of and Interests in, the Debtors, the Debtors' management and the Debtors' present and former board members and the Assets and properties of the Debtors, whether known or unknown; and (b) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtors) against, Claims (as defined in Section 101 of the Bankruptcy Code) against, liabilities (as guarantor of a Claim or otherwise) of, Liens on the direct or indirect Assets and properties of, and obligations of successors and assigns of, the Debtors and their successors and assigns based on the same subject matter as any Claim or Interest or based on any act or omission, transaction, or other activity or security, instrument, or other agreement of any kind or nature occurring, arising, or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was Filed, whether or not Allowed and whether or not the Holder of the Claim or Interest has voted on the Plan.

Releases by the Debtors.  Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, in their own capacity and as debtors in possession, the Liquidating Debtors, and their Estates, in each case on behalf of themselves and their Related Parties, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, shall be deemed to have forever released unconditionally, waived and discharged, and hereby is deemed to release unconditionally, waive, and discharge on such date the Released Parties from any and all obligations, rights, suits, damages, remedies, Causes of Action (including any derivative claims asserted or that could have been asserted on behalf of a Debtor, a Liquidating Debtor, or any Estate) and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether

individually or collectively), based on, relating to, or in any manner arising from, in whole or in part upon, directly or indirectly, in any manner whatsoever, the Debtors, the Debtors' Estates, the Debtors' affiliates, the Bankruptcy Cases, the Sale, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of the Claims or Interests before or during the Bankruptcy Cases, the negotiation, formulation, consummation or preparation of the Prepetition Loan Documents, the DIP Loan Documents or other indebtedness for money borrowed by the Debtors, the Plan (including any Plan Document and any Plan Supplement), the Disclosure Statement, the Sale Order, the PSA, or any related agreements, instruments, or other documents, or the solicitation of votes with respect to the Plan, the pursuit of approval of the Disclosure Statement or confirmation of the Plan, or the pursuit of Consummation of the Plan, in each case related to any act or omission, transaction, event, or other occurrence, taking place on or prior to the Effective Date.  Notwithstanding the foregoing release, no Released Party shall be released from acts or omissions which are the result of willful misconduct or fraud or from any obligations under the Plan or any document, instrument, or agreement executed to implement the Plan.

Release by Holders of Claims and Interests.  As of the Effective Date, each Releasing Party is deemed to have released and discharged the Debtors, the Liquidating Debtors, each Released Party, and each of the foregoing Persons' Related Parties from any and all obligations, rights, suits, damages, remedies, and Causes of Action (including any derivative claims asserted or that could have been asserted on behalf of a Debtor, a Liquidating Debtor, or any Estate), whether known or unknown, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, event, or other occurrence, taking place on or prior to the Effective Date in any way relating to, or in any manner arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Debtors, the Debtors' Estates, the Debtors' affiliates, the Bankruptcy Cases, the Sale, intercompany transactions, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of the Claims or Interests before or in the Bankruptcy Cases, the negotiation, formulation, consummation or preparation of the Prepetition Loan Documents, the DIP Loan Documents or other indebtedness for money borrowed by the Debtors, the Plan (including any Plan Document and any Plan Supplement), the Disclosure Statement, the Sale Order, the PSA, or any related agreement, instrument, or other document, or the solicitation of votes with respect to the Plan, the pursuit of approval of the Disclosure Statement or confirmation of the Plan, or the pursuit of Consummation of the Plan, in each case related to any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding the foregoing release, no Released Party shall be released from acts or omissions which are the result of willful misconduct or fraud or from any obligations under the Plan or any document, instrument, or agreement executed to implement the Plan.

**THE PLAN DEFINES "RELEASING PARTIES" TO MEAN, COLLECTIVELY, (I) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (II) THE HOLDERS OF CLAIMS OR INTERESTS THAT ARE UNIMPAIRED UNDER THE PLAN AND DO NOT OBJECT TO THE RELEASES SET FORTH HEREIN; (III) THE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTE TO**

**ACCEPT OR REJECT THE PLAN IS SOLICITED BUT WHO DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH HEREIN; AND (IV) ANY HOLDER OF A CLASS 5 INTEREST THAT HAS NOT DELIVERED A RELEASE OPT OUT FORM IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE DISCLOSURE STATEMENT ORDER BY THE VOTING DEADLINE. FOR THE AVOIDANCE OF DOUBT, THE PURCHASER SHALL NOT BE A RELEASING PARTY.  IF YOU DO NOT OPT OF THE RELEASES AS SET FORTH IN THE PRECEDING PROVISION IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THE BALLOT, YOU WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION TO THE EXTENT PROVIDED IN THE PLAN.**

Release Integral to Plan.  The foregoing release provisions are an integral part of the Plan and are essential to its implementation.  If and to the extent that the Bankruptcy Court concludes that the Plan cannot be confirmed with any portion of the foregoing releases, the Debtors reserve the right to amend the Plan so as to give effect as much as possible to the foregoing releases.

Injunction.  Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors, with respect to any such Claims or Interests which relate in whole or in part to any property, actions, or inactions of any of the Debtors, are permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting, or continuing in any manner, directly, or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, the Debtors, or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Debtors, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors, or any property of any such transferee or successor; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, any of their property, or any direct or indirect transferee of any property of, or successor-in-interest to, any of the foregoing Entities; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to the Debtors, any of their property, or any direct or indirect transferee of any property of, or successor-in-interest to, any Debtors; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Furthermore, except as otherwise expressly provided in the Plan, for the consideration described in the Plan, as of the Effective Date, all Persons and Entities who have held, hold, or may hold Claims released pursuant to Article 10 of the Plan, whether known or unknown, and their respective agents, attorneys, and all others acting for or on their behalf, shall be permanently enjoined on and after the Effective Date, with respect to any Claim released

01:24476781.8

pursuant to Article 10 of the Plan, from (a) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any Claim against them or the property of any of them; (b) seeking the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any Debtor or the property of the Debtor; (c) creating, perfecting, or enforcing any encumbrance of any kind against any Debtor; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to any Debtor; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan.  In the event that any Person or Entity takes any action that is prohibited by, or is otherwise inconsistent with the provisions of Section 10.2.2 or Article 10 of the Plan, then, upon notice to the Bankruptcy Court, the action or proceeding in which the Claim of such Entity is asserted shall automatically be transferred to the Bankruptcy Court for enforcement of the provisions of Section 10.2.2 and Article 10 of the Plan.

The Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce the provisions of Article 10 of the Plan, including, without limitation, to hear and determine any dispute as to whether any Claim or Cause of Action asserted by any Person or Entity against any Debtor is subject to the provisions of Article 10.2 of the Plan.

Exculpation.  No Exculpated Parties shall have or incur any liability whatsoever to any Person or Entity for any act taken or omission made in good faith in connection with or related to preparing, formulating, negotiating, implementing, disseminating, implementing, confirming, or consummating the Plan, including any settlement referenced therein, the Prepetition Loan Documents, the DIP Loan Documents, the PSA, the Sale Order, the Disclosure Statement, or any Plan Document or Plan Supplement, or any related agreement, instrument, or other document.  No Exculpated Party shall have any liability to the Debtors, any Creditor, Interest holder, any other party-in-interest in the Bankruptcy Cases or any other Entity for actions taken or not taken under the Plan, in connection herewith or with respect thereto, or arising out of their administration of the Plan or the property to be distributed under the Plan, in good faith, including, without limitation, failure to obtain Confirmation or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that the foregoing exculpation shall not apply to any act of willful misconduct or fraud.

### (c)    Binding Effect.

Upon Confirmation of the Plan and pursuant to § 1141(a), the provisions of the Plan shall bind the Debtors and all Holders of Claims against or Interests in the Debtors, including their successors and assigns, whether or not they vote to accept the Plan.  The Distributions made under the Plan are in full and complete settlement of all Claims and Interests against the Debtors.

### P.    Distributions Under the Plan.

Article 5 of the Plan for a detailed description of the procedures by which Distributions will be made to the Holders of Allowed Claims against the Debtors.

01:24476781.8

**Q.    Other Provisions of the Plan.**

       *(a)    Setoffs.*

       Except as otherwise provided in the Plan, agreements entered into in connection with the Plan, the Confirmation Order, or in agreements previously approved by Final Order of the Bankruptcy Court, the Debtors or the Plan Administrator may, but will not be required to, setoff against any Claim and the Distributions made with respect to the Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights, and other Causes of Action of any nature that a Debtor may hold against the Holder of such Claim; *provided, however*, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, any other action or omission of a Debtor, nor any provision of the Plan, shall constitute a waiver or release by such Debtor of any such claims, rights, and other Causes of Action that such Debtor may possess against such Holder.  To the extent a Debtor fails to setoff against a Holder of a Claim or Interest and the Plan Administrator seeks to collect a Claim from the Holder of such Claim or Interest after a Distribution to the Holder of such Claim or Interest pursuant to the Plan, the Plan Administrator shall be entitled to full recovery on its Claim, if any, against the Holder of such Claim or Interest.

       *(b)    Charitable Gift.*

       If at any time the Plan Administrator determines that the expense of administrating the Assets of the Liquidating Estates so as to make a final Distribution on Allowed Claims is likely to exceed the value of the Assets remaining in the Liquidating Estates, or the amount of Cash is not sufficient for a Pro Rata Distribution to the holders of Allowed Claims, the Plan Administrator shall have the authority to (i) reserve any amounts necessary to close the Bankruptcy Cases, (ii) donate any balance to a non- denominational charitable organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code that is unrelated to the Plan Administrator, with preference given to the charitable foundation maintained by the American College of Bankruptcy or the American Bankruptcy Institute, and (iii) close the Bankruptcy Cases in accordance with the Bankruptcy Code or Bankruptcy Rules.

       *(c)    Modification to the Plan.*

       The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend or modify the Plan prior to the Confirmation Date.  After the Confirmation Date, the Debtors may, with the consent of the Prepetition Secured Parties, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.  Further, because the Debtors have separate voting Classes, the Debtors reserve the right to file a new Plan, convert any of the Bankruptcy Cases to a case under chapter 7, and/or take such other actions as they deem appropriate.

       *(d)    Withdrawal and Revocation of the Plan.*

       The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, after obtaining the consent of the Prepetition

Secured Parties, or if the Effective Date does not occur, the Plan shall be of no further force or effect.

**R.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court retains such jurisdiction over the Bankruptcy Cases after the Effective Date as is legally permissible including, without limitation, jurisdiction:

- To determine (a) any Disputed Claims, Disputed Interests, and all related Claims accruing after the Confirmation Date, including, but not limited to, rights and liabilities under contracts giving rise to such Claims; (b) the validity, extent, priority, and non-avoidability of consensual and nonconsensual Liens and other encumbrances; (c) pre-Confirmation tax liability pursuant to Section 505 of the Bankruptcy Code; and (d) controversies and disputes regarding the interpretation of the Plan and documents executed in connection therewith;

- To allow, disallow, estimate, liquidate, or determine any Claim or Interest against the Debtors and to enter or enforce any order requiring the Filing of any such Claim or Interest before a particular date;

- To approve all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease of the Debtors pursuant to Section 365 of the Bankruptcy Code and the terms of the Plan;

- To determine any request for payment of an Administrative Expense Claim;

- To determine the allowance and payment of any Professional Claim;

- To resolve controversies and disputes regarding the interpretation and implementation of the Plan, any disputes relating to whether or not a timely and proper proof of Claim or Interest was Filed, or whether a Disallowed Claim or Disallowed Interest should be reinstated;

- To implement the provisions of the Plan and entry of orders in aid of Confirmation and Consummation of the Plan, including, but not limited to, any disputes concerning the enforceability or applicability of the releases and injunctions contained therein;

- To modify the Plan pursuant to Section 1127 of the Bankruptcy Code;

- To adjudicate any and all Causes of Action that arose in the Bankruptcy Cases prior to the Confirmation Date or in connection with the implementation of the Plan, whether or not pending on the Confirmation Date, including, but not limited to, any remands of appeals;

- To resolve any disputes concerning whether a person or entity had sufficient notice of the Bankruptcy Cases, the applicable bar dates, the hearing on the approval of the

01:24476781.8

Disclosure Statement as containing adequate information, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

- To determine any and all applications, Claims, Interests, pending adversary proceedings, and contested matters (including, without limitation, any adversary proceeding or other proceeding to recharacterize agreements or reclassify Claims or Interests) in the Bankruptcy Cases;

- To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

- To seek the issuance of such orders in aid of execution of the Plan, to the extent authorized by Section 1142 of the Bankruptcy Code;

- To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, but not limited to, the Confirmation Order;

- To recover all Assets of the Debtors and property of the Estates, wherever located, including any Cause of Action under Sections 544 through 551 of the Bankruptcy Code;

- To resolve any dispute relating to the approval and payment of the fees and expenses of the Plan Administrator, or their Professionals;

- To resolve matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

- To hear any other matter not inconsistent with the Bankruptcy Code;

- To resolve any and all disputes or controversies relating to Distributions to be made, and/or reserves or escrows to be established, under the Plan;

- To enter the Final Decree closing the Bankruptcy Cases;

- To appoint a successor Plan Administrator;

- To enforce the injunctions granted under the Plan; and

- To approve settlements relating to the above.

**S.     Defects, Omissions and Amendment of the Plan**

The Debtors may, with the consent of the Prepetition Secured Parties and with the approval of the Bankruptcy Court and without notice to Holders of Claims, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such a manner and to such extent necessary or desirable to expedite the execution

of the Plan. The Debtors may, with the consent of the Prepetition Secured Parties, propose amendments or alterations to the Plan before the Confirmation Hearing as provided in Bankruptcy Code Section 1127 if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with Bankruptcy Code Sections 1122 and 1123 and the Debtors have complied with Bankruptcy Code Section 1125. The Debtors may, with the consent of the Prepetition Secured Parties and the Plan Administrator, propose amendments or alterations to the Plan after the Confirmation Date but prior to substantial Consummation, in a manner that, in the opinion of the Bankruptcy Court, does not materially and adversely affect Holders of Claims, so long as the Plan, as modified, complies with Bankruptcy Code Sections 1122 and 1123, the Debtors have complied with Bankruptcy Code Section 1125, and after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under Bankruptcy Code Section 1129.

## ARTICLE IX.
## RISK FACTORS

Holders of Claims should read and consider carefully the factors set forth below, as well as the other information set forth in the Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), prior to voting to accept or reject the Plan.

### A.    Risks Related to Projections and Estimates.

All statements other than statements of historical facts included in the Disclosure Statement and the Incorporated Materials regarding the Debtors' financial position, including but not limited to words such as "anticipates," "expects," "estimates," "believes" and "likely," are forward- looking statements. The Debtors believe that their current views and expectations in this Disclosure Statement are based on reasonable assumptions; however, there are significant risks and uncertainties that could significantly affect expected results. Important factors that could cause actual results to differ materially from those in in this Disclosure Statement or the forward-looking statements ("Cautionary Statements") are disclosed throughout the Disclosure Statement. All subsequent written and oral forward-looking statements attributable to the Debtors, or persons acting on its behalf, are expressly qualified in their entirety by the Cautionary Statements. The Debtors do not intend to audit, update or otherwise revise the forward-looking statements contained herein to reflect events or circumstances after the date thereof or to reflect the occurrence of unanticipated events.

### B.    Objection to Classifications.

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an interest in a particular class only if such Claim or Interest is substantially similar to the other Claims or Interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court or other parties-in-interest will reach the same conclusion.

01:24476781.8

### C.    Risk of Non-Confirmation of the Plan.

Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the value of Distributions to dissenting Creditors and Interest Holders not be less than the value of Distributions such Creditors and Interest Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies all the requirements for confirmation of the Plan under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

### D.    Nonoccurrence of Effective Date of the Plan.

Even if all Classes of Claims that are entitled to vote accept the Plan, the Effective Date for the Plan may not occur.  The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied.  The Debtors believe that they will satisfy all requirements for the occurrence of the Effective Date and the Consummation required under the Plan.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for Consummation of the Plan have been satisfied.

## ARTICLE X.
## CONFIRMATION OF THE PLAN

### A.    Confirmation Procedure.

On May [29], 2019, the Bankruptcy Court entered the Disclosure Statement Order conditionally approving the Disclosure Statement for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan.  The Confirmation Hearing has been scheduled for July 17, 2019 at 4:00 p.m. (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom 2, Wilmington, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

### B.    Procedure for Objections.

Any objection to final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (i) the Debtors, Fairway Energy, LP, Attn.: Robert Flavin, 1000 Louisiana, Suite 1400, Houston TX 77002, Email: robert.flavin@fairwaymidstream.com; (ii) counsel for the Debtors, Haynes and Boone, LLP, Attn.: Patrick L. Hughes, 1221 McKinney, Suite 2100, Houston, TX, 77010, Email: patrick.hughes@haynesboone.com and Young Conaway Stargatt & Taylor, LLP, Attn.: Edmon Morton, 1000 North King Street, Wilmington, DE 19801, Email: EMorton@ycst.com; and (iv) counsel to Riverstone, White & Case LLP, Attn.: David Turetsky and Andrew Zatz, 1221

Avenue of the Americas, New York, NY 10020, Email: david.turetsky@whitecase.com and azatz@whitecase.com; and (v) the Office of the United States Trustee for the District of Delaware, Attn: Linda Richenderfer, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Email: Linda.Richenderfer@usdoj.gov; in each case, by no later than July 8, 2019 at 4:00 p.m. (prevailing Eastern Time). Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### C.    Voting Procedures and Requirements.

The Debtors are providing copies of the Disclosure Statement and Ballots to all known Holders of Impaired Claims who are entitled to vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan.  Accordingly, Classes of Claims that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.  In addition, Classes of Claims or Interests that are not entitled to a Distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

> **If you hold an Impaired Claim against a Debtor that is entitled to a Distribution under the Plan, you are entitled to vote on the Plan.**

Under the Plan, the Prepetition Lenders are Impaired, and accordingly, the Holders of Claims in Class 2 are entitled to vote to accept or reject the Plan.  The Holders of Allowed General Unsecured Claims in Class 4 are also Impaired, and accordingly, the Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.  Class 2 and Class 4 are referred to herein as the "Voting Classes."  The Holders of Claims in Class 1 and Class 3 are Unimpaired and are therefore not entitled to vote to accept or reject the Plan.  The Interests in Class 5 are impaired and receiving nothing on account of the Interests and are deemed to reject the Plan. Class 1, Class 3 and Class 5 are referred to herein as the "Non-Voting Classes."

Some Holders of Claims may hold Claims in more than one Impaired Class and must vote separately for each Class.  Such Holders shall be sent the appropriate Ballots for each Impaired Class by the Balloting Agent.

### D.    Solicitation Materials.

The Debtors, through their Balloting Agent, Prime Clerk LLC (the "Balloting Agent"), will cause Holders that are impaired to receive a Solicitation Package including: (a) an approved Ballot (with pre-addressed return envelope) to be used in voting to accept or to reject the Plan, (b) the Disclosure Statement (with all exhibits, including the Plan) in electronic format (i.e., on a CD-ROM or flash drive), (c) the Solicitation Procedures Order in paper or electronic format, (d) the Combined Hearing Notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan, adequacy of the Disclosure Statement, and related matters and (ii) the deadline for filing objections to confirmation of the Plan, and (d) other materials as authorized by the Bankruptcy Court.

01:24476781.8

If you are a Holder of a Class 2 or Class 4 Claim, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the Balloting Agent as follows:

    1.  In Writing:

        Fairway Energy, LP Ballot Processing Center
        c/o Prime Clerk LLC
        One Grand Central Place
        60 East 42nd Street, Suite 1440
        New York, NY 10165

    2.  Via Email:  fairwayenergyballots@primeclerk.com

    3.  Via Telephone: (844) 596-2260 (U.S./Canada) or (929) 333-8976 (International).

**E.**    **Acceptance.**

Holders of Claims in Classes 2 and 4 shall be entitled to vote separately to accept or reject the Plan.

Acceptance of the Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Plan, with certain exceptions discussed below.  Thus, acceptance of the Plan requires acceptance by each of the Impaired Classes.

Classes of Claims that are not Impaired under the Plan are deemed to have accepted the Plan.  Acceptances of the Plan are being solicited only from those persons who hold Claims in an Impaired Class.

The Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by the Holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that Class, but for that purpose, only those Claims, the Holders of which actually vote to accept or reject the Plan, are counted.

**F.**    **Confirmation of the Plan.**

To confirm the Plan, Section 1129 requires the Bankruptcy Court to make a series of determinations concerning the Plan, including, without limitation: (i) that the Plan classified Claims and Interests in a permissible manner; (ii) that the contents of the Plan complies with the technical requirements of the Bankruptcy Code; (iii) that the Debtors have proposed the Plan in good faith; and (iv) that the Debtors have made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan or otherwise.  The Debtors believe that all of these conditions have been or will be met with respect to the Plan.

The Bankruptcy Code requires that, unless the "cram down" provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the

Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes. Therefore, the Bankruptcy Court must find, to confirm the Plan, that the Plan has been duly accepted. In addition, the Bankruptcy Court must find that the Plan is feasible and that the Plan is in the "best interests" of all Holders of Claims and Interests. Thus, even if Holders of Claims were to accept the Plan by the requisite number of votes, the Bankruptcy Court is still required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interests of Holders of Claims and Interests.

### (a)    *The Best Interests Test.*

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, to confirm the Plan, the Bankruptcy Court must independently determine, pursuant to Section 1129(a)(7), that the Plan is in the best interests of each Holder of an Impaired Claim or Interest that has not voted to accept the Plan. This requirement is satisfied if the Plan provides each non-accepting Holder of a Claim or Interest in such Impaired Class a recovery on account of such Holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such Holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

As set forth in the liquidation analysis attached hereto as <u>Exhibit 2</u> (the "<u>Liquidation Analysis</u>"), after the Closing of the Sale, the only Assets remaining to the Debtors are the proceeds of the Wind Down Amount, comprising cash collateral of the Prepetition Lenders. Under the terms of the Sale and the financing orders in the Cases, the amounts made available from the Wind Down Amount will be paid to retain the Plan Administrator, the Professionals representing the Debtors through the Effective Date, and thereafter the Plan Administrator, the Allowed Priority Non-Tax Claims, and to Allowed Unsecured Claims, all pursuant to the amounts set forth in Wind Down Budget. In a chapter 7, none of these amounts would be available to pay any Allowed Claims, and the chapter 7 trustee would lack the means to provide any adequate protection to attempt to obtain access to the cash collateral comprising the Wind Down Amount. In effect, but for the Prepetition Lenders consent to the use of the Wind Down Amount to administer the Cases and to pay the Allowed Claims, there would be no amounts available to the Debtors, at all, nor any amounts to distribute to unanticipated Administrative Expense Claims, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims.

To determine the value that Holders of Impaired Claims and Interests would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated if the Chapter 11 Cases were converted to chapter 7 and a chapter 7 trustee liquidated the Assets (the "<u>Liquidation Value</u>"). The Liquidation Value would consist of the net proceeds from the disposition of the Assets, augmented by cash held by the Debtors and reduced by certain increased costs and claims that arise in chapter 7 that do not arise in chapter 11. As noted, by the Sale, all of the Assets were sold to the Purchaser. In exchange, Debtors received the benefit of the postpetition loans under the DIP Credit Agreement pursuant to the DIP Budget, and the Wind Down Amount paid by the Purchaser. These amounts yield a substantially greater value than anything that remains in the Estates following the Closing of the Sale. Debtors believe that the Plan provides recoveries to Holders of Claims and Interests not less than – and therefore greater than – the recoveries to Holders of Claims and Interests in a chapter 7 liquidation and, therefore, satisfies Section 1129(a)(7).

*(b)* *Feasibility.*

Even if the Plan is accepted by each Class of Claims and Interests voting on the Plan, and even if the Bankruptcy Court determines that the Plan satisfies the "best interests" test, the Bankruptcy Code requires that, for the Plan to be confirmed by the Bankruptcy Court, the Debtors must demonstrate that Consummation of the Plan is not likely to be followed by the liquidation or further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the Debtors' ability to meet their obligations under the Plan and determined that the Debtors and the Plan Administrator will be able to make all payments contemplated by the Plan.

### G.    Non-Acceptance and Cram down.

Pursuant to Section 1129(b), the Bankruptcy Court may confirm the Plan despite the nonacceptance of the Plan by an Impaired Class. This procedure is commonly referred to as a "cram down." Section 1129(b) provides that upon request of the proponent of the Plan, the Bankruptcy Court shall confirm the Plan despite the lack of acceptance by an Impaired Class or Classes if the Bankruptcy Court finds that:

(a) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class;

(b) the Plan is "fair and equitable" with respect to each non-accepting Impaired Class;

(c) at least one Impaired Class accepted the Plan (without counting acceptances by insiders); and

(d) the Plan satisfies the requirements set forth in § 1129(a) other than § 1129(a)(8).

In general, Section 1129(b) permits confirmation of a plan notwithstanding non-acceptance by an Impaired Class if that Class and all junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting Class be paid in full before a junior Class may receive anything under the Plan.

The Bankruptcy Code establishes different "fair and equitable" tests for Holders of Secured Claims, Unsecured Claims and Interests. As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such Class.The Debtors believe that the Plan is fair and equitable with respect to each Class treated therein.

*(a)* *Secured Claims.*

With respect to a Class of Secured Claims that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (i) the Holders of such Secured Claims will retain the liens securing such Claims and will receive on account of such Claim deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such Holder's interest in such property; or (ii) the Holders of such Claims will realize the indubitable equivalent of such Claims under the Plan.

*(b)*     ***General Unsecured Claims.***

With respect to a Class of General Unsecured Claims that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (i) each Holder of a General Unsecured Claim of the dissenting Class receives or retains under the Plan property of a value equal to the Allowed amount of its General Unsecured Claim; or (ii) the Holders of Claims or Interests that are junior to the Claims of the Holders of such General Unsecured Claims will not receive or retain any property under the Plan.

*(c)*     ***Interests.***

With respect to a Class of Interests that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that (i) each Holder of an Interest of the dissenting Class receives or retains, on account of such Interest, property of a value equal to the greatest of the Allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such Interest; or (ii) the Holders of any Interest that is junior to the Interests of such Class will not receive or retain any property under the Plan.

*(d)*     ***No Unfair Discrimination.***

A Plan "does not discriminate unfairly" with respect to a nonaccepting Class if the value of the Cash and securities to be distributed to the nonaccepting Class is equal or otherwise fair when compared to the value of Distributions to other Classes whose legal rights are the same as those of the nonaccepting Class. Because all similarly situated Holders of Claims or Interests are classified together and all Claims or Interests in a given Class are treated identically, the Debtors believe the Plan does not unfairly discriminate against any Class.

# ARTICLE XI.
# ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives to the Plan include (a) the liquidation of the Debtors under chapter 7 of the Bankruptcy Code; or (b) an alternative Plan under chapter of the Bankruptcy Code.

## A.     Chapter 7 Liquidation

A straight liquidation bankruptcy or "chapter 7 case" requires liquidation of the Debtors' Assets by an impartial trustee. In a chapter 7 case, the amount Holders of General Unsecured Claims would receive depends upon the net estate available after all of the Debtors' Assets have been reduced to cash. The cash realized from liquidation of each of the Debtors' Assets would be distributed in accordance with the order of distribution prescribed in Bankruptcy Code Section 507. Whether a bankruptcy case is one under chapter 7 or chapter 11, Secured Claims, Administrative Expense Claims and Priority Claims are entitled to be paid in cash and in full before Holders of General Unsecured Claims receive any funds.

If the Bankruptcy Cases were converted to cases under chapter 7 of the Bankruptcy Code, the present Priority Claims may have a priority lower than Priority Claims generated by the

01:24476781.8

chapter 7 case, such as the chapter 7 trustee's fee or the fees of attorneys, accountants and other Professionals the trustee may engage.  Conversion to chapter 7 then would create an additional layer of Priority Claims.

In a chapter 7 liquidation case, there will be no Wind Down Amount allocable to Creditors, nor provision of releases to Holders of Interests.

If the Bankruptcy Cases were converted to cases under chapter 7, the Bankruptcy Court would appoint a trustee to liquidate the Debtors' Assets and to distribute the proceeds as described immediately above.  The Prepetition Lenders would be entitled to the Wind Down Amount comprising cash collateral securing their Prepetition Secured Claims.  No funds would be left to administer.  Moreover, the chapter 7 trustee would be entitled to receive compensation under Bankruptcy Code Section 326.  The trustee's fee on all monies disbursed or turned over in the case by the trustee to parties in interest, excluding the Debtors, but including Holders of Secured Claims would not exceed (i) 25% on the first $5,000 or less, (ii) 10% on any amount in excess of $5,000 but not in excess of $50,000, (iii) 5% on any amount in excess of $50,000 but not in excess of $1,000,000, and (iv) reasonable compensation not to exceed 3% on any amount in excess of $1,000,000.  The trustee's fees would be allowed as a cost of administration and entitled to be paid in full prior to the costs and expenses incurred in a chapter 11 case and prior to any payment to Holders of General Unsecured Claims.

It is also highly likely that the chapter 7 trustee will retain his own attorneys and accountants, and perhaps other Professionals such as appraisers, whose fees would also constitute Priority Claims in a chapter 7 case, with a priority that may be higher than those claims arising under a chapter 11 case.

As noted, against this further incurrence of administrative claims is the fact there would be no proceeds available to any other Creditors the estates in a chapter 7.  The more than $45 million Prepetition Credit Agreement Secured Claims exceeds the projected Wind Down Amount and Net Distributable Assets remaining after payment of Prepetition Secured Tax Claims; and such amounts are solely payable to Creditors under the terms of the Plan. Liquidation under chapter 7 of the Bankruptcy Code will also entail the appointment of a trustee having no experience or knowledge of the Debtors' businesses, their records or Assets.  A substantial period of education will be required in order for any chapter 7 trustee to wind up the cases effectively.  Simply stated, the chapter 7 trustee would be in an inferior position to administer anything without prior knowledge regarding the Debtors' businesses and without any source of funding to support such efforts.

Lastly, liquidation in a chapter 7 would forego the benefits of the remainder of the Wind Down Amount and Net Distributable Assets that the Purchaser is funding for the benefit of non-secured claims whether administrative, priority or unsecured, in addition to funding administrative claims up to the limits in the DIP Budget.

Because the Debtors are anticipated to have no Assets after closing of the Sale other than the Wind Down Amount, the Liquidation Analysis demonstrates that Creditors will receive a greater Distribution under the Plan from the Wind Down Amount than a hypothetical liquidation

under chapter 7 of the Bankruptcy Code that lacks any such funding.  The analysis provided is believed to be reasonable.

**ACCORDINGLY, THE DEBTORS RECOMMEND THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

### B.    Dismissal

If dismissal of the Bankruptcy Cases were to occur, the Debtors would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code.  In the event of dismissal, it is highly unlikely that Holders of General Unsecured Claims would receive any amount on their Claims.  Dismissal could undermine the prior Sale.  It also would eliminate the access to the Wind Down Amount.  Even the most diligent Holders of General Unsecured Claims would likely fail to realize any recovery on their Claims.

### C.    Exclusivity and Alternative Plan Potential

On March 25, 2019, the Debtors filed the *Debtors' Expedited Motion to Extend the Exclusivity Period During Which Only the Debtors May Confirm a Plan* (the "Exclusivity Motion") [Docket No. 287], seeking to extend the Exclusive Periods to file and solicit acceptances for the Plan.  On April 9, 2019, the Bankruptcy Court entered an order granting the Exclusivity Motion and extending the Exclusive Periods to June 24, 2019 and August 26, 2019, 2019, respectively [Docket No. 305] (the "Exclusivity Order").

Because the Debtors have filed the Plan and seek its confirmation during the respective Exclusive Periods established under the Bankruptcy Code, and as extended by the Exclusivity Order, no other alternative plans can be proposed at this time.  Moreover, the Debtors believe that any alternative plan would not be viable and would not provide the same recovery to Creditors as that proposed under the current Plan.  The Debtors therefore believe that the Plan is in the best interest of Creditors.

### ARTICLE XII.
### CERTAIN UNITED STATES FEDERAL INCOME TAX
### CONSEQUENCES OF THE PLAN

The Debtors originally elected to be taxed as a partnership under the provisions of the United States Internal Revenue Code. Under these provisions, the taxable income or loss of the Debtors is passed through to its partners and reported on their individual tax returns. Therefore, no provision or liability and no tax benefit or asset-related to federal income taxes has been included in these consolidated financial statements. The Debtors are subject to Texas Margin Tax; however, the Debtors did not incur any such taxes in 2018 or 2017.

The Debtors did not have any accrued interest or penalties associated with any unrecognized tax benefits, nor was any interest expense recognized during the year. The Debtors did not have any uncertain tax positions generated from unrecognized tax benefits resulting from differences between positions taken in tax returns and amounts recognized in the consolidated financial statements as of December 31, 2018 or 2017.

01:24476781.8

Net income (loss) for financial statement purposes may differ significantly from taxable income (loss) reportable to unitholders as a result of differences between the tax bases and financial reporting bases of assets and liabilities and the taxable income (loss) allocation requirements under the partnership agreement. In addition, individual unitholders have different investment bases depending upon the timing and price of acquisition of their common units, and each unitholder's tax accounting, which is partially dependent upon the unitholder's tax position, differs from the accounting followed in the consolidated financial statements. As a result, the aggregate difference in the basis of net assets for financial and tax reporting purposes cannot be readily determined as the partnership does not have access to information about each unitholder's tax attributes in the partnership.

The Plan provides for a liquidation of the Assets that remain following the conclusion of the sale process and Auction and will enable the Distribution of the proceeds of that liquidation to the Debtors' creditors pursuant to the terms of the Plan. All Interests in the Debtors will be effectively cancelled, and Debtors' wound up. Holders of Claims and Interests should consult their own tax advisors regarding the tax consequences of the treatment of the Claims and Interests under the Plan.

## ARTICLE XIII.
## CONCLUSION

This Disclosure Statement provides information regarding the Debtors' bankruptcy and the potential benefits that might accrue to Holders of Claims against the Debtors under the Plan as proposed. The Plan is the result of extensive efforts by the Debtors and their advisors to provide the Holders of Allowed Claims with an opportunity for a meaningful dividend.

      The Debtors believe that the Plan is feasible and will provide each Holder of a Claim against the Debtors with an opportunity to receive greater benefits than those that would be received by any other alternative.  The Debtors, therefore, urge interested parties to vote in favor of the Plan.


Dated: June 3, 2019

                                FAIRWAY ENERGY, LP, FAIRWAY
                                ENERGY PARTNERS, LLC, AND
                                FAIRWAY ENERGY GP, LLC


                                By: */s/ Robert M. Flavin*
                                Name: ROBERT M. FLAVIN
                                Title: Chief Financial Officer

01:24476781.8